RODGER R. COLE (CSB NO. 178865)
rcole@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

JENNIFER L. KELLY (CSB NO. 193416)
jkelly@fenwick.com
MARY E. MILIONIS (CSB NO. 238827)
mmilionis@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

Attorneys for Plaintiffs and Counterclaim-Defendants, Capcom Co., Ltd. and Capcom Entertainment, Inc., and Third-Party Defendant Capcom U.S.A., Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CAPCOM CO., LTD. AND CAPCOM ENTERTAINMENT, INC.,

Plaintiffs,

v.

THE MKR GROUP, INC.,

Defendant.

THE MKR GROUP, INC.,

Counterclaim-Plaintiff and Third-Party Plaintiff,

v.

CAPCOM CO., LTD. AND CAPCOM ENTERTAINMENT, INC.,

Counterclaim-Defendants

and

CAPCOM U.S.A, INC.

Third-Party Defendant.

Case No. CV-08-0904 RS

**PLAINTIFFS' AND THIRD PARTY DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS AMENDED COUNTERCLAIMS AND THIRD PARTY COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

Date: August 6, 2008
Time: 9:30 a.m.
Courtroom: 4, 5th Floor
Judge: Hon. Richard Seeborg

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ..... vi

ISSUES TO BE DECIDED ..... vii

MEMORANDUM OF POINTS AND AUTHORITIES ..... 1

I. INTRODUCTION ..... 1

II. FACTUAL BACKGROUND ..... 1

A. The Wild Popularity Of The Flesh-Eating Zombie ..... 1

B. MKR's 1979 Film, *George A. Romero's Dawn of the Dead* ..... 3

C. Capcom's 2006 Video Game, *Dead Rising* ..... 4

III. APPLICABLE LEGAL STANDARDS ..... 6

A. Standards On A Motion To Dismiss ..... 6

B. Standards for Copyright Infringement On A Motion To Dismiss ..... 7

IV. MKR'S COPYRIGHT CLAIM FAILS AS A MATTER OF LAW ..... 9

A. All Of MKR's Claimed Similarities Must Be Filtered Out ..... 9

1. The Idea of Humans Battling Zombies In A Mall Is Not Protectable ..... 10

2. *Scenes A Faire* Flowing From the Basic Plot Are Not Protectable ..... 11

3. Elements Unoriginal to MKR Are Not Protectable ..... 12

4. Ideas Merged With Expression Are Not Protectable ..... 13

B. A Comparison of DOTD with *Dead Rising* Quickly Confirms They Share No Similarity in Protectable Expression, Much Less Substantial Similarity ..... 14

1. Plot and Sequence of Events ..... 14

2. Setting ..... 16

3. Theme ..... 17

4. Characters ..... 18

5. Mood ..... 19

6. Pace ..... 20

7. Dialogue ..... 20

V. MKR'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW ..... 21

VI. MKR'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW ..... 24

VII. CONCLUSION ..... 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apple Computer, Inc. v. Microsoft Corp.*,
35 F.3d 1435 (9th Cir. 1994)........................................................................................ 13

*Bell Atl. Corp. v. Twombly*,
127 S. Ct. 1955 (2007)................................................................................................ 7

*Benjamin v. Walt Disney Co.*,
No. CV 05-2280 GPS (MCx), 2007 U.S. Dist. LEXIS 91710
(C.D. Cal. June 5, 2007)........................................................................................ 18, 20

*Berkic v. Crichton*,
761 F.2d 1289 (9th Cir.1985)...................................................................... 9, 10, 12, 22

*Bethea v. Burnett*,
2005 WL 1720631 (C.D. Cal. June 28, 2005) .............................................. 8, 11, 13

*Boyle v. Stephens, Inc.*,
1998 WL 80175 (S.D.N.Y. Feb. 25, 1998)............................................................ 8, 12

*Cano v. A World of Difference Institute*,
1996 WL 371064 (N.D. Cal. May 31, 1996) ............................................................ 10

*Cavalier v. Random House, Inc.*,
297 F.3d 815 (9th Cir. 2002)......................................................................... 7, 8, 9, 10

*Cel-Tech Comms. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ............................................................................................. 24

*Christianson v. West Pub. Co.*,
149 F.2d 202 (9th Cir. 1945)........................................................................................ 7

*Cleary v. News Corp.*,
30 F.3d 1255 (9th Cir. 1994)...................................................................................... 25

*Comedy III Prods., Inc. v. New Line Cinema*,
200 F.3d 593 (9th Cir. 2000)...................................................................................... 24

*Dastar Corporation v. Twentieth Century Fox Film Corp.*,
539 U.S. 23 (2003)............................................................................................... 22, 23

*Data East USA, Inc. v. Epyx, Inc.*,
862 F.2d 204 (9th Cir. 1998)...................................................................................... 13

*Dick Clark Co., Inc. v. Alan Landsburg Prods., Inc.*,
1985 WL 1077775 (C.D. Cal. June 13, 1985) ............................................................ 13

*Dick Clark v. America Online, Inc.*,
No. CV-98-5650 CAS (CWx), 2000 U.S. Dist. LEXIS 17368
(C.D. Cal. Nov. 30, 2000) .......................................................................................... 22

*Eaton v. NBC*,
972 F. Supp. 1019 (E.D. Penn. 1997) ........................................................................ 18

*Epstein v. Washington Energy Co.*,
83 F.3d 1136 (9th Cir. 1996)........................................................................................ 7

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)............................................................................................... 10, 13

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Felix the Cat Prods., Inc. v. New Line Cinema*, No. CV 99-9339 FMC (RCx), 2000 U.S. Dist. LEXIS 21763 (C.D. Cal. Apr. 28, 2000) ........ 23

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072 (9th Cir. 2006) ........ 7, 8, 10, 16

*G.S. Rasmussen & Assoc. v. Kalitta Flying Serv.*, 958 F.2d 896 (9th Cir. 1992) ........ 24

*Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526 (S.D.N.Y. 2007) ........ 8

*Hogan v. DC Comics*, 48 F. Supp. 2d 298 (S.D.N.Y. 1999) ........ 12

*Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129 (C.D. Cal. 2001) ........ 9

*Identity Arts v. Best Buy Enter. Servs. Inc.*, No. C 05-4656 PJH, No. C 06-1631 PJH, 2007 U.S. Dist. LEXIS 32060 (N.D. Cal. Apr. 18, 2007) ........ passim

*Jacobsen v. Katzer*, 2007 U.S. Dist. LEXIS 63568 (N.D. Cal. Aug. 17, 2007) ........ 24, 25

*Knieval v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ........ 7

*Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209 (9th Cir. 1998) ........ 24, 25

*Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042 (9th Cir. 1994) ........ 10, 11

*Litchfield v. Spielberg*, 736 F.2d 1352 (9th Cir. 1984) ........ 11, 22

*Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250 (DLC), 2007 U.S. Dist. LEXIS 88960 (S.D.N.Y. Dec. 3, 2007) ........ 19

*N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578 (9th Cir. 1983) ........ 6

*Narell v. Freeman*, 872 F.2d 907 (9th Cir. 1989) ........ 21

*Olson v. NBC, Inc.*, 752 F.2d 1446 (9th Cir. 1988) ........ 13, 19

*Playboy Enters. v. Welles*, 279 F. 3d 796, 803 (9th Cir. 2002) ........ 22

*RDF Media v. Fox Broad. Co.*, 372 F. Supp. 2d 556 (C.D. Cal. 2005) ........ 23, 25

*Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003) ........ 12, 19, 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Shwarz v. U.S.*,
234 F.3d 428 (9th Cir. 2000) .......... 7

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*,
562 F.2d 1157 (9th Cir. 1977) .......... 7

*Sinicola v. Warner Bros., Inc.*,
948 F. Supp. 1176 (E.D.N.Y. 1996) .......... 16

*Sivak v. Versen*,
No. 06cv0416-LAB (WMc), 2007 U.S. Dist. LEXIS 22430
(S.D. Cal. Mar. 27, 2007) .......... 23

*Steckman v. Hart Brewing, Inc.*,
143 F.3d 1293 (9th Cir. 1998) .......... 7

*Strombeck v. New Line Cinema*,
384 F.3d 283 (6th Cir. 2004) .......... 18

*Summit Machine Tool Mfg. Corp. v. Victor CNC Sys., Inc.*,
7 F.3d 1434 (9th Cir. 1993) .......... 25

*Thomas v. Walt Disney Co.*,
No. C-07-4392 CW, 2008 U.S. Dist. LEXIS 14643
(N.D. Cal. Feb. 14, 2008) .......... passim

*Walker v. Time Life Films, Inc.*,
615 F. Supp. 430 (S.D.N.Y. 1985) .......... 8, 16

*Warner v. American Broadcasting Companies, Inc.*,
720 F.2d 231 (2d Cir. 1983) .......... 16

*Williams v. Crichton*,
84 F.3d 581 (2d Cir. 1996) .......... passim

*Willis v. Home Box Office*,
No. 00 Civ. 2500 (JSM), 2001 U.S. Dist. LEXIS 17887
(S.D.N.Y. Nov. 5, 2001) .......... 9

*Zella v. E.W. Scripps Co.*,
529 F. Supp. 2d 1124 (C.D. Cal. 2007)
.......... 7, 8

**STATUTES**

17 U.S.C. § 102(B) .......... 10

37 C.F.R. § 202.1(a) .......... 21

Cal. Bus. & Prof. Code § 14330 .......... vi, 24

Cal. Bus. & Prof. Code § 17200 .......... vi, 24, 25

Cal. Stat. 2007, c. 711 (A.B. 1484), § 1 .......... 24

Copyright Act § 106(1) .......... 25

Copyright Act § 106(2) .......... 25

Copyright Act § 106(3) .......... 25

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

## TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

Copyright Act § 301 .......... vi

Lanham Act § 43(a) .......... 22, 23

**OTHER AUTHORITIES**

Fed. R. of Civ. Proc. 12(b)(6) .......... vi

**RULES**

4 *Nimmer on Copyright*, § 13.03[A][1][b], at 13-42 .......... 14

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**NOTICE OF MOTION AND MOTION**

NOTICE IS HEREBY GIVEN that on August 6, 2008 at 9:30 a.m., in the Courtroom of the Honorable Richard Seeborg, United States Courthouse, Courtroom 4, 5th Floor, 289 South 1st Street, San Jose, California 95113, Plaintiffs and Counterclaim-Defendants Capcom Co., Ltd. and Capcom Entertainment, Inc. and Third Party Defendant Capcom U.S.A., Inc. (collectively, "Capcom") will move this Court to dismiss the Amended Counterclaims and Third Party Complaint (the "Counterclaim") filed by Defendant, Counterclaim-Plaintiff and Third Party Plaintiff The MKR Group, Inc. ("MKR") pursuant to Federal Rule of Civil Procedure 12(b)(6).

This motion is brought on the grounds that: (1) MKR fails to state a claim for copyright infringement (First Counterclaim) because MKR's alleged copyrighted work and Capcom's allegedly infringing work are not substantially similar as a matter of law; (2) MKR fails to state a claim for violation of the Lanham Act (Second Counterclaim) because this claim seeks redress for Capcom's alleged copying of the ideas and expression contained in MKR's copyrighted work and is thus a copyright claim in disguise; and (3) MKR's claim for relief under California Business & Professions Code §§ 17200 and 14330 (Third Counterclaim) and its claim for common law trademark infringement, unfair competition, misappropriation, and dilution (Fourth Counterclaim) fail as a matter of law because these claims are preempted by Section 301 of the Copyright Act and are substantially congruent to MKR's failed Lanham Act claim.

This motion is based on this Notion of Motion and Motion, the Memorandum of Points and Authorities that follows, the Request for Judicial Notice in Support of Plaintiffs' and Third Party Defendant's Motion to Dismiss Amended Counterclaims and Third Party Complaint, the Declaration of Jennifer L. Kelly in Support of Plaintiffs' and Third Party Defendant's Motion to Dismiss Amended Counterclaims and Third Party Complaint, and the Declaration of Koichi Niida in Support of Plaintiffs' and Third Party Defendant's Motion to Dismiss Amended Counterclaims and Third Party Complaint, all pleadings and papers filed herein, oral argument by counsel and such other and further matters that properly may be received by the Court.

## ISSUES TO BE DECIDED

1. Whether MKR fails to state a claim for copyright infringement because Capcom's video game *Dead Rising* is not substantially similar to MKR's motion picture *George A. Romero's Dawn of the Dead* as a matter of law.

2. Whether MKR fails to state a claim for violation of the Lanham Act because this claim seeks redress for Capcom's alleged copying of the ideas and expression reflected in MKR's alleged copyrighted work, and thus falls within the exclusive purview of copyright law.

3. Whether MKR fails to state a claim for violation of Section 17200 of the California Business and Professions Code because that claim is preempted by Section 301 of the Copyright Act and is substantially congruent to its failed Lanham Act claims.

4. Whether MKR fails to state claims for common law trademark infringement, unfair competition, misappropriation and dilution because those claims are preempted by Section 301 of the Copyright Act and are substantially congruent to its failed Lanham Act claims.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

The idea of battling zombies in a mall is not protectable as a matter of law. To the contrary, this concept has been done to death (so to speak). MKR's assertion that Capcom's action/adventure video game *Dead Rising* infringes the copyrights and trademarks in its horror film *George A. Romero's Dawn of the Dead* ("DOTD") because both works feature humans battling zombies in a shopping mall therefore rests on a fundamental misconception of copyright law. ¶ 15.[1] Indeed, beyond this completely unoriginal and unprotectable idea embodied in the two works, MKR can identify only a handful of alleged similarities between them: (1) both works include violence, gore and comedy; (2) both malls have two levels; (3) both works include a helicopter as a means of accessing the mall; (4) both works include a journalist as one of many characters; and (5) in both works, one of the characters makes a reference to "hell." ¶¶ 15, 35, 41. Yet each of these alleged similarities is also an unoriginal, unprotectable element of the works driven by the basic, wholly unprotectable idea of zombies in a mall and therefore cannot give rise to a claim for infringement. By this motion, Capcom seeks to put to rest the notion that that anyone—including MKR—can have a monopoly on the concept of zombies in a mall. Copyright law offers no such protection of basic ideas; neither does the Lanham Act or California state law.

## II. FACTUAL BACKGROUND

### A. The Wild Popularity Of The Flesh-Eating Zombie

The concept of humans battling flesh-eating zombies—even in the setting of a shopping mall—is not new. Of course, the zombie has been a fixture of pop culture for nearly a century, and contemporary iterations of this familiar theme—not surprisingly—place their zombies in contemporary settings like malls. As observed in reviews of *Dead Rising*:

- "<u>Zombies have invaded every nook and cranny of popular culture</u>. From the serious (as in Romero's flicks) to the not so serious (as in SNL skits, Shaun of the Dead, or Mike Jackson's "thriller" video), the living dead as they are sometimes affectionately called inspire artists of all mediums to create homage to those that can't quite honor themselves. Capcom's Inafune has joined in the reverence of zombie-dom by producing Dead Rising—an Xbox 360 [game] <u>steeped in the classic yet horrific juices of its pop culture predecessors</u>." Ex. H at 9 (emphasis added).

[1] Unless otherwise noted, all factual citations are to MKR's Counterclaim and exhibits thereto.

- "Zombies: the quintessential Hollywood horror trademark that has been a part of our scary cinema for as long as silver nitrate has been a part of film." *Id*. at 11 (emphasis added).

Among the early zombie films are *White Zombie* (1932), *I Walked With A Zombie* (1943), *Plan 9 From Outer Space* (1959), and *The Last Man on Earth* (1964). Request for Judicial Notice ISO Motion to Dismiss Counterclaims and Third Party Complaint ("RJN"), Exs. 6-13.[2]

The modern conception of the zombie—a mindless, decaying corpse that has come back to life with an insatiable desire to feast on human flesh—was portrayed by George A. Romero in the cult classic *Night of the Living Dead* (1968), the first of several zombie horror films he wrote and directed. ¶ 6 & Exs. A at 1, B at 1, H at 9, 17. Other films by Romero include *Dawn of the Dead* (1979), *Day of the Dead* (1985), and *Land of the Dead* (2005). Ex. A at 1, B at 1, G at 4, H at 9; RJN Exs. 14-20. All feature a "zombie apocalypse" theme, in which a widespread uprising of zombies assaults civilization, and those attacked by zombies quickly "re-animate" as zombies—leading to a massive zombie outbreak, with survivors taking refuge in various hideouts, scavenging for weapons and supplies while fighting to stay alive. RJN at 7-8; Exs. 14-20; *see also* Ex. H at 17 (referencing "zombie apocalypse" theme).

For example, in *Night*—in which MKR claims no rights[3]— survivors barricade themselves into a farmhouse, scavenging for supplies and weapons to fight off the hordes of zombies outside. RJN at 7 & Exs. 14-15. One by one, the survivors are attacked by the zombies, with resulting violence, blood and gore. While the cause of the epidemic is not known, there is speculation it resulted from radiation emanating from a Venus space probe. It is also revealed that zombies can only be "killed" with a gunshot or heavy blow to the head. The movie concludes with reporters arriving by helicopter and the National Guard and civilians surrounding the house and shooting anything that moves—including the sole remaining survivor. *Id*.

Dozens of subsequent zombie-themed films have explored this same apocalyptic theme, including (among many others): *Night of the Comet* (1984) (survivors scavenge for supplies and loot an abandoned mall); *Shaun of the Dead* (2004) (survivors barricade themselves into pub

---

[2] As explained in the RJN and in Part II.B., *supra*, the Court may take judicial notice of publicly available zombie-themed films and video games and the generic elements of such works.
[3] Nor could it as the film has fallen into the public domain. *See* RJN Ex. 16.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

surrounded by zombies); *Planet Terror* (2007) (survivors hide out in a restaurant surrounded by zombies and later use helicopter to kill zombies); *28 Days Later* (2002) (survivors struggle to survive in a quarantined Great Britain, taking refuge and scavenging for supplies in various abandoned locations); *28 Weeks Later* (2007) (zombie outbreak is revived, prompting military to exterminate the entire population of Great Britain, with a few survivors escaping via helicopter); and the *Resident Evil* series (*Resident Evil* (2002), *Resident Evil: Apocalypse* (2004) and *Resident Evil: Extinction* (2007)), based on Capcom's *Resident Evil* franchise of zombie-themed video games, all of which feature a protagonist battling zombies amidst a breakdown of society and attempts to quarantine zombies and potentially infected survivors.[4] RJN at 8-11 & Exs. 21-36.

This theme is equally popular in the video game industry. *E.g.*, Ex. H. at 6 ("from *Resident Evil* to *House of the Dead*, plenty of games [before *Dead Rising*] have given us the ability to shoot, stab, slice, and explode zombies") & 14 (noting video game industry's "zombie-slaying genre"). Games exploring this theme include Capcom's own *Resident Evil* series. Ex. H at 6; RJN at 11-13; Exs. 37-41. The first *Resident Evil* (1996), for example—released ten years before *Dead Rising*—features a protagonist fighting zombies in an abandoned mansion. While the game has alternate endings, one features the protagonist escaping via helicopter just before the mansion explodes. *Id*. at 11-12 & Ex. 37. Similarly, *Urban Dead*, a free multiplayer online game, pits zombies against survivors, who must barricade themselves into "resource buildings" where supplies and weapons are located, like shopping malls (including one named "Monroeville Mall"—*the same mall featured in DOTD*). *Id*. at 13 & Exs. 42-43.

### B. MKR's 1979 Film, *George A. Romero's Dawn of the Dead*[5]

DOTD is the only film in the Romero series in which MKR claims any rights. ¶ 6 & Ex. B. at 1. DOTD picks up where now-in-the-public-domain *Night* left off—*i.e.*, it depicts the

[4] As the Counterclaim shows, Capcom is almost as well known for producing works within the zombie genre as Romero. *E.g.*, Ex. H. at 1 ("While Romero may be the biggest name in zombies, Capcom isn't too far behind, distributing the Resident Evil zombie games, which have defied video game-franchise logic by continuing to improve with each sequel.")

[5] While MKR's Counterclaim does not describe the plot of DOTD or attach the film as an exhibit, MKR refers to and relies upon DOTD and it is central to all of its claims, so the Court may consider the DVD copy of the film and the copyright deposit filed with the Copyright Office. *See* RJN at 2-3 & Exs 1-3. For the same reasons the Court can consider the copy of *Dead Rising* provided by Capcom and its underlying script (the "Script"). *See Id*. & Exs 4-5.

FENWICK & WEST LLP ATTORNEYS AT LAW MOUNTAIN VIEW

country struck by a plague of flesh-eating zombies. DOTD opens in a Philadelphia television studio, with occupants panicking as they hear reports about the dead returning to life. Stephen, a traffic helicopter pilot, and his pregnant girlfriend, Francine, plot to steal the station's helicopter and escape the city. Meanwhile, members of the Philadelphia SWAT team, including Roger and Peter, raid a building and kill survivors who are ignoring martial law. Upon discovering zombies in a basement kept hidden by the residents, Peter and Roger decide to escape too. That night, the group flies away in the station's helicopter, at one point flying over farmhouse portrayed in *Night*.

As the four fly over Pennsylvania, they see that the zombie outbreak has spread everywhere. When they land to refuel, the zombies attack and they only narrowly escape. As they continue to fly, they see a shopping mall and land on its roof, believing the mall will be a safe place. Upon entering, they discover that zombies have already gotten inside and are wandering about aimlessly. The survivors barricade the mall entrance using large trucks (during which Roger is bitten and eventually dies), and then kill the zombie inhabitants. The group then wanders about the stores gleefully, relishing the chance to plunder without consequence. The survivors eventually set up living quarters in a storage area, and then live there for *months*—as evidenced by Francine's transition from early to late pregnancy—surviving on supplies from the various shops. As time passes, emergency broadcasts from the outside world cease and the survivors slowly realize their refuge has become their prison.

Near the film's end, a group of bikers invades the mall, intent on looting. As they enter, the zombies outside gain entrance. A major battle ensures, during which Stephen and many of the bikers are killed. The film ends with Peter and Francine escaping in a low-fueled helicopter.

### C. Capcom's 2006 Video Game, *Dead Rising*

*Dead Rising* is an entirely different genre of works – an action/adventure video game developed by Capcom exclusively for the Xbox 360. ¶¶ 15, 19. Released on August 8, 2006, the game's packaging contains a prominent disclaimer that reads:

> THIS GAME WAS NOT DEVELOPED, APPROVED OR LICENSED BY THE OWNERS OR CREATORS OF GEORGE A. ROMERO'S DAWN OF THE DEAD™

¶ 16.

*Dead Rising* centers on its leading character, Frank West, a photojournalist intent on capturing the story of a lifetime: why the National Guard has quarantined Willamette, Colorado. The game begins with Frank surveying Willamette by helicopter (the only means of access to the town since all roads are blocked), seeing that it has become overrun with zombies. Script at 1-7. Frank directs the pilot to drop him on top of the local mall, which is surrounded by zombies and is the center of all the action—precisely where Frank wants to be. *Id*. at 7-8.

After a brief encounter with a mysterious Hispanic man named Carlito (Script at 11-14), Frank makes his way downstairs and sees survivors trying to barricade the entrance. *Id*. at 14-21. As the zombies break through, a Homeland Security officer, Brad, shouts at the survivors to hurry upstairs to safety in the air conditioning room, but Frank is the only one who makes it. *Id*. at 21-22. The janitor then welds the door shut. *Id*. at 23-24. Neither Brad nor Jessie, another Homeland Security officer, will tell Frank what they know about the zombie infestation. *Id*. at 26-27. Intent on getting the scoop, Frank leaves the security room via the air ducts. *Id*. at 27.

The game player, playing the role of Frank, then engages in an action-packed battle against the thousands of zombies who have invaded the mall and other survivors who have gone mad (known as "Psychopaths").[6] As Frank tries to fight off zombies and unlock the mystery of the zombie infestation (by completing "case files" along the way that reveal the central game plot), he faces a variety of choices as to other courses of action, including helping the nearly 50 other survivors make it to safety and locating supplies and weapons. Throughout this lightening-paced adventure, the player uses Frank's photographic skills to capture the insanity on film: the better the photograph, the more points the player is awarded. The mall's stores offer an endless variety of resources for Frank to survive until the helicopter returns for him in three days. From the player's perspective, the creative use of weapons, ranging from the conventional—guns, swords, and lead pipes—to the unconventional—lawnmowers, mannequins, park benches, and bowling balls—is probably the most appealing aspect of the game. *See*, *e.g.*, Ex. H. at 3, 12.

As the story unfolds, Frank meets Carlito's sister, Isabela, and Dr. Barnaby, the head of a

[6] The extent to which the storyline unfolds and the mystery of the zombie outbreak revealed depends on the skill of and choices made by the player during gameplay.

research laboratory in Carlito's hometown of Santa Cabeza. Frank learns that, in the course of developing a method of mass-producing cattle, the lab discovered a parasitic insect that turned living things into zombies; that one of the insects escaped and infected Santa Cabeza; and the U.S. government wiped out the entire city and engaged in a massive coverup. Frank also learns that Carlito—out of vengeance—caused the outbreak in Willamette by releasing an insect there. Isabela reveals that Carlito has also hidden bombs underneath the mall that, when detonated, will release larva into the air and create a worldwide zombie pandemic. Script at 84-94; 115-117.

As the game continues, the player (as Frank) tries to collect the bombs before they are detonated. Script at 96-101. If successful, the story continues with Frank and the other survivors trying to escape the mall. Isabela reveals that Carlito has a laptop containing information about his plans hidden somewhere in the mall, as well as a jamming device that has prevented the survivors from calling for outside help. *Id*. at 106-108. The survivors eventually deactivate it and Jessie calls for help, only to learn that a Special Forces unit has been directed to kill everyone in the mall so that the cause of the outbreak—and the U.S. government's role in the destruction of Santa Cabeza—will not be revealed. *Id*. at 118-124. Frank makes his way to the roof to wait for the helicopter. When it arrives, a zombie attacks the pilot and the helicopter crashes. The game appears to end as Frank slumps to his knees, with zombies surrounding him. *Id*. at 113-136.

However, a player who completes all case files goes into "overtime" mode, and the game continues with Isabela saving Frank from the zombies, but not before he is bitten. Isabela creates a treatment that delays zombification, and she and Frank escape through the malls' underground tunnels in a Humvee while fighting off zombies and soldiers. Script at 140-171. The game ends after Frank battles a soldier who admits he was behind the destruction of Santa Cabeza. A text epilogue reveals that Frank left Willamette with credible information about the story, forcing the U.S. government to accept responsibility for the livestock research. *Id*. at 171-172.

## III. APPLICABLE LEGAL STANDARDS

### A. Standards On A Motion To Dismiss

"The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). A

complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007) (citation omitted). The factual allegations must include facts to state a claim that is "plausible on its face," that is, "plausibly suggesting (not merely consistent with)" a right to relief. *Id*. at 1966, 1974. The Court need not accept as true any allegations that are conclusory, legal conclusions, unwarranted deductions of fact or unreasonable inferences. *See Epstein v. Washington Energy Co*., 83 F.3d 1136, 1140 (9th Cir. 1996).

The Court may consider not only exhibits attached to the complaint, but other documents referenced therein "'whose authenticity no party questions,'" even if not physically attached. *Thomas v. Walt Disney Co.*, No. C-07-4392 CW, 2008 U.S. Dist. LEXIS 14643, at *5 n.1 (N.D. Cal. Feb. 14, 2008); *see also Knieval v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005); *Steckman v. Hart Brewing, Inc*., 143 F.3d 1293, 1295-96 (9th Cir. 1998). The court may also consider any matter subject to judicial notice. *Shwarz v. U.S.*, 234 F.3d 428, 435 (9th Cir. 2000).

Accordingly, on a motion to dismiss copyright claims, the Court properly may consider—and compare—the plaintiff's alleged copyrighted work and the defendant's allegedly infringing work—*<u>even if copies of the works are not attached to the complaint</u>*. *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1128-1129 (C.D. Cal. 2007); *Thomas*, 2008 U.S. Dist. LEXIS 14643, at *5 n.1; *see also* RJN at 2-5.

**B. <u>Standards for Copyright Infringement On A Motion To Dismiss</u>**

To prevail on its copyright claim, MKR must prove (among other elements) that DOTD and *Dead Rising* are "substantially similar" within the meaning of the Copyright Act. *See Cavalier v. Random House, Inc*., 297 F.3d 815, 822 (9th Cir. 2002).[7] It is well-settled that a copyright claim can be dismissed at the pleading stage after the district court has compared the works at issue and concluded there is no substantial similarity between them as a matter of law. *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("[t]here is ample authority for

[7] Other elements, such as ownership and defendant's access to the work, are not—and need not be—disputed for purposes of this motion. Indeed, even where access is conceded, courts routinely reject claims for copyright infringement on the basis of lack of substantial similarity. *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp*., 562 F.2d 1157, 1172 (9th Cir. 1977); *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1081 (9th Cir. 2006).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss."). Accordingly, courts in this Circuit—including this Court—routinely dismiss claims for copyright infringement at the pleading state, *with prejudice*, after comparing the works. *See*, e.g., *Thomas*, 2008 U.S. Dist. LEXIS 14643, at *17; *Zella*, 529 F. Supp. 2d at 1139; *Identity Arts v. Best Buy Enter. Servs. Inc.*, No. C 05-4656 PJH, No. C 06-1631 PJH, 2007 U.S. Dist. LEXIS 32060, at *47-52 , *79-82 (N.D. Cal. Apr. 18, 2007)[8]

The substantial similarity test has two components: the "extrinsic test," which is determined as a matter of law by the court, and the intrinsic test. *Funky Films*, 462 F.3d at 1077. When a plaintiff cannot satisfy the extrinsic test, he cannot prove copyright infringement as a matter of law, and his claim should be dismissed. *Id*. The extrinsic test, which is objective in nature, focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Id*. In applying the extrinsic test, the Court must ***filter out*** elements of the works that receive no protection under copyright, like basic ideas, situations driven by the basic plot, unoriginal elements, and ideas "merged" with expression. *Cavalier*, 297 F.3d at 822; *Bethea v. Burnett*, 2005 WL 1720631, at *7-8 (C.D. Cal. June 28, 2005).

As part of this essential filtering process, the Court may take judicial notice of generic or "stock" elements of works within the genre at issue. *See Zella*, 529 F. Supp. 2d at 1131 (taking judicial notice that the elements of a host, guest celebrities, an interview and a cooking segment are "common and prevalent" in publicly available television shows); *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 546-547 (S.D.N.Y. 2007) (taking judicial notice of novels written by third parties in the thriller genre, as well as the defendant's own prior novels, to determine whether alleged similarities between plaintiff's screenplay and defendant's novel were stock elements of the thriller genre or of defendant's own prior works); *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 438 (S.D.N.Y. 1985) (taking judicial notice that "members of the New York Police

[8] In determining substantial similarity on a motion to dismiss, the content of the works "supersede and control contrary allegations and conclusions, or descriptions of the works as contained in the pleadings." *Boyle v. Stephens, Inc.*, 1998 WL 80175, *4 (S.D.N.Y. Feb. 25, 1998) (quoting *Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434 (S.D.N.Y. 1985)); *see also Zella*, 529 F. Supp. 2d at 1139 (citing *Boyle* with approval).

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

Department are often portrayed as Irish, smokers, drinkers, and third or fourth generation police officers"); *Willis v. Home Box Office*, No. 00 Civ. 2500 (JSM), 2001 U.S. Dist. LEXIS 17887, at *5 (S.D.N.Y. Nov. 5, 2001) ("It does not strain the concept of judicial notice to observe that books, movies, and television series are full of such unethical men and women in a variety of businesses and . . . this is a not uncommon perception of talent agents").

Once the Court has filtered out and disregarded all unprotectable elements of the works, it "must take care to inquire only whether the 'protectable elements, standing alone, are substantially similar.'" *Cavalier*, 297 F.3d at 822 (quoting *Williams v. Crichton*, 84 F.3d 581, 588 (2d Cir. 1996)). Moreover, substantial similarity must be measured at the level of the "concrete elements" of each work, rather than at the level of the basic idea, or story, that the work conveys. *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1179 (C.D. Cal. 2001) (*citing Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir.1985) (emphasis in original).

## IV. MKR'S COPYRIGHT CLAIM FAILS AS A MATTER OF LAW

Under this framework, this Court must conclude, as a matter of law, that DOTD and *Dead Rising* are not substantially similar and dismiss MKR's copyright claim with prejudice. The Court needs to look no further than the works themselves to reach this inescapable conclusion. Indeed, MKR cannot identify any similarity between the works—much less a substantial one—with respect to any *protected* element of DOTD. Rather, the few similarities MKR has alleged are driven by the *wholly unprotectable* concept of humans battling zombies in a mall during a massive zombie outbreak. MKR's claim thus fails the extrinsic test for two reasons. *First*, the Copyright Act does not protect any of MKR's claimed similarities, each and every one of which must be filtered out. *Second*, a comparison of the works shows they share no similarities in plot, sequence of events, setting, theme, dialogue, mood, pace, characters, or dialogue.

### A. All Of MKR's Claimed Similarities Must Be Filtered Out

At the most abstract level, there is some similarity in *ideas* between DOTD and *Dead Rising*: both are based on the general concept of survivors battling zombies in a mall during a zombie outbreak. Both involve all the resulting violence, blood, and gore one would expect. And

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

both include some comedy.[9] But neither these similarities—nor the few other isolated similarities MKR has alleged—are afforded any protection under the Copyright Act.

**1. <u>The Idea of Humans Battling Zombies In A Mall Is Not Protectable</u>**

As an initial matter, no one—including MKR—can claim a monopoly over an idea, much less a basic plot idea as well-worn as the one utilized in both DOTD and *Dead Rising*. The reason: copyright law provides no protection for ideas, but only the expression of ideas. 17 U.S.C. § 102(B); *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 344-45 (1991); *see also Cano v. A World of Difference Institute*, 1996 WL 371064, *6 (N.D. Cal. May 31, 1996). Thus, the basic (and totally unoriginal) idea of including violence, gore and comedy in a zombie-themed work receives absolutely no protection and any similarities between DOTD and *Dead Rising* based on such ideas must be filtered out. *See Berkic*, 761 F.2d at 1293-94.

This fundamental tenet applies equally to basic plot ideas, which receive *<u>no protection</u>* under copyright. *Berkic*, 761 F.2d at 1293 ("No one can own the basic idea for a story. General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind"); *see also Cavalier*, 297 F.3d at 824; *Thomas*, 2008 U.S. Dist. LEXIS 14643 at *10-11.

Courts therefore uniformly reject claims of infringement based on similarity of basic plot ideas—including ones that involved far more detail than the basic plot at issue here:

- *Berkic*, 761 F.2d at 1293: no infringement despite shared plotlines in *Coma* and *Reincarnation* of "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and "a young professional who courageously investigates, and finally exposes, the criminal organization."
- *Williams v. Crichton*, 84 F.3d at 589-590: no infringement despite shared plotlines in *Jurassic Park* and *Dinosaur World* involving modern-day dinosaur park where characters spend the night and escape from dangerous dinosaurs by helicopter through the combined wit of the children and adults.
- *Funky Films*, 462 F.3d at 1081: no infringement despite shared plotlines in *Six Feet Under* and *The Funk Parlor* of a "family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business."
- *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994): no infringement despite shared plotlines in *Honey, I Shrunk the Kids* and *The Formula* of

[9] MKR has alleged that the zombies' recreational activities and the ways in which they are killed in each of the works "provide[s] unexpected comedic relief." ¶ 15.

FENWICK & WEST LLP ATTORNEYS AT LAW MOUNTAIN VIEW

kids who are accidentally shrunken down to miniscule size and are exposed to dangerous situations before they are restored to normal size.

- *Thomas*, 2008 U.S. Dist. LEXIS 14643, at *10: no infringement despite shared plotlines in *Finding Nemo* and *Squisher the Fish* of "young fish in the ocean that are captured by divers and put in a fish tank."
- *Bethea*, 2005 WL 1720631, at *11: no infringement despite shared plotlines in *The Apprentice* and *C.E.O.* of "a group of dynamic contestants from varied backgrounds competing in business challenges in a dynamic corporate environment for promotions and benefits and, ultimately, a real job as a top-level executive of a corporation."

This prohibition on finding substantial similarity based on a shared basic plot *holds true even where, as here, the plaintiff identifies various other similarities between the works*, because such lists of similarities are "'inherently subjective and unreliable,' particularly where 'the list emphasizes random similarities scattered throughout the works.'" *Williams*, 84 F.3d at 590 (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)). In *Williams*, for example, the court rejected an argument that the following list of similarities could support a finding of substantial similarity even though the works shared the same general plot: encounters with small dinosaurs, encounters with brachiosaurs, visits to dinosaur nurseries, tours with automated vehicles and recorded guides, stranded characters encountering ferocious dinosaurs, characters in boats being pursued by dinosaurs, dinosaurs escaping from paddock fences, and characters escaping pack-hunting dinosaurs through the intervention of another dinosaur. *Williams*, 84 F.3d at 590, fn. 3. Similarly, in *Kouf*, 16 F.3d at 1045-46, the Ninth Circuit was "unimpressed" by the plaintiff's "'compilation of 'random similarities scattered throughout the works'" and concluded the works were not substantially similar even though they shared the same basic plot *and* contained "a lawnmower scene, a sprinkler scene, the presence of an attic, danger scenes, concerned parents, and kids sleeping outside overnight."

Thus, before comparing DOTD and *Dead Rising*, the Court must filter out any similarities between them based on the shared basic plot *idea* of humans taking refuge in and battling zombies in a suburban shopping mall accessed via helicopter during a massive zombie outbreak.

### 2. ***Scenes A Faire* Flowing From the Basic Plot Are Not Protectable**

The doctrine of *scenes a faire* dispenses with the few remaining similarities MKR has alleged. *Scenes a faire* include "all situations and incidents which flow naturally from a basic

plot premise." *Berkic*, 761 F.2d at 1293. Just as basic plot ideas receive no protection, *scenes a faire* receive no protection and must be filtered out. *See*, *e.g.*, *Rice v. Fox Broad. Co*., 330 F.3d 1170, 1177 (9th Cir. 2003) (there are "only a finite number of ways to reveal the secrets behind magic tricks, and the perform and reveal sequence is the most logical 'expression' of this idea," thus rendering that sequence unprotectable); *Williams*, 84 F.3d at 589 (similarities in plaintiff's and defendant's work consisting of "electrified fences, automated tours, dinosaur nurseries, and uniformed workers . . . are classic scenes a faire that flow from the uncopyrightable concept of a dinosaur zoo"); *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 310 (S.D.N.Y. 1999) (most similarities were "unprotectable themes and concepts that flowed predictably" from the idea of a half-human, half-vampire character on quest to discover origins, including discovery of a "sinister geneology," a struggle between good and evil, and use of flashbacks to portray events from the past).

*Any* work featuring humans battling zombies in a shopping mall can be expected to include, *inter alia*, a healthy dose of violence and gore; creative use of items found in the mall to kill zombies (which, depending on the taste of the viewer, might be perceived as humorous); a journalist (the logical occupation of a character trying to crack the mystery behind the zombie outbreak)[10]; and a reference to hell—the place from which the dead who have returned to life seem to have come. Likewise, a helicopter is the logical means of transport—indeed, the *only* means of transport—when the zombies have overrun the ground and the military has blocked off all roads into town (as was the case in *Dead Rising*, but not DOTD). Such *scenes a faire* cannot form the basis of MKR's claim, and must be filtered out.

**3. Elements Unoriginal to MKR Are Not Protectable**

MKR's claim is equally doomed for the independent reason that none of the alleged similarities between DOTD and *Dead Rising* are original to MKR. Rather, they constitute stock elements that are common and prevalent in zombie-themed works, including *Night of the Living Dead*, in which MKR has not claimed and cannot claim any rights.

---

[10] Contrary to MKR's disingenuous claim, DOTD does not include a journalist as a leading character, but rather, a television traffic helicopter pilot who is one of four main characters. The content of the works "supersede and control contrary allegations and conclusions, or descriptions of the works as contained in the pleadings." *Boyle*, 1998 WL 80175, *4.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

As the United States Supreme Court has explained, "[t]he *sine qua non* of copyright is originality." *Feist Publ'ns, Inc.*, 499 U.S. at 345 (emphasis in original). "To qualify for copyright protection, a work must be original to the author." *Id*. Thus, in *Bethea*, the court held that stock, unoriginal elements of the reality television genre—such as lack of a scripted dialogue and having contestants live together—do not receive any protection. *Bethea*, 2005 WL 1720631, at *12, 14 (court must filter out "elements borrowed from another author or from the public domain"); *see also Dick Clark Co., Inc. v. Alan Landsburg Prods., Inc.*, 1985 WL 1077775 (C.D. Cal. June 13, 1985) (use of attractive host, studio audience, and raised television set with large screen were all stock—and therefore unprotectable—elements of a television show about "bloopers"); *Olson v. NBC, Inc.*, 752 F.2d 1446, 1451 (9th Cir. 1988) (use of action, comedy, quick pace and lack of any identifiable theme "are common to the genre of action-adventure television series and therefore do not demonstrate substantial similarity").

Most of MKR's claimed similarities—survivors taking refuge in and battling zombies in a structure filled with weapons and supplies during a zombie outbreak; resulting violence and gore; use of a helicopter—are stock elements that have appeared in countless zombie-themed movies and video games, including *Night of the Living Dead*—from which MKR *admits Dead Rising* drew inspiration. Ex. G. at 1 (*Dead Rising* is "based on what zombie movies from the 60s and 70s really represented" and "paid homage to the zombie movies of yesteryear, like in the George Romero movies"); RJN at 7-13 & Exs. 14-44. MKR did not originate these elements. Rather, these are stock elements of the zombie genre for which the Copyright Act provides no protection.

**4. Ideas Merged With Expression Are Not Protectable**

The "merger" doctrine provides that, when an idea can be expressed in only a limited number of ways, it "merges" with its expression, and receives no protection absent identical copying. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1444 (9th Cir. 1994); *see also Data East USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 209 (9th Cir. 1998) (elements of karate video game—including number of combatants, logistics of the match, common karate moves, and certain background scenes—not protectable because they resulted from "either constraints inherent in the sport of karate or computer restraints."); *Dick Clark*, 1985 WL 1077775, at *1, *3

(show featuring a host, studio audience, studio guests, and the host showing "blooper" outtakes on a large, raised screen while adding commentary was an unprotectable format because it was one of only a limited number of ways the idea of a blooper show could be expressed).

The merger doctrine is equally fatal to MKR's claim. There are only a limited number of ways to portray the basic idea of humans battling zombies during a massive zombie outbreak. A mall is an obvious choice for survivors seeking food, supplies and weapons—indeed, few other structures would meet all three needs while also providing enough space for a human/zombie battle royale.[11] Moreover, survivors can only travel by helicopter when zombies have overrun the city and the roads are blocked off. Finally, a mall can only be depicted in a limited number of ways—using a mall with two levels is a natural choice (indeed, most suburban malls in America have two or more levels), and the limited number of possible available levels compels the conclusion that merger (among other considerations) bars MKR's feeble claim that the choice of a two-level mall evidences originality sufficient for protection under copyright law. MKR therefore cannot establish copyright infringement based on any of these elements.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

### B. A Comparison of DOTD with *Dead Rising* Quickly Confirms They Share No Similarity in Protectable Expression, Much Less Substantial Similarity

A comparison of DOTD and *Dead Rising* demonstrates that the works are not substantially similar—in fact, they are *completely different*—independently justifying dismissal.

#### 1. Plot and Sequence of Events

A work's plot is "'the sequence of events by which the author expresses his theme or idea . . .'" *Identity Arts*, 2007 U.S. Dist. LEXIS 32060, at *27 (citations omitted). The plot must constitute a "pattern that is sufficiently concrete" and must be common to both works to warrant a finding of substantial similarity. 4 *Nimmer on Copyright*, § 13.03[A][1][b], at 13-42.

MKR has not (and cannot) allege a protectable plot common to both works or show that the works have a similar sequence of events. The *only* similarity in plot and sequence of events is that the characters travel to a suburban mall via helicopter during a zombie outbreak, enter the

[11] Ex. H at 3 ("Just like [DOTD], the characters in *Dead Rising* choose to take refuge in the best place to find food and weapons.")

mall, and battle zombies until they eventually escape. As discussed in Part IV.A, this is a general plot idea that must be filtered out. *See also Identity Arts*, 2007 U.S. Dist. LEXIS 32060, at *30 (noting that only similarities in plot were in its general idea, not in the concrete storylines that expressed that idea, which were "distinctive and dissimilar, despite the presence of some commonalities"). Here, at the level of protectable expression, there is virtually no similarity.

A substantial difference between the works, by itself precluding any finding of substantial similarity in plot, flows from the fact that the works are in different genres. DOTD is a film with a fixed plot; *Dead Rising* is a video game, embodying a pre-established plot that is interspersed between periods of free gameplay, and affected by the player's strategic choices and skill.

Insofar as *Dead Rising* has established plot elements, they are, demonstrably, utterly different from those of DOTD. The "concrete" plot of *Dead Rising* is Frank West's attempt to unlock—and capture on film—the mystery of the zombie infestation in the small town of Willamette, Colorado over a 72 hour period. Unlike DOTD, Frank goes to the mall not to *get away* from the zombies, but to *go to* them, so he can discover their cause and break the story of a lifetime. The zombies break into the mall in one of the very first "scenes," and the majority of the game is spent obtaining clues while killing as many zombies and Psychopaths as possible and escorting other survivors to safety. A successful player will discover the cause of the zombie infestation, escape the mall, and become a hero by exposing the U.S. government's role in the epidemic. The vast majority of the game's scenes have absolutely no counterpart in DOTD.

By contrast, DOTD centers on four survivors who seek refuge in a mall to *get away* from zombies. Unlike the localized outbreak in *Dead Rising*, in DOTD the zombie outbreak appears to be *at least* nationwide. After opening scenes in a television studio and tenement building (which have no counterpart in *Dead Rising*), the survivors—intent on escaping the city—land at the mall and camp out there for *months*, avoiding interactions with the zombies. They make no attempt to figure out what caused the zombie outbreak, and in fact, the cause is never discussed. And they do not encounter any other survivors already inside the mall, much less assist them to safety. Instead, the survivors use their time in the mall to clear it of its initial zombie inhabitants, plunder the stores and listen to radio broadcasts. The major zombie battle occurs near the *end* of the film,

when the bikers raid the mall—additional scenes that have no counterpart in *Dead Rising*. In the end, the two lone survivors escape via helicopter, very different from the escape in *Dead Rising*.

In sum, DOTD and *Dead Rising* bear no resemblance to each other beyond the basic and wholly unprotectable plot idea of zombies in a shopping mall. Ironically, this fundamental *dissimilarity* between the works is noted in a review of *Dead Rising* MKR attached to its Counterclaim in an purported attempt to support its claim,[12] which states that, while the basic setup of DOTD and *Dead Rising* is the same—zombies in a mall—everything else is different:

> [T]he action quickly heads in a unique direction, with less of the satirical elements of "Dawn" and more strategy. *Dead Rising* has a thicker plot than the film and is sometimes flawed, but Capcom's ultraviolent title for the Xbox 360 gets the basics right: it offers an incredible variety of ways to slaughter lumbering zombies.

Ex. H at 1.

**2. Setting**

While both works take place, in part, in a bi-level suburban shopping mall, this level of abstraction cannot support a finding of substantial similarity. *See Funky Films*, 462 F.3d at 1080 (setting of "contemporary, family-run funeral home" unprotectable); *Williams*, 84 F.3d at 589 (setting of "dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers" unprotectable because it "flow[ed] from the uncopyrightable concept of a dinosaur zoo"); *Walker*, 784 F.2d at 50 (setting of police station in the 41st precinct of the south Bronx unprotectable); *Thomas*, 2008 U.S. Dist. LEXIS 14643 at * 16-17 (setting of a reef in the ocean and a fish tank unprotectable because it "'naturally and necessarily flows from

[12] MKR's reliance on video game reviewers' belief that *Dead Rising* is a "ripoff" of DOTD (*see* ¶ 18) is wholly misplaced. The inquiry on the extrinsic test is whether the works are "substantially similar" in their protected expression—a concept with which the public at large is generally not familiar. *See, e.g., Warner v. American Broadcasting Companies, Inc.*, 720 F.2d 231, 245 (2d Cir. 1983) (trial court's conclusion that two works are not substantially similar "is not to be altered by the availability of survey evidence indicating some people applying some standard of their own were reminded by one work of the other"). Even if MKR could establish that *Dead Rising is* based on or inspired by DOTD, it would still have to satisfy the substantial similarity test. *See Sinicola v. Warner Bros., Inc.*, 948 F. Supp. 1176, 1190 (E.D.N.Y. 1996) (court could not ignore the "profound differences" between the works, even in face of plaintiff's claim that the allegedly infringing film was an "adaptation" of his novel: "Even assuming the Film is adapted from the Novel, 'a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff's'…Copyright infringement requires a showing of substantial similarity whether or not a work is 'adapted' from another. Even if a subsequent work reminds people of an earlier work, there is still no infringement in the absence of substantial similarity.") (citations omitted).

the basic plot premise' of a fish captured from the ocean and put into a fish tank").

Moreover, the malls in DOTD and *Dead Rising* are qualitatively very different. DOTD is set in "Monroeville Mall" in Monroeville, Pennsylvania, and is a contemporary mall anchored by a JC Penney that includes an ice rink—neither of which is featured in *Dead Rising's* mall. By contrast, *Dead Rising* is set in "Willamette Parkview Mall" in the town of Willamette, Colorado, which is a modern-day mega mall with several themed sections and includes a roller coaster, theater, park, supermarket and an underground tunnel system—none of which is featured in the DOTD mall. While both malls have escalators and an indoor fountain, these are features of most suburban malls in America, and cannot support a finding of substantial similarity. *See* Part IV.A.

**3. <u>Theme</u>**

The themes of DOTD and *Dead Rising* are also totally different. The dominant themes of DOTD—by MKR's own admission, are "mall culture" and the "insidious" and "rampant" consumerism that is "incapable of solving the world's evils." ¶ 12; *see also* Ex. A at 1 (DOTD is "merciless in its satiric view of the American consumer society"). This theme is played out through the survivors' gleeful plunder of the mall's stores while fully aware that death and devastation lies just outside the mall's doors, and the biker's break-in to join the plundering—putting all survivors' lives at risk. *Id*. ("[t]he depravity in the healthy survivors, and the true immorality comes as two bands of human survivors fight each other for the shopping center").

The theme of *Dead Rising* is inherently different, driven by the simple fact that it is a video game. Unlike a film, which is a completely fixed work subject to passive viewing by the consumer, a video game is an activity involving strategy and action, and the player's strategic choices and skill impact how the storyline plays out. To the extent *Dead Rising* can be said to have a "theme," it is based on the player's goal, which is to kill as many zombies as possible. Thus, whereas DOTD's theme is anti-consumerism, *Dead Rising's* theme is zombie-slaying.[13] *See* Ex. H. at 15 ("[w]hile there are plenty of missions to keep [the player] busy, this game is, at its heart, all about killing zombies in the goriest manner possible.").

[13] Unlike in DOTD, there is no storyline in *Dead Rising* indicating that the mall is intended to symbolize consumerism or greed; instead, it is simply a location that provides endless resources Frank West needs to complete his mission while killing as many zombies as possible.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

In all events, broad themes like "mall culture," consumerism, greed, or even "hell on earth" are far too general to support a finding of substantial similarity. *See Strombeck v. New Line Cinema*, 384 F.3d 283, 297 (6th Cir. 2004) (themes like "saving the world, the battle between good and evil, sibling rivalry or familial secrets and issues" are "common themes and ideas throughout literature and are beyond any level of abstraction at which copyright protection might begin to attach"); *Benjamin v. Walt Disney Co.*, No. CV 05-2280 GPS (MCx), 2007 U.S. Dist. LEXIS 91710, at *12 (C.D. Cal. June 5, 2007) (no protection for "stock themes" such as "people do not choose love, love chooses you," "in relationships you can either follow your head or follow your heart"); *Identity Arts*, 2007 U.S. Dist. LEXIS 32060, at *32-33 (allegedly shared theme of "every moviegoer can be a 'hero' by turning off their cell phones" was part of the overall concept for the faux movie trailers, not an "actual concrete element" that could be protected under the copyright laws). Thus, even if *Dead Rising* shared DOTD's theme, at this level of generality, it would not have sustained an infringement claim.

**4. Characters**

The characters in DOTD and *Dead Rising* bear no resemblance to one another, further underscoring the fundamental dissimilarity of the works. Recognizing the importance of this factor, MKR asserts that both works feature a "hard-boiled, tough, cynical journalist[]" as the "leading male character[] . . ." But the assertion is demonstrably false.[14] DOTD has four lead characters: a traffic helicopter pilot, his girlfriend, and two members of the Philadelphia SWAT team. *Dead Rising* has one lead character, a freelance photojournalist. None of these lead characters is remotely similar to one another in name, appearance, personality, or occupation.

Even if both works did feature a cynical journalist, this still would not support a finding of substantial similarity. The "cynical journalist" is itself a stock character, expected to be present in myriad stories which, like *Dead Rising's*, center on an attempt to solve a mystery. *See Benjamin*, 2007 U.S. Dist. LEXIS 91710, at *18 (likeable 30 year old female who has escaped her humble

[14] Similarity of occupation or basic traits would not be enough. *See Eaton v. NBC*, 972 F. Supp. 1019, 1029 (E.D. Penn. 1997) ("basic human traits that certain characters share, including age, sex, and occupation, 'are too general or too common to deserve copyright protection.'"); *Identity Arts*, 2007 U.S. Dist. LEXIS, at * 77 (similarity in genre of character (there, martial arts fighters), is "not enough to support a finding that the characters themselves are similar").

past to pursue her dream in the big city represents an unprotectable "stock[] character" present in "almost every romantic comedy"); *see also Mallery v. NBC Universal, Inc.*, No. 07 Civ. 2250 (DLC), 2007 U.S. Dist. LEXIS 88960, at *18 (S.D.N.Y. Dec. 3, 2007) ("a 'minority artist' who has the ability to paint the future is an 'idea' that is not protected under the copyright laws").

Finally, MKR totally ignores that there are literally dozens and dozens of characters in *Dead Rising* that have no counterpart in DOTD—including, for example, Carlito and Isabela, Dr. Barnaby, the Homeland Security officers, the janitor, the Psychopaths, and the nearly 50 other survivors trapped in the mall. *See Identity Arts*, 2007 U.S. Dist. LEXIS, at *43 ("plaintiff cannot merely sweep aside the presence of so many other varied characters who appear in the differing spots, and whose attributes and demeanor bear no similarity with respect to one another").

**5. <u>Mood</u>**

Again, the "mood" of these different-genre works can be understood in two ways. First, treating the fixed elements of *Dead Rising* as though it were a film, the limited "mood" similarities are "idea-dictated." Both works feature an overall mood of horror and mystery. But this cannot sustain a copyright claim, because elements which flow naturally from a basic plot idea, and which are common in the treatment of a given idea, are not protectable. This includes a mood that flows naturally from the basic plot premise—as would a mood of horror and mystery in any zombie-themed work. *See Rice*, 330 F.3d at 1177 (overall mood of secrecy and mystery arose from basic plot idea of a show about revealing magic tricks; unprotectable); *Olson*, 855 F.2d at 1451 (comic mood is standard to action-adventure television genre; unprotectable). A shared mood of horror and mystery therefore cannot support a finding of substantial similarity.

Moreover, *Dead Rising* also includes a prominent action/adventure mood that is totally absent in DOTD. Frank, intent on getting the scoop, must search for clues about the cause of the zombie epidemic while fighting off the hordes of zombies—he is not merely trying to survive. The characters in DOTD, on the other hand, are content to ride out the infestation—avoiding confrontations at all costs—and make no attempt to understand the cause of the outbreak.

From another perspective, the two works have fundamentally different moods. DOTD's "mood" is that of passive suspense and anxiety, generated by the viewer's perception of the

drama as an observer. *Dead Rising*'s mood is that of challenge and excited action – because the customer of the game is not a passive viewer, but rather an active *user and actor*.

**6. <u>Pace</u>**

The pace of the works is also completely different. While DOTD opens with and has a handful of relatively chaotic scenes, most of the movie is relatively slow-paced, with the survivors biding their time over the several *months* they spend in the mall. In contrast, *Dead Rising* moves at a rapid clip from the very first scene, where Frank is frantically trying to snap photographs of the zombies on the ground from his perch in the helicopter, to the final scene, in which he escapes the mall in the Humvee. The entire game takes place over only 72 hours. These dramatic differences in pace illustrate that the two works express the generic idea of being holed up in a mall during a zombie outbreak in extraordinarily different ways. Again, the differences in pace are partly driven by the differences in genre between a movie and a game.

**7. <u>Dialogue</u>**

The dialogue in DOTD and *Dead Rising* is not remotely similar. The only allegedly similar line MKR can point to is two characters' reference to hell—"this, my friend, is hell" (*Dead Rising*) versus "when there is no more room in hell, the dead will walk the earth" (DOTD). ¶ 15; Script at 14. This is patently insufficient to support a finding of substantial similarity.

*First*, one need only compare the lines to conclude they are not similar, much less substantially similar. *Second*, as noted above a reference to "hell" is to be expected in any work that features the dead coming back to life—rendering the word or concept an unprotectable *scene a faire*. *Third*, the line is but a single line out of a full length feature film—insufficient *as a matter of law* to support a claim of infringement. *See Benjamin*, 2007 U.S. Dist. LEXIS 91710, at *13 (that both protagonists confront their estranged husbands and pressure them to sign divorce papers by saying "I have a plane to catch" was "insufficient to show substantial similarity as a matter of law"); *Identity Arts*, 2007 U.S. Dist. LEXIS 32060, at *35-36 (that both faux movie trailers featured character saying, in response to sound of ringing cell phone, "it's coming from the audience" was insufficient to support a finding of substantial similarity). *Finally*, notwithstanding MKR's bizarre claim that the word from DOTD is "copyrighted" (¶ 15(d)), the

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

law is clear that words and short phrases such as this are not copyrightable. 37 C.F.R. § 202.1(a); *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989); *Identity Arts*, 2007 U.S. Dist. LEXIS 32060, at *36 (line "it's coming from the audience" not copyrightable). MKR's reliance on this point is a measure of the desperate bankruptcy of its position.

* * * * *

Summing up, DOTD and *Dead Rising* share no protectable similarities whatsoever:

| Claimed Similarity | Not A Protectable Similarity |
|---|---|
| Humans take refuge in and battle zombies in suburban shopping mall accessed via helicopter during massive zombie outbreak | Basic plot ideas unprotectable; stock concept or zombie genre unoriginal to MKR |
| Comedy | Unprotectable idea; *scenes a faire*; stock element of zombie genre |
| Blood, violence, and gore | Unprotectable idea; *scenes a faire*; stock element of zombie genre |
| Setting of suburban, bi-level shopping mall | Part and parcel of unprotectable plot; setting too abstract to merit copyright protection; *scenes a faire*; comparison of works shows significant differences between malls; idea/expression merger; idea unoriginal to MKR |
| Helicopter | Part and parcel of unprotectable plot; *scenes a faire*; idea/expression merger; stock element of zombie genre |
| Cynical journalist | Comparison of works shows this to be false and no similarity between any other characters; cynical journalist a stock character; *scenes a faire*; dozens and dozens of other characters in both works that have no resemblance to each other |
| Themes of "mall culture" and "consumerism" | Comparison of works shows no similarity of themes; claimed theme too abstract to merit copyright protection |
| Dialogue reference to "hell" | Quoted lines not actually similar; one similar line insufficient as a matter of law; *scenes a faire* |

## V. MKR'S LANHAM ACT CLAIM FAILS AS A MATTER OF LAW

MKR's Second Counterclaim claim also fails at the outset, because it is nothing but a second, repackaged copyright claim masquerading as a Lanham Act claim.

The gravamen of this claim is that Capcom took copyrighted elements of DOTD, put them

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

in *Dead Rising*, and misrepresented *Dead Rising* as its own, causing consumer confusion as to the source of game's content. *See* ¶¶ 41, 42 (alleging Capcom made "extensive use" of "major elements" of DOTD in *Dead Rising* and in its marketing of same in ways "which highlight such elements," causing consumers to be confused as to *Dead Rising's* affiliation with DOTD/Romero/MKR); *see also* ¶¶ 17, 18.[15] This is nothing but an attempt to recast MKR's failed copyright claim as a trademark claim. Fortunately, the law does not permit this.[16]

The claim fails as a matter of law because it is, unquestionably, premised on Capcom's alleged taking of DOTD's creative content—*i.e.*, the notion that consumers will be confused into believing *Dead Rising* is affiliated with MKR because DOTD and *Dead Rising* express the same underlying idea of humans battling zombies in a shopping mall, in the same way. *See* ¶¶ 17, 18, 41. The Supreme Court has made clear that allegations of confusion about the source of the ideas or expression reflected in a creative work are outside the reach of the Lanham Act, and thus, any such claim must be asserted within copyright or fail altogether. *Dastar Corporation v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 31-33, 37 (2003).

In *Dastar*, like here, plaintiffs asserted a Section 43(a) (false designation of origin) claim based on the assertion that defendant's television series copied one plaintiff's book and another plaintiff's television series based on that book (which had fallen into the public domain), but attributed itself, rather than plaintiffs—as its source. The Court rejected the claim on the ground that the Lanham Act was not intended to protect the source of any idea, concept or

[15] MKR cannot credibly allege—and in fact, does not allege—that the marks "Dead Rising" and "George A. Romero's Dawn of the Dead" are confusingly similar in and of themselves. ¶ 41. Nor could it establish that Capcom's use of a disclaimer on *Dead Rising's* packaging that expressly disavowed any affiliation with DOTD gives rise to liability under the Lanham Act; to the contrary, this is a textbook example of a nominative fair use. *See Playboy Enters. v. Welles*, 279 F. 3d 796, 803, 805 (9th Cir. 2002); *see also Dick Clark v. America Online, Inc.*, No. CV-98-5650 CAS (CWx), 2000 U.S. Dist. LEXIS 17368, at *20 (C.D. Cal. Nov. 30, 2000).

[16] To the extent MKR is claiming that it, not Capcom, is the source of *Dead Rising's* content, its claim is for "reverse passing off" under Section 43(a) of the Lanham Act—the type of claim that arises when the defendant misrepresents the plaintiff's goods as his own. As such, the claim fails for the same reason MKR's copyright claim does: the works are not substantially similar. *See Litchfield v Spielberg*, 736 F.2d at 1358 (plaintiff's Lanham Act claim failed because "without substantial similarity there can be no claim for reverse passing off under Section 43(a)"); *Berkic*, 761 F.2d at 1291 n.1 (court's finding that *Coma* was not substantially similar to *Reincarnation* "disposes of the plaintiff's Lanham Act claim").

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

communication embodied in a product, but only the source of the product itself:

> We think the most natural understanding of the "origin" of "goods"—the source of wares—is the producer of the tangible product sold in the marketplace, in this case the physical Campaigns videotape sold by Dastar… [A]s used in the Lanham Act, ***the phrase "origin of goods" is in our view incapable of connoting the person or entity that originated the ideas or communications that "goods" embody or contain***. Such an extension would not only stretch the text, but it would be out of accord with the history and purpose of the Lanham Act and inconsistent with precedent.

*Id.* at 31-32. In so holding, the Court emphasized that broadening Section 43(a) to encompass the source of ideas or expression for creative works would constitute "special treatment" causing the "Lanham Act to conflict with the law of copyright…" *Id.* at 33.

In the five years since *Dastar*, courts in this Circuit have consistently dismissed Lanham Act claims that, like MKR's, were based on alleged confusion as to the origin of the creative content embodied in a work. For example, in *RDF Media v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 562-63 (C.D. Cal. 2005), the court dismissed Lanham Act claims premised on the contention that defendant's television show *Wife Swap US* copied the "total image and appearance" of plaintiff's show *Trading Spouses*. The court observed that plaintiff was, in essence, asking the court to recognize the creative work *itself* as subject to protection under the Lanham Act—an unwarranted extension into an area already protected by copyright law. *Id.* at 563 (plaintiff's contention "fails to grasp the fundamental difference between copyright protection and trademark protection"); *see also Sivak v. Versen*, No. 06cv0416-LAB (WMc), 2007 U.S. Dist. LEXIS 22430, at *21 (S.D. Cal. Mar. 27, 2007) (Lanham Act claim premised on failure to attribute plaintiff as source of radio programs failed since plaintiff claimed copyrighted interests in the ideas, concepts, or communications embodied in the programs; thus, "her exclusive remedy is under copyright law"); *Felix the Cat Prods., Inc. v. New Line Cinema*, No. CV 99-9339 FMC (RCx), 2000 U.S. Dist. LEXIS 21763, at *10 (C.D. Cal. Apr. 28, 2000) ("the complaint's multiple attempts at invoking trademark law would require the Court to extend trademark law beyond commercial use and make actionable the expression of an idea in a motion picture").

Likewise here, MKR asserts *Dead Rising* infringes its trademark rights because the game's alleged appropriation of the ideas and other creative *content* from DOTD supposedly generates consumer confusion. *See* ¶ 41 (by using "major elements" from DOTD in *Dead Rising*,

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

"Capcom seeks to lure consumers who are fans of Mr. Romero and 'DAWN OF THE DEAD' into connecting them with 'DEAD RISING'"). MKR's attempt to circumvent the requirement of substantial similarity by recasting its claim as a Lanham Act claim fails as a matter of law. *Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 595 (9th Cir. 2000) ("the Lanham Act cannot be used to circumvent copyright law").

## VI. <u>MKR'S STATE LAW CLAIMS FAIL AS A MATTER OF LAW</u>

MKR's remaining Counterclaims are equally doomed. The Third (violations of Sections 17200[17] and 14330[18] of the California Business and Professions Code) and the Fourth (common law trademark infringement, unfair competition, misappropriation and dilution) are premised on the *<u>exact</u> <u>same</u> <u>conduct</u>* as MKR's failed copyright and Lanham Act claims. Indeed, MKR does not allege a single new fact in support of these myriad state law claims; it merely incorporates by reference the same conduct alleged in support of its federal claims, and then alleges that conduct gives rise to these additional causes of action. *See* ¶¶ 51-57; 58-63. MKR is mistaken.

Each of MKR's state law claims is preempted by the Copyright Act. As this Court has recognized, "the federal copyright preemption of overlapping state law claims is 'explicit and broad.'" *Jacobsen v. Katzer*, 2007 U.S. Dist. LEXIS 63568, *6 (N.D. Cal. Aug. 17, 2007) (quoting *G.S. Rasmussen & Assoc. v. Kalitta Flying Serv.*, 958 F.2d 896, 904 (9th Cir. 1992)). A state law claim is preempted where: (1) the work at issue falls within the subject matter of copyright; and (2) the rights asserted under state law are "equivalent" to those protected by the Copyright Act. *Id.* at *7; *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212-13 (9th Cir. 1998); *Thomas*, 2008 U.S. Dist. LEXIS 14643 at *20.

The first element of this test is easily met, as MKR alleges that the works on which all of

---

[17] MKR's 17200 claim should be independently dismissed because it does not allege any threat to competition. The scope of Section 17200 is not unlimited; it only prohibits business practices that rise to the level of "unlawful, unfair, or fraudulent" acts. Cal. Bus. & Prof. Code § 17200. MKR has only asserted a claim under the "unfair" prong of 17200. In claims between competitors, a 17200 "unfair" claim requires "conduct that threatens an incipient violation of antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel-Tech Comms. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 184-87 (1999).

[18] MKR's citation to Cal. Bus. & Prof. Code § 14330 is misplaced as that statute was repealed by the California Legislature in 2007. Stats. 2007, c. 711 (A.B. 1484), § 1.

FENWICK & WEST LLP ATTORNEYS AT LAW MOUNTAIN VIEW

its claims are based fall squarely within the subject matter of copyright. ¶¶ 6, 30, 31. So is the second element, since each of MKR's state law claims is premised on its assertion that Capcom "copied major elements" (¶¶ 17, 18, 34, 41) of DOTD and its remake, incorporated them into *Dead Rising*, and created and distributed that allegedly infringing work. *See, e.g.*, ¶ 34, 35; 52-54; 59-60. Manifestly, these allegations seek to remedy supposed violations of rights protected under Sections 106(1)-(3) of the Copyright Act. *See Kodadek*, 152 F.3d at 1213; *see also Jacobsen*, 2007 U.S. Dist. LEXIS 63568, at * 8 (to escape preemption, state law claim must include an "extra element" rendering it "qualitatively different" from copyright claim). Under these circumstances, courts have no trouble concluding that the same types of state law claims MKR has asserted here are preempted. *E.g.*, *id.* at *8-9 (17200 and unjust enrichment claims); *Thomas*, 2008 U.S. Dist. LEXIS 14642, at *25-26 (17200 claim); *Summit Machine Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1442 (9th Cir. 1993) (misappropriation claim).

To the extent MKR contends the "extra element" is Capcom's alleged violations of the Lanham Act, that argument must be rejected.[19] MKR's Lanham Act claim is merely a repackaged copyright claim, and its boilerplate allegations regarding the Lanham Act can save its state law claims from preemption no more than they can save the Lanham Act claim itself.

## VII. CONCLUSION

The idea of battling zombies in a mall is not protectable as a matter of law. And once that claim falls, the balance of MKR's claims are dead on arrival. Capcom respectfully requests that MKR's Counterclaim be dismissed with prejudice in its entirety.

Dated: June 11, 2008

FENWICK & WEST LLP

By: /s/ Jennifer L. Kelly
Jennifer L. Kelly

Attorneys for Capcom

[19] In any event, where, as here, a Lanham Act claim fails, state law claims that are premised on or otherwise "substantially congruent" with that claim—as all of MKR's state law claims plainly are—necessarily fail as well. *Cleary v. News Corp.*, 30 F.3d 1255, 1263 (9th Cir. 1994) (17200 and common law unfair competition claims are "substantially congruent" with Lanham Act claim and so rise or fall with the federal claim); *see also Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1181-1182 (9th Cir. 2003) (17200 claim); *RDF*, 372 F. Supp. 2d at 565 (common law unfair competition and civil conspiracy claims). Indeed, this is an independent basis on which all of MKR's state law claims should be dismissed.

RODGER R. COLE (CSB NO. 178865)
rcole@fenwick.com
FENWICK & WEST LLP
Silicon Valley Center
801 California Street
Mountain View, CA 94041
Telephone: (650) 988-8500
Facsimile: (650) 938-5200

JENNIFER L. KELLY (CSB NO. 193416)
jkelly@fenwick.com
MARY E. MILIONIS (CSB NO. 238827)
mmilionis@fenwick.com
FENWICK & WEST LLP
555 California Street - 12th Floor
San Francisco, CA 94104
Telephone: (415) 875-2300
Facsimile: (415) 281-1350

Attorneys for Plaintiffs and Counterclaim-defendants Capcom Co., Ltd. and Capcom Entertainment, Inc., and Third Party Defendant Capcom U.S.A., Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CAPCOM CO., LTD. AND CAPCOM ENTERTAINMENT, INC.,

Plaintiffs,

v.

THE MKR GROUP, INC.,

Defendant.

THE MKR GROUP, INC.,

Counterclaim-Plaintiff and Third-Party Plaintiff,

v.

CAPCOM CO., LTD. AND CAPCOM ENTERTAINMENT, INC.,

Counterclaim-Defendants

and

CAPCOM U.S.A, INC.

Third-Party Defendant.

Case No. CV-08-0904 RS

**[PROPOSED] ORDER GRANTING PLAINTIFFS' AND THIRD-PARTY DEFENDANT'S MOTION TO DISMISS AMENDED COUNTERCLAIMS AND THIRD PARTY COMPLAINT**

**[Fed. R. Civ. Proc. 12(b)(6)]**

Date: August 6, 2008
Time: 9:30 a.m.
Courtroom: 4, 5th Floor
Judge: Hon. Richard Seeborg

The Motion to Dismiss Counterclaim-Plaintiff The MKR Group, Inc.'s ("MKR") Amended Counterclaims and Third-Party Complaint brought by Plaintiffs and Counterclaim-Defendants Capcom Co., Ltd. and Capcom Entertainment, Inc. and Third Party Defendant Capcom U.S.A., Inc. (collectively, "Capcom") for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) came on regularly for hearing before this Court on August 6, 2008, at 9:30 a.m., in Courtroom 4, 5th Floor. Both Capcom and MKR were represented by counsel. After full consideration of the briefs in support and in opposition thereto, all other papers submitted in connection therewith, all other matters on file in this action and presented to the Court, and having heard the arguments of counsel,

IT IS HEREBY ORDERED that Capcom's Motion is **GRANTED** as follows:

All claims in MKR's Amended Counterclaims and Third-Party Complaint are **DISMISSED WITH PREJUDICE**.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

IT IS SO ORDERED.

Dated: ________________, 2008

______________________________
Hon. Richard Seeborg
United States Magistrate Judge