1   Allen J. Baden (CSB NO. 255805)
    abaden@kenyon.com
2   Mark Yuan (CSB NO. 246146)
    myuan@kenyon.com
3   Jonathan D. Reichman (*Pro Hac Vice*)
    jreichman@kenyon.com
4   Mimi Rupp (*Pro Hac Vice*)
    mrupp@kenyon.com
5   KENYON & KENYON LLP
    River Park Towers
6   333 W. San Carlos St., Ste. 600
    San Jose, CA  95110
7   Tel:  408.975.7500
    Fax:  408.975.7501
8
    Attorneys for Defendant, Counterclaim-Plaintiff and
9   Third-Party Plaintiff
    THE MKR GROUP, INC.
10
                    UNITED STATES DISTRICT COURT
11
                   NORTHERN DISTRICT OF CALIFORNIA
12
                          SAN JOSE DIVISION
13

14

15   CAPCOM CO., LTD. and CAPCOM          Case No.  3:08-CV-00904 (RS)(MED)
     ENTERTAINMENT, INC.,
16                                        Hearing Date:  September 3, 2008
     Plaintiffs,                          Time:             9:30 a.m.
17                                        Honorable Richard Seeborg
     v.
18
     THE MKR GROUP, INC.,
19
     Defendant.
20   THE MKR GROUP, INC.,                 **THE MKR GROUP, INC.'S**
                                          **MEMORANDUM OF POINTS AND**
21   Counterclaim-Plaintiff and Third-Party   **AUTHORITIES IN OPPOSITION TO**
     Plaintiff,                           **CAPCOM'S MOTION TO DISMISS MKR's**
22                                        **AMENDED COUNTERCLAIMS AND**
     v.                                   **THIRD PARTY COMPLAINT**
23
     CAPCOM CO., LTD. and CAPCOM
24   ENTERTAINMENT, INC.,

25   Counterclaim-Defendants,

     and
26
     CAPCOM U.S.A., INC.,
27
     Third-Party Defendant.
28

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT

CASE NO.  3:08-CV-00904 (RS)(MED)

1

# TABLE OF CONTENTS

2    I.    INTRODUCTION ............................................................................................. 1

3    II.    FACTUAL BACKGROUND ............................................................................ 3

4    III.    MKR HAS STATED A VALID COPYRIGHT CLAIM TO PROTECT ITS ORIGINAL
       *EXPRESSION*................................................................................................... 5

5

6        A.    Because MKR's Claims are Plausible on Their Face, MKR is Entitled to Offer
             Evidence to Support Them........................................................................... 5

7        B.    *Dawn of the Dead* and *Dead Rising* are Substantially Similar ................ 6

8        C.    The Merger and *Scenes á Faire* Doctrines Do Not Apply Because the Ideas Can be
             Expressed in a Plurality of Manners ..................................................... 10

9

10        D.    The Game Industry Media Recognizes and Decries *Dead Rising*'s Infringement  13

11    IV.    MKR HAS STATED A VALID LANHAM ACT CLAIM TO PROTECT ITS *SOURCE-
       IDENTIFYING ELEMENTS* ........................................................................ 15

12    V.    MKR'S STATE LAW CLAIMS ARE NOT PREEMPTED BECAUSE THEY SEEK TO
       PROTECT RIGHTS NOT AFFORDED BY COPYRIGHT LAW.................. 19

13

14    VI.    THE COURT SHOULD EXCLUDE EXHIBITS 5-44 TO CAPCOM'S REQUEST FOR
       JUDICIAL NOTICE ...................................................................................... 20

15        A.    Exhibits 5-44 Grossly Exceed the Scope of Allowable Evidence on a Motion to
             Dismiss....................................................................................................... 21

16        B.    Judicial Notice Does Not Apply to Exhibits 5-44.................................... 22

17        C.    The Court Should Exclude Capcom's Proffered Evidence Rather Than Convert
             This Dismissal Motion .............................................................................. 24

18

19    VII.    CONCLUSION.............................................................................................. 25

20

21

22

23

24

25

26

27

28

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND            i            CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

TABLE OF AUTHORITIES

**Cases**

*Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407 (9th Cir. 1996)............................................. 18

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 20

*Apple Computer, Inc. v. Formula Int'l, Inc.*, 725 F.2d 521 (9th Cir. 1984) ................................. 10

*Bach v. Forever Living Products U.S., Inc.*, 473 F.Supp.2d 1110 (W.D. Wash. 2007) .......... 15, 16

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 376 F. Supp. 2d 251 (D.R.I. 2005) .................... 17

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ................................................................. 6

*Brackett v. Hilton Hotels Corp.*, No. 3:08-cv-02100 (N.D. Cal. Jun. 30, 2008)...................... 19, 20

*Branch v. Tunnell*, 14 F.3d 449 (9th Cir. 1994).............................................................. 20, 22, 24

*Brother Records, Inc. v. Jardine*, 318 F.3d 900 (9th Cir. 2003).................................................... 18

*Campbell ex rel. Campbell v. Sec'y of Health and Human Servs.*, 69 Fed. Cl. 775 (Fed. Cl. 2006) ................................................................................................................................................ 24

*Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) .............................................................. 1

*CDN Inc. v. Kapes*, 197 F.3d 1256 (9th Cir. 1999) ....................................................................... 11

*Copple v. Astrella & Rice, P.C.*, 442 F. Supp. 2d 829 (N.D. Cal. 2006)...................................... 22

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003) ............................... 15, 16

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)........................................................ 24

*DeMarco v. DepoTech Corp.*, 149 F. Supp. 2d 1212 (S.D. Cal. 2001) ........................................ 22

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394 (9th Cir. 1997)................... 16

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 12 U.S.P.Q.2d 1657 (E.D. Cal. 1989)........................ 17

*Feist Pubs., Inc. v. Rural Telephone Svc. Co.*, 499 U.S. 340 (1991) .............................................. 7

*Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526 (S.D.N.Y. 2007)................................................... 23

*Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294 (S.D.N.Y. 2005) .................................................. 23

*Gilligan v. Jamco Development Corp.*, 108 F.3d 246 (9th Cir. 1997)............................................. 5

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542 (9th Cir. 1990) ...................... 20

*Hall v. City of Santa Barbara*, 833 F.2d 1270 (9th Cir.1986) ....................................................... 5

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT

ii

CASE NO.  3:08-CV-00904 (RS)

1    *Harper & Row v. Nation Enters.*, 471 U.S. 539 (1985)......................................................... 8

2    *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311 (2d Cir. 1987)...... 17

3    *In re Tyrone F. Conner Corp., Inc.,* 140 B.R. 771 (E.D. Cal. 1992) ........................................... 22

4    *Internat'l Order of Job's Daughters v. Lindeburg and Co.*, 633 F.2d 912 (9th Cir. 1980) ........... 19

5    *Jasso v. Citizens Telecommunications Co. of CA, Inc.*, No. CIV S-05-2649, 2007 WL 97036

6        (E.D. Cal. Jan. 9, 2007)........................................................................................................ 22

7    *Laws v. Sony Music Entm't*, 448 F.3d 1134 (9th Cir. 2006) ...................................................... 19

8    *Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)................................................. 20, 22, 24

9    *Lucas v. Bechtel Corp.*, 633 F.2d 757 (9th Cir. 1980) ...................................................... 6, 24, 25

10   *Lussier v. Runyon*, 50 F.3d 1103 (1st Cir. 1995) ................................................................ 21, 23

11   *Mattel Inc. v. Walking Mountain Prods.,* 353 F.3d 792 (9th Cir. 2003)...................................... 16

12   *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002)................................................................ 8, 9, 11

13   *Montwillo v. Tull*, No. C 07-3947, 2008 WL 2264574 (N.D. Cal. June 2, 2008)........................ 12

14   *New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302 (9th Cir. 1992)....................... 18

15   *Nichols v. Universal Pictures*, 45 F.2d 119 (2d Cir. 1930)....................................................... 11

16   *Nintendo of Am., Inc. v. Dragon Pacific Int'l,* 40 F.3d 1007 (9th Cir.1994) ................................ 16

17   *Nordwall v. Sec'y of Health and Human Servs.*, No. 05-123V, 2008 WL 857661 (Fed. Cl. Feb.

18       19, 2008) ............................................................................................................................ 24

19   *Playboy Enters. v. Welles, Inc.*, 279 F.3d 796 (9th Cir. 2002)................................................... 18

20   *RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556 (C.D. Cal. 2005)................................. 15

21   *Russ Berrie & Co., Inc. v. Jerry Elsner Co.*, 482 F. Supp. 980 (S.D.N.Y. 1980)......................... 11

22   *Satava v. Lowry*, 323 F.3d 805 (9th Cir. 2003) ...................................................................... 12

23   *Scheuer v. Rhodes*, 416 U.S. 232 (1974) ............................................................................... 5, 6

24   *Schwarz v. Universal Pictures Co.*, 85 F.Supp. 270 (S.D. Cal. 1949)....................................... 11

25   *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990) ..................................................................... 6

26   *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977)...

27       .......................................................................................................................................... 6

28   *Sobhani v. @Radical.Media, Inc.*, 257 F. Supp. 2d 1234 (C.D. Cal. 2003) ................................ 23

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          iii          CASE NO.  3:08-CV-00904 (RS)
THIRD PARTY COMPLAINT

*Summit Machine Tool Mfg. Corp. v. Victor CNC Systems, Inc.*, 7 F.3d 1434 (9th Cir. 1993) .......... ....................................................................................................................................... 18, 19

*Swirksy v. Carey*, 376 F.3d 841 (9th Cir. 2004) .......................................................................... 12

*Toho Co., Ltd. v. William Morrow & Co.,* 33 F.Supp.2d 1206 (C.D. Cal. 1998) ......................... 16

*Twentieth Century Fox Film Corp. v. Marvel Ents.*, 155 F. Supp. 2d 1 (S.D.N.Y. 2001) ............. 23

*United States v. Jones,* 29 F.3d 1549 (11th Cir. 1994) ................................................................. 22

*Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th Cir. 1969) .............................. 17

*Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285 (S.D. Cal. 2003) .......................................... 22, 24

*Walker v. Woodford*, 454 F. Supp. 2d 1007 (S.D. Cal. 2006) ...................................................... 22

*Whitehead v. CBS/Viacom, Inc.,* 315 F. Supp. 2d 1 (D.D.C. 2004) ............................................. 15

*Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124 (C.D. Cal. 2007) .............................................. 23

**Statutes**

15 U.S.C. § 1125 ........................................................................................................................... 1

17 U.S.C. § 106 ............................................................................................................................. 1

FED. R. CIV. PROC. 12 ............................................................................................................ passim

FED. R. CIV. PROC. 56 ................................................................................................. 6, 20, 24, 25

FED. R. EVID. 201 .............................................................................................................. 20, 22, 24

**Treatises**

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ...................................................... 7

Paul Goldstein, *Goldstein On Copyright* (3d ed. 2005) .......................................................... 7, 10

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT

iv

CASE NO. 3:08-CV-00904 (RS)

1  ## I.    INTRODUCTION

2      Capcom[1] plainly and impermissibly copied salient elements of The MKR Group, Inc.'s

3  ("MKR") *Dawn of the Dead* films (the "Films") to "avoid the drudgery in working up something

4  fresh."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994).  The Copyright Act of

5  1976 grants copyright owners the exclusive right to authorize "derivative works," defined as any

6  form in which a work may be transformed, recast or adapted; video game versions of blockbuster

7  films like *Dawn of the Dead* are quintessential examples of derivative works.  *See* 17 U.S.C.

8  § 106(2).    Moreover, the Lanham Act and state law guard against, *inter alia*, wrongful

9  exploitation of the tremendous goodwill embodied in MKR's DAWN OF THE DEAD brand.  *See*

10  15 U.S.C. § 1125(a)-(c); Counterclaims ¶ 17.

11      Capcom is not merely paying homage to George Romero, nor is it parodying the Films or

12  MKR's DAWN OF THE DEAD and GEORGE A. ROMERO'S DAWN OF THE DEAD®

13  trademarks (collectively, the "DAWN OF THE DEAD Marks").    Rather, in *Dead Rising*

14  (sometimes referred to herein as the "Infringing Game"), Capcom has willfully copied a

15  substantial amount of the Films' protected expression, and now attempts to label such protected

16  expression "stock elements."    In addition to the Films' copyrighted elements, Capcom has

17  pilfered the Films' source-identifying components -- such as the *Dawn of the Dead* title,[2] George

18  A. Romero's name, and MKR's ZOMBIE HEAD Design® trademark -- to successfully capitalize

19  on the DAWN OF THE DEAD Marks, and entice the enormous DAWN OF THE DEAD fan base

20  to purchase the Infringing Game.  Capcom's encroachment upon MKR's exclusive rights severely

21  limits MKR's ability to develop and market a successful video game version of its Films.

22  Moreover, if Capcom develops the Infringing Game into a feature film,[3] then MKR's ability to

23

24  [1]      "Capcom" collectively refers to Plaintiffs/Counterclaim-Defendants Capcom Co., Ltd., Capcom Entertainment, Inc., and Third-Party Defendant Capcom U.S.A., Inc.

25  [2]      "Dawn of the Dead" and "Dead Rising" share the term "DEAD" and the same meaning of

26  zombies awakening.

27  [3]      Declaration of Mimi Rupp ("Rupp Decl.") at ¶ 16, Ex. N (*LA Weekly* reporting that

28  Capcom is planning on developing certain of its video games into feature films (like Capcom's *Resident Evil* game and feature film franchise)).

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO DISMISS AMENDED COUNTERCLAIMS AND THIRD PARTY COMPLAINT                    1                    CASE NO.  3:08-CV-00904 (RS) (MED)

1   license movie remakes and other derivative works based on its Films is radically and unfairly

2   compromised.

3       To add insult to injury, Capcom expressly enquired about the availability of a license from

4   MKR to adapt the Films into a video game, but failed to pursue it.  MKR Counterclaims ¶ 17.

5   Instead, Capcom cavalierly proceeded with the creation and distribution of the Infringing Game

6   on its own.  *Id.*  Capcom's conduct not only suggests a contempt for MKR's rights, but for

7   intellectual property law in general.[4]  Now that Capcom is finally being held accountable for its

8   wanton infringement of the Films and the intellectual property therein -- from which it has reaped

9   millions of dollars in revenues, while at the same time effectively co-opting the market -- it hopes

10  that the Court will fall for its siren call that "zombies in a mall are not protectable."   But

11  conclusory statements which mischaracterize the uncanny, substantial similarities between the

12  works as "stock elements" are insufficient grounds to justify a dismissal motion.

13      As will be demonstrated below, Capcom's siren call fails for two reasons.   First,

14  Capcom's indiscriminate appropriation of the Films goes well beyond merely copying the alleged

15  idea of "zombies in a mall."[5]  (In fact, as explained below, the *idea* behind the Films is a critique

16  of consumerism, which is conveyed through the unique metaphoric expression of zombies in a

17  mall.)  Second, Capcom wholly disregards the different protections afforded under copyright law

18  and trademark law.  Despite Capcom's valiant attempt to distract the Court with its "stock

19  elements" rhetoric, MKR simply seeks to protect its valuable copyrighted and trademarked

20  intellectual property against illegal exploitation, as it is entitled to do under federal and state law.

21

22

---

23  [4]     Capcom's wholesale exploitation of Mr. Romero's name, the "DAWN OF THE DEAD"

24  brand, and the Films' most salient elements is so brazen that Keiji Inafune, the Infringing Game's
    creator, wore a DAWN OF THE DEAD t-shirt in an interview.  Counterclaims ¶ 15.

25  [5]     In its memorandum of law, Capcom hedges this claim by shoehorning multiple elements

26  into its 'unprotectable idea': " . . .[T]he Court must filter out any similarities between [*Dead
    Rising* and the Films] based on the shared basic plot *idea* of humans taking refuge in and battling

27  zombies in a suburban shopping mall accessed via helicopter during a massive zombie outbreak."
    (Capcom Memo at p. 11).  Of course, the Court is under no obligation to filter out the substantial

28  and significant protectable elements which Capcom willfully and wantonly copied.

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          2          CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1    Contrary to Capcom's assertions, MKR's Counterclaims are not required on a dismissal

2    motion to withstand the scrutiny of what is essentially a summary judgment motion.  As Capcom

3    well knows, a complaint (or counterclaim) is simply required to provide notice to the adverse

4    party of the nature of the claims against it.  Capcom's motion ignores the minimal requirements

5    of notice pleading, and instead asks the Court to decide the merits of MKR's Counterclaims on

6    the pleadings, rather than to determine whether MKR has adequately stated its claims for relief

7    under Rule 12(b)(6).  The Court should reject Capcom's invitation to ignore the Federal Rules.

8    **II.    FACTUAL BACKGROUND**

9    The very core of MKR's business is the exploitation of its valuable intellectual property.

10   Specifically, MKR's primary business almost since its inception in 1977 has been to monetize the

11   value of the copyright and trademark rights in its motion pictures.  Through authorized licensees,

12   MKR is also a seller of ancillary merchandise.  One of MKR's key properties is *Dawn of the*

13   *Dead*, the original 1979 version of which was produced by MKR's president and principal

14   shareholder, Richard P. Rubinstein.  This film was directed by George A. Romero, one of the

15   most respected and critically honored horror film directors worldwide since the early 1970s.  In or

16   around 2004, MKR licensed a remake of the film, which was released and distributed in the

17   United States by Universal Pictures.  Counterclaims ¶ 6.

18   MKR's *Dawn of the Dead* series of motion pictures constitutes an enormously successful

19   film franchise.  Both the original film and the authorized remake are extremely well known to the

20   public; they have been profitable theatrically, on cable television, and on home video to this day.

21   Counterclaims ¶ 7.  The 1979 film continues to earn significant revenue, as evidenced from the

22   more than one million DVD units which have been shipped in the United States since 2004, and

23   from its October 4, 2007 Blu-ray DVD release, which earned MKR over $80,000 in royalties

24   within 90 days.  *Id.*  Considering that the budget for the original *Dawn of the Dead* was

25   approximately $650,000, and the film earned over $7,000,000 in its first two years of theatrical

26   release, the 1979 Film is one of the most profitable horror movies of all time.  *Id.*  The 2004

27   remake (the "2004 Film") has also been highly successful, grossing over $100 million worldwide.

28   *Id.* at ¶ 6.

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          3          CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1    In addition to financial success, Mr. Romero's unique commentary on suburban mall

2    culture (the rights to which are owned by MKR) has garnered unparalleled critical acclaim for

3    over thirty years.  Counterclaims ¶ 8.  Roger Ebert, Pulitzer Prize-winning, renowned film critic

4    for *The Chicago Sun-Times*, noted that "*Dawn of the Dead* is one of the best horror ever

5    made . . . ," and gave the film his top four star rating.  *Id.*  In 2005, the DVD release of *Dawn of*

6    *the Dead* won the Academy of Science Fiction, Fantasy & Horror Films' prestigious "Saturn

7    Award" for "Best DVD Classic Film Release."  (By comparison, *E.T.: The Extra-Terrestrial* won

8    this category in 2002.)  *Id.* at ¶ 8.

9    In 2004, Capcom contacted MKR to enquire about the availability of a license to use

10    elements from MKR's *Dawn of the Dead* films in a video game.[6]  Counterclaims ¶¶ 14, 21.

11    Although MKR advised Capcom that the rights were available, Capcom failed to pursue the

12    matter further, and no license was ever negotiated or granted.  *Id.*  Two years later, MKR became

13    aware of Capcom's promotional videos for *Dead Rising*, which embodied scenes that were

14    strikingly similar to scenes in the Films.  *Id.*  In August 2006, Capcom released the Infringing

15    Game without MKR's consent.  *Id.* at ¶ 15.  MKR's belief that Capcom was intentionally

16    capitalizing on the Films' outstanding fame to market *Dead Rising* was swiftly confirmed by

17    game industry experts and fans, who noted that *Dead Rising* was a blatant "rip off" of the 1979

18    Film.  *Id.* at ¶ 13.

19    Among the similarities noted in the Counterclaims are: (1) both works are set in a bi-level

20    "mega" shopping mall; (2) the mall has a gun shop; (3) the mall is located in a rural area with

21    National Guardsmen patrolling the mall's environs; (4) both works are set in motion by a

22    helicopter that takes the lead characters to the mall, which is besieged by crazed, flesh-eating

23    zombies; (5) many of the zombies wear plaid shirts; (6) both works feature a subtext critique of

24    sensationalistic journalism through their use of tough, cynical journalists, with short brown hair

25    and leather jackets, as a lead male character; (7) both works feature the creative use of quotidian

26

27    [6]    Interestingly, Capcom was apparently tired of rehashing its own zombie franchise,
28    *Resident Evil*, and decided that exploiting MKR's Films was more lucrative than the toil and
uncertainty of developing an original zombie-themed game.

KENYON & KENYON
LLP
NEW YORK

items (*e.g.*, propane tanks, screwdrivers, fireplace tools, chainsaws, and vehicles) to kill zombies; (8) both works are a "carnivalesque parody of rampant consumerism";[7] (9) both works use Muzak for comedic effect (juxtaposing banal with the horrific); and (10) *Dead Rising*'s dialogue references the tagline for the 1979 film's release ("When there's no more room in hell, the dead will walk the earth").[8]

MKR anticipates that discovery will unearth even more facts supporting its already well-pled claim, especially given the Infringing Game's dependence on the player's skill and choices made during play (Capcom Memo at 5, n.6), which makes any given scene far less accessible than in a film.

### III.     MKR HAS STATED A VALID COPYRIGHT CLAIM TO PROTECT ITS ORIGINAL *EXPRESSION*

#### A.     Because MKR's Claims are Plausible on Their Face, MKR is Entitled to Offer Evidence to Support Them

Since Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," the Ninth Circuit recognizes "a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 248-49 (9th Cir. 1997) (*citing Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir.1986) ("It is axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'").

On a Rule 12(b)(6) dismissal motion, the issue is not whether a claimant will ultimately prevail, but whether it is entitled to offer evidence to support its claims. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds*, *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Although mere labels, conclusions and formulaic recitations of a claim's elements are

---

[7]     Capcom tries to minimize this element through trite generalizations such as "comedy is in the eye beholder", arguing that if *Dead Rising* is a dark comedy, it is only in the mind of the player. But a comparison of the 1979 Film and the Infringing Game reveals that the 1979 Film and the Infringing Game share the same tone and constitute dark parodies of the excesses of our materialistic culture.

[8]     The proprietary rights to this famous line (in favor of one of MKR's predecessors-in-interest) have been expressly recognized in federal court. *See*, *Dawn Associates v. Links*, 203 U.S.P.Q. 831, 835 (N.D. Ill. 1978).

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          5          CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1   insufficient, the Rules require "only enough facts to state a claim to relief that is plausible on its

2   face," assuming all allegations are true.  *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-

3   65, 1974 (2007).  Indeed, a well-pleaded complaint may proceed even if actual proof of those

4   facts is improbable, and "that a recovery is very remote and unlikely."  *Id.*, *quoting Scheuer*, 416

5   U.S. at 236.

6          If, on a Rule 12(b)(6) motion, matters outside the pleadings are presented and not

7   excluded by the Court, the motion must be treated as one for summary judgment under Rule 56.

8   In that case, the Court must allow "sufficient fact gathering" so that all parties may present *all*

9   *material made pertinent by Rule 56.  Lucas v. Bechtel Corp.*, 633 F.2d 757, 759 (9th Cir. 1980).

10  As detailed in Section VI below, this Court should exclude the extraneous evidence presented in

11  Capcom's Request for Judicial Notice rather than convert the instant motion to one for summary

12  judgment.  In the alternative, if the Court so converts the instant motion, MKR respectfully

13  requests an opportunity to take discovery.

14         **B.      *Dawn of the Dead* and *Dead Rising* are Substantially Similar**

15         Capcom tells only half the story in its presentation of the substantial similarity test.

16  Capcom neglects to mention that if a showing of similarity is made on the extrinsic evaluation of

17  a work, it is wrong for a court to resolve the intrinsic evaluation of such work on summary

18  judgment, let alone on a dismissal motion.  *Shaw v. Lindheim*, 919 F.2d 1353, 1360-61 (9th Cir.

19  1990).  Instead, the fact-finder must make the subjective intrinsic evaluation of the work.  *Id.*  The

20  finder of fact, applying the "ordinary reasonable person" standard, must look at the works as a

21  whole to evaluate their "total concept and feel."  *Sid & Marty Krofft Television Prods., Inc. v.*

22  *McDonald's Corp.*, 562 F.2d 1157, 1164, 1167 (9th Cir. 1977) ("The two works involved in this

23  appeal should be considered and tested, not hypercritically or with meticulous scrutiny, but by the

24  observations and impressions of the average reasonable reader and spectator.").

25         Capcom claims that the "well-worn" plot idea of "humans taking refuge in and battling

26  zombies in a suburban shopping mall accessed via helicopter during a massive zombie outbreak"

27  is part of the public domain, and therefore cannot be copyrighted.  However, Capcom confuses

28  idea with expression in several respects.  First, the idea underlying MKR's Films is rampant,

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          6          CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

mindless consumerism.  MKR has expressed this idea through the portrayal of consumers (*e.g.*, mall goers) as zombies trying to wrest control of a shopping mall from survivors.  In the Films, the viewer may vicariously experience the undeniable pleasures of an unchecked shopping spree through the protagonists' giddy looting of stores in the mall.  Rupp Decl. at ¶ 15, Ex. M.  But at the same time, the Films force the viewer to confront the sinister underbelly of such retail bliss by portraying the mall as a prison populated by zombies (stand-ins for doltish consumers, submissive to the powers of compulsive consumption).  Indeed, the zombies symbolize humans robbed of their agency, reduced to parasitic undead who feed upon human flesh, literally, and the environs of the mall, figuratively.  *Id.*  (In the 1979 film, Peter explains to Stephen why the zombies are trying to break into the mall: "It's not us they're after, it's the place.")

Second, Capcom loads so many elements into its characterization of the "idea,"[9] it is clear that this "idea" is actually protectable expression.  Although "[t]he sine qua non of copyright is originality," the "requisite level of creativity is extremely low; even a slight amount will suffice." *Feist Pubs., Inc. v. Rural Telephone Svc. Co.*, 499 U.S. 340, 345 (1991); 1 Paul Goldstein, *Goldstein On Copyright* § 2.2.1 (3d ed. 2005).  The Supreme Court notes that the "vast majority of works will make the grade quite easily, as they possess some creative spark, 'no matter how crude, humble or obvious' it might be." *Id.*  (citing 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1.08 [C][1]); *see also* 1 Goldstein § 2.2.1. [10]

Third, even assuming *arguendo* that this "humans taking refuge in and battling zombies in a suburban shopping mall accessed via helicopter during a massive zombie outbreak" plot device

---

[9]    As noted above, Capcom characterizes the idea as: "humans taking refuge in and battling zombies in a suburban shopping mall accessed via helicopter during a massive zombie outbreak." (Capcom Memo at p. 11).

[10]    Capcom further stacks the deck by citing nearly exclusively summary judgment cases for the proposition that courts routinely dismiss infringement claims when only a basic plot idea has been copied.  Moreover, these cases generally concern the comparison of a screenplay or story concept with a realized work, which does not apply to the comparison of a visual work with another visual work.  For example, *Thomas v. Walt Disney Co.*, 85 U.S.P.Q.2d 1874 (N.D. Cal. 2008)—the only dismissal motion case cited for this proposition—compared a story submission to a film, and therefore did not consider any visual similarities.

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT

7

CASE NO.  3:08-CV-00904 (RS) (MED)

1   is a "well-worn cliché," Capcom has no justification for copying as many salient, protectable

2   elements from the Films as it does in *Dead Rising*. In particular, as side-by-side screen shots

3   illustrate (Rupp Decl. at ¶¶ 4-14, Exs. B-L), Capcom slavishly copies iconic scenes from the

4   Films. As visual works, there is nothing to filter out from the respective stills, because the stills

5   are copyrighted expression in themselves. While it may be true that any artist can visually render

6   the idea of a zombie or a gaggle of zombies in a mall parking lot, he may not copy another's

7   embodiment of this idea as Capcom has done. Capcom cannot copy MKR's expression. Rather,

8   Capcom must create its own original expression. *Harper & Row v. Nation Enters.*, 471 U.S. 539,

9   556-57 (1985).

10   Fourth, Capcom seeks to manipulate the level of abstraction to justify its copying. As

11   noted in *Metcalf v. Bochco*, while the plot premises such as "boy meets girl" are not protectable

12   when considered individually, the presences of many "generic similarities [can] . . . satisfy the

13   extrinsic test." 294 F.3d 1069, 1074 (9th Cir. 2002). In the instant dispute, the works at issue

14   may be abstracted as follows (from idea to protectable expression):

15   • Two works about zombies;

16   • Two works about flesh-eating (not brain-eating) zombies;

17   • Two works about survivors battling flesh-eating zombies;

18   • Two works about survivors battling flesh-eating zombies in the suburbs;

19   • Two works about survivors battling flesh-eating zombies in a shopping mall in a

20   rural setting;

21   • Two works about survivors desperately trying to keep the zombies from invading a

22   mall in a rural setting, which functions as a sanctuary;

23   • Two works about survivors desperately trying to keep the zombies from invading a

24   mall in a rural setting, which functions as a sanctuary, with much action taking

25   place on a mall rooftop (complete with the highly unusual helicopter landing pad),

26   in a helicopter, in an open atrium plaza with fountains, in an elevator, in an

27   abandoned service corridor, and in utilitarian "safe" control rooms which function

28   as the sleeping area for the male protagonists;

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT                8          CASE NO. 3:08-CV-00904 (RS) (MED)

- Two works about survivors desperately trying to keep the zombies from invading a mall in a rural setting, which functions as a sanctuary, with much action taking place on a mall rooftop (complete with the highly unusual helicopter landing pad), in a gun store in a mall (also highly unusual), in a helicopter, in an open atrium plaza with fountains, in an elevator, in an abandoned service corridor, and in utilitarian "safe" control rooms which function as the sleeping area for the male protagonists, who try to figure out the mystery of the zombies, *i.e.*, "what are they?"

- Two dark comedies about survivors desperately trying to keep the zombies from invading a mall in a rural setting and murderous and psychotic street toughs, *e.g.*, the marauding motorcycle gang members, which functions as a sanctuary, with much action taking place on a mall rooftop (complete with the highly unusual helicopter landing pad), in a gun store in a mall (also highly unusual), in a helicopter, in an open atrium plaza with fountains, in an elevator, in an abandoned service corridor, and in utilitarian "safe" control rooms which function as the sleeping area for the leading male characters, who are hard-boiled journalists[11] who try to figure out the mystery of the zombies, *i.e.*, "what are they?"

Because the works contain so many similarities at a nearly granular level of abstraction, it follows that (1) Capcom's copying exceeds mere "stock ideas," and (2) MKR has satisfied the "extrinsic test." *Metcalf*, 294 F.3d 1074. Indeed, the copied elements which Capcom claims "naturally flow" from "zombies at a mall" (*e.g.*, a leading male journalist with short brown hair and a leather jacket; bi-level upscale mall with a gun store and a helicopter landing pad; a mall

[11] Capcom makes much of the fact that the leading male character in the 1979 Film is a television traffic helicopter pilot, presumably responsible for traffic reports and any "disaster" news requiring helicopter coverage such as fires—*i.e.*, not the august stature of Pulitzer-prize winning journalists—and therefore not worthy of the title of journalist. However, the journalist in the Infringing Game is a rag tag freelance photographer, a position not exactly befitting Edward R. Murrow either. Moreover, Capcom's cynical attempt to slightly alter the leading male's occupation from traffic reporter/pilot to freelance photographer, both of whom illustrate a send-up of the sensationalism of mass media, does not give it free license to exploit a substantial amount of the Films' protected expression.

1   filled with shoppers wearing flannel shirts; campy violence; substantial use of a helicopter;

2   creative use of quotidian items to kill zombies; a "carnivalesque parody of rampant

3   consumerism") must be considered, not filtered out.  Accordingly, there is no justification for

4   dismissing MKR's well-pled Counterclaims without, at minimum, providing MKR an

5   opportunity to offer evidence at trial to support its claims.

6   
7               **C.      The Merger and *Scenes á Faire* Doctrines Do Not Apply Because the
                          Ideas Can be Expressed in a Plurality of Manners**

8               Capcom misinterprets the merger doctrine.  This doctrine does not apply when the same

9   idea can be expressed in a plurality of different manners.  *Apple Computer, Inc. v. Formula Int'l,*

10  *Inc.*, 725 F.2d 521, 525 (9th Cir. 1984); 1 Goldstein, § 2.3.2-2.3.2.1.  At a minimum, Capcom can

11  represent zombies at a mall without quoting iconic scenes from the Films.  Capcom's mall is

12  essentially a visual facsimile of the mall in the 2004 Film, *e.g.*, an upscale bi-level mall with

13  marble walls and a similar layout; moreover, many of the zombies and fellow survivors are

14  inexplicably wearing flannel shirts.   It does not naturally flow that upscale contemporary

15  shoppers wear a statistically disproportionate number of flannel shirts, which are a signature of

16  the 1979 Film, which is set in rural Pennsylvania -- a time and place where flannel shirts were *de*

17  *riguer*.  In particular, the Infringing Game features a distinctive zombie character wearing a red

18  and black flannel shirt; this character appears prominently in the "vignettes" feature.  Such

19  character is an analogue to the 1979 Film's "Plaid Boy" zombie, who was such a distinctive

20  character that MKR licenses a trademarked Halloween costume featuring a zombie mask and a

21  bloody, ripped red, black and green plaid shirt.

22              Moreover, *Night of the Comet* -- the lone "zombie-themed" film which Capcom cites for

23  the proposition that "zombies in a shopping mall" are to a zombie movie as "foot chases and Irish

24  cops" are to a police drama -- illustrates how "zombies at a mall" can be articulated in a myriad of

25  different ways.  As a preliminary matter, it is important to note the gamesmanship on Capcom's

26  part by its representation that *Night of the Comet* is about fighting zombies at a shopping mall.

27  The only relevant scene takes place at a department store, and lasts for approximately ten

28  

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          10          CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1    minutes, or only 10 to 15% of the film.  Most of *Night of the Comet* is set in other locations,

2    ranging from a movie theater to a radio station to an underground bunker.

3        In *Night of the Comet*, the sisters/protagonists do not leave the department store, which is

4    allegedly part of a "shopping arcade" that the viewer never sees.  The sisters' motivation for

5    going to the department store is not to flee the menace of swarming zombies; rather, it is the

6    allure of a free shopping spree.  Further, the "zombies" featured in *Night of the Comet* are not

7    "undead" – they are humans who have been partially exposed to the comet of the title, and as a

8    result are dying slowly.  *Night of the Comet*'s so-called "zombies" generally do not kill solely to

9    acquire human flesh for sustenance.  For example, the zombies in the department store tie up the

10   sisters and attempt to shoot them with guns for shoplifting, before the girls are rescued.

11       The merger doctrine only applies if an idea and the expression of it are so inextricably

12   entwined that they are one: *i.e.*, there is only one possible way to express and embody the idea in

13   a work.  *See, e.g., CDN Inc. v. Kapes*, 197 F.3d 1256, 1261 (9th Cir. 1999).  Here, it follows that

14   the merger doctrine does not apply, because the only limitation to representing zombies in a mall

15   is a game developer's or director's imagination.

16       Turning to Capcom's fallback position that most of the similarities between the works

17   constitute "*scenes á faire*," and are therefore not copyrightable, Capcom misses the point that

18   *scenes á faire* —literally "scenes that must be done"—are clichéd storylines or common visual

19   references, such as "star-crossed lovers," or the depiction of Santa Claus with a traditional Santa

20   costume, white beard, and nose like a cherry.  *Schwarz v. Universal Pictures Co.*, 85 F.Supp. 270,

21   275 (S.D. Cal. 1949); *Nichols v. Universal Pictures*, 45 F.2d 119, 122 (2d Cir. 1930); *Russ Berrie*

22   *& Co., Inc. v. Jerry Elsner Co.*, 482 F. Supp. 980, 986 (S.D.N.Y. 1980); *see also Metcalf*, 294

23   F.3d at 1074 (9th Cir. 2002).   By contrast, Capcom's wholesale exploitation of copyrightable

24   elements -- such as a leading male journalist with short brown hair and a leather jacket; bi-level

25   upscale mall with a gun store; a mall filled with shoppers wearing flannel shirts and swarming

26   flesh-eating zombies; campy violence; substantial use of a helicopter; creative use of quotidian

27   items to kill zombies, a "carnivalesque parody of rampant consumerism" -- goes far beyond any

28   understanding of *scenes á faire*.  *See, e.g., Metcalf*, 294 F.3d at 1074 (reversing summary

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT

11

CASE NO.  3:08-CV-00904 (RS) (MED)

1    judgment for defendant because "the presence of so many generic similarities [e.g., *scenes á*

2    *faire*] . . . satisfy the extrinsic test . . . even if none of these common plot elements [an idealistic

3    young professional choosing between financial and emotional reward and love triangles among

4    young professionals] is remarkably unusual in and of itself, the fact that both [works] contain all

5    of these similar events gives rise to a triable question of substantial similarity of protected

6    expression.") (quotation omitted).

7        Further, Capcom fails to recognize that the Ninth Circuit now applies the *scenes á faire*

8    analysis at the infringement stage, and not the copyrightability stage, of the analysis.  *Montwillo*

9    *v. Tull*, No. C 07-3947, 2008 WL 2264574 (N.D. Cal. June 2, 2008) (denying summary judgment

10   motion and rejecting defendant's *scenes á faire* defense); *Satava v. Lowry*, 323 F.3d 805, 810 (9th

11   Cir. 2003).  In *Montwillo*, this Court cautioned against the error of expanding the *scenes á faire*

12   defense into a doctrine of non-copyrightability.  Capcom incorrectly applies the *scenes á faire*

13   doctrine like a whipsaw, dicing up the Films into non-copyrightable pieces.  This is a classic

14   misapplication of the doctrine.[12]  Rather, the Court must consider MKR's creative decisions as a

15   whole.  *See Montwillo*, 2008 WL 2264574, at * 6.  Moreover, the mere fact that elements have

16   appeared in a prior work does not mean such elements are *scenes á faire*.  *Swirksy v. Carey*, 376

17   F.3d 841, 850 (9th Cir. 2004).  The standard is considerably higher; such elements must appear

18   often enough in the type of work at issue that it truly may be said to be commonplace.  *Id.*  Such

19   elements cannot be "'commonplace' by definition if [they are] shared by only two [works]." *Id.*

20       Despite Capcom's attempt to convince the Court that "zombies at a shopping mall" is a

21   subgenre of zombie films, the Films are the sole expression of a novel metaphor which brilliantly

22   juxtaposes absurdly profane, gory zombies with the hopelessly mundane and antiseptic consumer

23   shopping mall.  At least one academic has published an article explicating this metaphor.  Rupp

24   Decl. at ¶ 15, Ex. M. ("The importance of place in the experience of shopping is explicitly

25   acknowledged in *Dawn of the Dead* when Peter explains to Stephen that the zombies are

26   _____

[12]    Although similarities arising from the mere appearance of *scenes á faire* elements do not

27   count in the substantial similarity analysis, the particular treatment of *scenes á faire* elements can
     constitute original expression, and should therefore be considered.  *See, e.g., Kurt S. Adler, Inc. v.*

28   *World Bazaars, Inc.*, 897 F. Supp.92, 95 (S.D.N.Y. 1995).

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          12          CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1    continuing to clamour outside the mall because they feel a residual connection with the place:

2    'It's not us they're after, it's the place.  They remember that they want to be here.").   The

3    Infringing Game impermissibly replicates this "carnivalesque of rampant consumerism" down to

4    stealing the famous shopping spree at a gun store within the mall.  *Id.*

5
6
                   **D.     The Game Industry Media Recognizes and Decries *Dead Rising*'s
                            Infringement**

7         What gives the ultimate lie to Capcom's position on copyright infringement, is the

8    overwhelming public response to *Dead Rising*, which has recognized the Game for exactly what

9    it is – a blatant infringement of the Films.  If the critical test is the reaction of the ordinary

10   observer or reasonable person, a myriad of such individuals have noted that *Dead Rising* is

11   simply a videogame adaptation of the Films:

12        •   The video game's setup is a complete theft of the 1978 George A. Romero classic
13            'Dawn of the Dead,' right down to the Muzak being piped through the mall speakers."
14            *San Francisco Chronicle*, August 15, 2006.

15        •   "*Dead Rising* is best described as an interactive version of George A. Romero's horror
16            flick, *Dawn of the Dead*, in which a flesh-eating mob of zombies attempts to break
17            into a shopping mall to attack the people inside."  *USA Today*, August 17, 2006.

18        •   "It's a gorgeous and fully interactive game world ripped straight out of George
19            Romero's Dawn of the Dead.  Just like in that movie, the characters in Dead Rising
20            choose   to   take   refuge   in   the   best   place   to   find   food   and   weapons."
21            *Computerandvideogames.com*, March 23, 2006.

22        •   "Taking a page directly from George Romero's classic gorefest *Dawn of the Dead*, the
23            majority of *Dead Rising*'s action takes place inside a large mall that's been overrun by
24            the undead."  *Gamespy.com*, January 6, 2006.

25        •   "You won't have to look at more than a few frames of *Dead Rising* to realize its
26            similarities to Romero's *Dawn of the Dead.*"  *Teamxbox.com*, May 12, 2006.

27        •   "Lately however, zombie movies have gone from cheesy to cheesier, taking a back
28            seat to other horrifying tales until a few years ago when George A. Romero's original

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND       13       CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

*Dawn of the Dead* was remade for present times. It was both satirical and horrifying, taking a place in a world where zombies had overrun the rest of civilization, less a few survivors who took to the once safe haven of a shopping mall. Replace the title of *Dawn of the Dead* with *Dead Rising* and you've basically got the premise for Capcom's first voyage on the Xbox 360." *Teamxbox.com*, July 12, 2006.

- "[D]awn of the Dead"]…took a satirical look at everything from the consumer culture permeating American society to racism to the skewed way the media covers disasters….I was a bit surprised, then, that Capcom would so obviously lift the setting for their latest zombiefest, called *Dead Rising*, from George Romero's masterpiece. Didn't they know that fans would cry foul?" *Gamespy.com*, July 6, 2006.

- "[T]his is a game you should play for how well it appreciates, honors, and finally does justice to its subject material. The front of the box carries this disclaimer: 'This game was not developed, approved, or licensed by the owners or creators of George A. Romero's Dawn of the Dead'. Yeah, whatever, Capcom lawyers. We've been waiting a long while for a developer to live up to the potential of Romero's vision. And as we said at the top of this review: It's about time!" *Yahoo! Games*, August 10, 2006.

- "Like Clive Barker's Jericho, it was also refused classification by the USK. With it's [sic] unremitting gore, it's [sic] got an almost slapstick violence that harks back to moments in Evil Dead and of course Dawn of the Dead. If there was a video nasty for the Xbox 360 then Dead Rising, with its casually horrific disembowlings [sic], cannibalism and voyeurism, is it." *Xboxer.tv*, January 31, 2008.

Counterclaim ¶ 18. Capcom attempts to minimize such widespread and immediate reaction to the Infringing Game by arguing that industry experts, who are well-versed in the horror genre and video games, are ill-equipped to determine whether the respective visual works are substantially similar. But these individuals – who share the outlook and perspective of the fan base for whom they write – are in fact ideally suited to make such evaluation. At a minimum, their reactions demonstrate that MKR is entitled to "its day in court" on its copyright infringement claim.

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO DISMISS AMENDED COUNTERCLAIMS AND THIRD PARTY COMPLAINT          14          CASE NO. 3:08-CV-00904 (RS) (MED)

1

2

### IV.    MKR HAS STATED A VALID LANHAM ACT CLAIM TO PROTECT ITS *SOURCE-IDENTIFYING ELEMENTS*

3

4

Capcom attempts to characterize MKR's Lanham Act claims as "nothing but a second,

5

repackaged copyright claim masquerading as a Lanham Act claim."    Capcom Memo at 21.

6

MKR's Counterclaims, however, plainly allege Lanham Act violations distinct from copyright

7

law.  The core of MKR's Lanham Act claims is Capcom's wholesale exploitation of MKR's

8

DAWN OF THE DEAD Marks[13] and other source-identifying elements from the Films to entice

the enormous DAWN OF THE DEAD fan base.

9

Trademark and copyright law serve fundamentally different purposes, and protect against

10

separate wrongs, even if the claims arise from the same set of facts.  *Bach v. Forever Living*

11

*Products U.S., Inc.*, 473 F.Supp.2d 1110, 1117 (W.D. Wash. 2007).  Whereas copyright law

12

protects the creative work as a whole, trademark law protects those particular symbols, elements

13

or devices which identify a product in the marketplace, and prevents misappropriation or

14

confusion as to its source.  *Id.* , *citing RDF Media Ltd. v. Fox Broad. Co.,* 372 F. Supp. 2d 556,

15

563 (C.D. Cal. 2005); *Whitehead v. CBS/Viacom, Inc.,* 315 F. Supp. 2d 1, 13 (D.D.C. 2004).

16

Citing *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), and

17

related cases, Capcom asserts that MKR is using trademark law to protect ideas and other creative

18

*content*.  Capcom Memo at 21-23.  MKR's Counterclaims, however, explicitly ground its Lanham

19

Act claims in Capcom's exploitation of those components of the Films which are *source-*

20

*identifying*.  For example, Paragraph 16 alleges:

21

> <u>Above and beyond</u> copying the films' major elements, Capcom has
> sought to capitalize on the <u>fame of George A. Romero</u>, and on the
> <u>fame of the title "DAWN OF THE DEAD"</u>, by using the similar
> title "DEAD RISING", and by placing a "notice" on the packaging
> for "DEAD RISING" . . . which was neither authorized nor
> requested by MKR . . . It <u>exploits Mr. Romero's fame, and the fame
> of the "DAWN OF THE DEAD" title</u>, to attract buyers.    <u>In
> addition</u>, Capcom displays a <u>colorable imitation of MKR's famous</u>

22

23

24

25

26

---

[13]      Secondary meaning to the DAWN OF THE DEAD mark has been expressly recognized in

27

federal court.  *See*, *Dawn Associates v. Links*, 203 U.S.P.Q. 831, 836 (N.D. Ill. 1978) ("Plaintiffs

28

have adequately established that both 'Night of the Living Dead' and 'Dawn of the Dead' have
achieved a secondary meaning . . . .").

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT                    15                    CASE NO.  3:08-CV-00904 (RS) (MED)

ZOMBIE HEAD trademark on the packaging for "DEAD RISING".

Thus, as opposed to using trademark law to prosecute the plagiarism of *content*, as in *Dastar*, MKR's Lanham Act claims seek to protect the Films' *source-identifying elements — e.g.*, Mr. Romero's name, the *Dawn of the Dead* title, and the ZOMBIE HEAD Design® trademark on the Infringing Game's packaging. Capcom's use of the Films' source-identifying elements reflect Capcom's intent to trade-off of the fame of Mr. Romero and the *Dawn of the Dead* films to entice consumers who are fans of Mr. Romero and *Dawn of the Dead*.

For another example, MKR's DAWN OF THE DEAD licensed merchandise includes a trademark "PLAID BOY" costume consisting of a blood stained, distressed plaid shirt and a zombie mask. Counterclaims ¶ 11, Ex. C. As discussed above, Capcom inexplicably portrays many upscale shoppers in flannel shirts—thus misappropriating MKR's trademark rights in order to tap into the Films' enormous fan base.

Under similar circumstances, many courts have analyzed the same set of facts under both trademark and copyright law without concluding that the trademark claims were "piggybacking" on the copyright claims. *See, e.g., Bach*, 473 F.Supp.2d at 1117-18 (considering both trademark claims grounded in the *Jonathan Livingston Seagull* name, title and trade dress, and copyright claims grounded in the character, text and images), *citing Mattel Inc. v. Walking Mountain Prods.,* 353 F.3d 792 (9th Cir. 2003) (considering copyright and trademark implications of series of photographs depicting Barbie in various absurd positions); *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.,* 109 F.3d 1394 (9th Cir. 1997) (affirming grant of preliminary injunction as violating Dr. Seuss's copyright and trademark rights); *Nintendo of Am., Inc. v. Dragon Pacific Int'l,* 40 F.3d 1007 (9th Cir.1994) (affirming damages award under both copyright and trademark law where defendant copied and sold Nintendo games (copyright infringement) but advertised that they were Nintendo products (trademark violation)); *Toho Co., Ltd. v. William Morrow & Co.,* 33 F.Supp.2d 1206 (C.D. Cal. 1998) (issuing preliminary injunction against book entitled "Godzilla" (trademark violation) which included images and photographs from original Godzilla film and descriptions of the Godzilla character (copyright violations)). MKR's Counterclaims

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT

16

CASE NO. 3:08-CV-00904 (RS) (MED)

1    similarly recognize the different rights protected under copyright law and trademark law; thus,

2    MKR has adequately stated a claim under the Lanham Act.

3        Capcom's other conclusory arguments with respect to MKR's Lanham Act claims

4    (confined to suggestive footnotes) are wholly unfounded upon law or fact.  First, Capcom

5    maintains that MKR cannot and does not allege that the marks DEAD RISING and DAWN OF

6    THE DEAD are confusingly similar in and of themselves.  However, Paragraph 43 of MKR's

7    Counterclaims plainly states: "'DEAD RISING' is confusingly similar to MKR's trademark

8    'DAWN OF THE DEAD'."[14]  As noted *supra*, both titles share the term "DEAD" and connote

9    the same meaning of zombies awakening.

10        Second, Capcom asserts that MKR cannot establish a Lanham Act violation based on the

11   disclaimer on *Dead Rising*'s packaging.  To the contrary, courts have expressly found that such a

12   disclaimer *ipso facto dilutes a trademark and may itself cause consumer confusion.  E. & J. Gallo*

13   *Winery v. Gallo Cattle Co.*, 12 U.S.P.Q.2d 1657, 1989 WL 159628, at **19, 30 (E.D. Cal. 1989);

14   *see also Beacon Mut. Ins. Co. v. OneBeacon Ins. Corp.*, 376 F. Supp. 2d 251, 266 (D.R.I. 2005)

15   ("the efficacy of disclaimers generally is in doubt"), *citing Home Box Office, Inc. v.*

16   *Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1315-16 (2d Cir. 1987).

17        Capcom's assertion that its disclaimer somehow constitutes nominative fair use is equally

18   misguided.  Nominative fair use only applies when the alleged infringer needs to use another's

19   mark to describe its product, such as an automobile repair shop which must be able to convey that

20   it repairs Volkswagen cars.  *Volkswagenwerk Aktiengesellschaft v. Church*, 411 F.2d 350 (9th

21   Cir. 1969).  Such nominative fair use requires that the alleged infringer prove: (1) that the product

22   or service in question is not readily identifiable without use of the trademark; (2) that only so

23   much of the mark is used as is reasonably necessary to identify the product or service; and (3) that

24   the user do nothing which would, in conjunction with the mark, suggest sponsorship or

25   endorsement by the trademark holder.  *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407,

26

27   [14]    Despite the erroneous reference to "DEAD RISING" as MKR's trademark instead of

28   Capcom's trademark, the allegation remains clear, especially in light of the pending opposition
     proceeding, also mentioned in the Counterclaims ¶ 16.

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND            17            CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1  412 (9th Cir. 1996), *citing New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302,

2  308 (9th Cir. 1992).

3      Whereas the failure of *any* prong will defeat a nominative fair use defense, all three

4  prongs fail in this case.  *See Playboy Enters. v. Welles, Inc.*, 279 F.3d 796, 804 (9th Cir. 2002).

5  First, the prominent use of the mark "GEORGE A. ROMERO'S DAWN OF THE DEAD®" is

6  not necessary to describe *Dead Rising*; Capcom may freely and accurately describe its video

7  game without using MKR's mark.  Second, by referring to "GEORGE A. ROMERO'S DAWN

8  OF THE DEAD," Capcom misappropriates not only the *Dawn of the Dead* title, but also George

9  A. Romero's name.  Capcom could have readily identified "Dawn of the Dead" without reference

10 to Mr. Romero.  Thus, Capcom uses more of the mark than is reasonably necessary, and the

11 second prong fails as well.  The third requirement—doing nothing to suggest sponsorship or

12 endorsement—"is merely the other side of the likelihood-of-confusion coin." *Brother Records,*

13 *Inc. v. Jardine*, 318 F.3d 900, 909 n.5 (9th Cir. 2003).  As discussed above, disclaimers may

14 *themselves* cause consumer confusion.  Capcom is not merely referring to MKR's Films, but is

15 doing so in a form and manner -- *i.e.*, through a disclaimer -- which constitutes misappropriation.

16 Not surprisingly, Capcom cannot point to a single case where use of another's mark in a

17 disclaimer constituted nominative fair use.  Hence, the third prong also fails, so nominative fair

18 use cannot defeat the adequacy of MKR's stated claims.

19     With respect to Capcom's last argument -- reverse passing off -- as discussed above,

20 MKR's Lanham Act claims are based on Capcom's infringement of MKR's source-identifying

21 elements, not the Films' content (which is the subject of its copyright claims).  Thus, MKR does

22 not allege reverse passing off, which occurs when an infringer obtains a second party's goods,

23 removes the second party's name, and markets the second party's goods under its own name.

24 *Summit Machine Tool Mfg. Corp. v. Victor CNC Systems, Inc.*, 7 F.3d 1434, 1437 (9th Cir. 1993).

25

26

27

28

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND    18    CASE NO. 3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1
2

**V.    MKR'S STATE LAW CLAIMS ARE NOT PREEMPTED BECAUSE THEY SEEK TO PROTECT RIGHTS NOT AFFORDED BY COPYRIGHT LAW**

3    Finally, Capcom asserts that MKR's state law claims fail because they are preempted by

4    the Copyright Act.  This assertion also lacks merit.  The Ninth Circuit has developed a two-part

5    test to determine whether the Act preempts a state law claim:

6

7

8

9

> We must first determine whether the "subject matter" of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103.  Second, assuming that it does, we must determine whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders.

10    *Brackett v. Hilton Hotels Corp.*, No. 3:08-cv-02100, slip op. at 13 (N.D. Cal. Jun. 30, 2008)

11    (Rupp Decl. at ¶ 17, Ex. O), *quoting Laws v. Sony Music Entm't*, 448 F.3d 1134, 1137-38 (9th

12    Cir. 2006).  Essentially, this analysis determines "whether the state law claim contains an element

13    not shared by the federal law; an element which changes the nature of the action so that it is

14    qualitatively different from a copyright infringement claim."  *Brackett*, slip op. at 13, *quoting*

15    *Summit*, 7 F.3d at 1439-40.

16    Again, in this case, MKR's state law claims are grounded in Capcom's misuse of MKR's

17    statutory and common law *source-identifying elements*, not of MKR's *content*.  Thus, even if the

18    Films were the general "subject matter" of the state law claim, the rights asserted under state law

19    are not equivalent to those protected by the Copyright Act.

20    As with MKR's Lanham Act claims, state law regarding trademarks and unfair

21    competition exists independently from copyright law.  *Internat'l Order of Job's Daughters v.*

22    *Lindeburg and Co.*, 633 F.2d 912, 916 (9th Cir. 1980).  In general, the common law protects

23    against the broad business tort of "unfair competition," *of which trademark infringement is one*

24    *species.  Id.*  at 915.  *In addition to* the federal protection afforded by the Lanham Act, state

25    statutory or common law may protect against trademark infringement and other types of unfair

26    competition, such as misappropriation as alleged herein.  *Id.* at 916.  MKR has adequately stated

27    both Lanham Act and state law claims which stand independent of any rights to the Films'

28

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT

19

CASE NO.  3:08-CV-00904 (RS) (MED)

*content* under copyright law.  Thus, MKR's state law claims are well-pled as well.  *See Brackett*, slip op. at 14 (denying defendants' motion to dismiss plaintiff's state law claims, since "where a state law claim adds an additional element, it is not preempted by Section 301").

## VI.    THE COURT SHOULD EXCLUDE EXHIBITS 5-44 TO CAPCOM'S REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201(e), MKR opposes in part Capcom's request for judicial notice, asks the Court to strike all references to the media and documents which are attached as Exhibits 5-44 to the Request for Judicial Notice in Support of Plaintiffs' and Third-Party Defendant's Motion to Dismiss Amended Counterclaims and Third Party Complaint (DI # 37) ("Capcom RJN").

In ruling on a Rule 12(b)(6) motion, a district court generally may not consider any material beyond the pleadings.  *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (*overruled on other grounds*, *Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1123-24 (9th Cir. 2002)), *citing Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  There are, however, two exceptions to this rule.  *Lee*, 250 F.3d at 688.  First, a court may consider documents whose contents are alleged in the complaint and whose authenticity no party questions.  *Branch*, 14 F.3d at 453; *see also Lee*, 250 F.3d at 688.  Second, under Fed. R. Evid. 201, a court may take judicial notice of "matters of public record."  *Lee*, 250 F.3d at 688-89.

When "matters outside the pleading are presented to and not excluded by the court, the motion *shall* be treated as one for summary judgment and disposed of as provided in Rule 56." *Lee*, 250 F.3d at 688 (emphasis in original), *quoting* FED. R. CIV. P. 12(b)(6); *Branch*, 14 F.3d at 453.  In such case, "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  *Branch*, 14 F.3d at 453, *quoting* FED. R. CIV. P. 12(b)(6). In turn, Rule 56(f) requires a court to refuse summary judgment where the nonmoving party has not had the opportunity to discover information which is essential to its opposition.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5, 257 (1986).

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND         20          CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1    MKR does not oppose Capcom's introduction of Exhibits 1-4.  Exhibits 1 and 4 embody

2    the 1979 Film and the Infringing Game, respectively, the contents of which are alleged in MKR's

3    Counterclaims.  Exhibits 2 and 3 (a synopsis and certified script, respectively, of the 1979 Film)

4    were filed with the U.S. Copyright Office, and are therefore matters of public record.  MKR does

5    not dispute the authenticity or content of these documents, and therefore agrees that they are

6    admissible for purposes of Capcom's motion.

7        In addition, MKR notes that the contents of the 2004 Film are alleged in its

8    Counterclaims.  Therefore, MKR respectfully requests that the Court also consider the 2004 Film.

9    *See* Rupp Decl. at ¶ 3, Ex. A.

10       Capcom's remaining exhibits, however, as well as its alleged "fact" that generic elements

11   are present in zombie-themed films and video games, grossly exceed the scope of allowable

12   evidence in a dismissal motion under Rule 12(b)(6).  Thus, the Court must either exclude them or

13   convert the instant motion to one for summary judgment.  Conversion to a summary judgment

14   motion, however, would be premature.  Therefore, MKR respectfully requests that the Court

15   entirely exclude Capcom's Exhibits 5-44, and deny Capcom's request for judicial notice of

16   alleged generic or "stock" elements.

17           **A.      Exhibits 5-44 Grossly Exceed the Scope of Allowable Evidence on a
                        Motion to Dismiss**
18

19       Exhibit 5 purports to be the "script of *Dead Rising*."  However, despite its alleged

20   "authentication" by the Niida Declaration, the script wholly lacks foundation, as the Niida

21   Declaration does not disclose *who* wrote the script, *when*, or for *what purpose*.  Moreover, since

22   the Infringing Game's scenario unfolds according to the player's skill and choices made during

23   game play, MKR cannot easily verify the contents of this purported script (which was not filed

24   with the Copyright Office), and therefore disputes its contents.  A court "may not defenestrate

25   established evidentiary processes, thereby rendering inoperative the standard mechanisms of

26   proof and scrutiny, if the evidence in question is at all vulnerable to reasonable dispute."  *Lussier*

27   *v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995).  Thus, the Court should reject Exhibit 5 to

28   Capcom's Request for Judicial Notice.

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT

21

CASE NO.  3:08-CV-00904 (RS) (MED)

1    The remainder of Capcom's proffered evidence, Exhibits 6-44, comprises films and video

2    games which are offered to show the allegedly generic elements of the Films. However, these

3    "piece[s] of evidentiary matter that do[] not exist independently of the complaint" are

4    inappropriate evidence upon this dismissal motion. *DeMarco v. DepoTech Corp.*, 149 F. Supp.

5    2d 1212, 1220 (S.D. Cal. 2001), *distinguishing Branch*, 14 F.3d 449.

6              **B.    Judicial Notice Does Not Apply to Exhibits 5-44**

7    Capcom requests judicial notice of Exhibits 5-44 as well as its alleged "stock" elements.

8    Federal Rule of Evidence 201 "permits a court to take judicial notice of two kinds of facts:

9    (1) those that are generally known within the court's territorial jurisdiction; and (2) those that are

10   capable of accurate and ready determination by resort to sources whose accuracy cannot

11   reasonably be questioned, for example, almanac, dictionary, calendar or similar source." *Walker*

12   *v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006). Put differently, "the fact must be one

13   that only an unreasonable person would insist on disputing." *Id.*, *quoting United States v. Jones*,

14   29 F.3d 1549, 1553 (11th Cir. 1994). Taking judicial notice under this rule "preclude[s] a party

15   from introducing evidence and in effect, direct[s] a verdict against him as to the fact noticed."

16   *Von Grabe v. Sprint PCS*, 312 F. Supp. 2d 1285, 1311 (S.D. Cal. 2003).

17   The Ninth Circuit tends to be strict with its application of Rule 201(b). *Von Grabe*, 312 F.

18   Supp. 2d at 1311. A court may not take judicial notice of any matter which is "subject to

19   reasonable dispute," even if such matter is documented in a public record. *Lee*, 250 F.3d at 689-

20   90, *quoting* FED. R. EVID. 201(b); *Copple v. Astrella & Rice, P.C.*, 442 F. Supp. 2d 829,

21   835 (N.D. Cal. 2006); *Walker*, 454 F. Supp. 2d at 1022.   The party requesting judicial notice

22   bears the burden of persuading the court that the particular fact is not reasonably subject to

23   dispute, and is capable of immediate and accurate determination. *Jasso v. Citizens*

24   *Telecommunications Co. of CA, Inc.*, No. CIV S-05-2649, 2007 WL 97036, at *2 (E.D. Cal. Jan.

25   9, 2007), *citing In re Tyrone F. Conner Corp., Inc.,* 140 B.R. 771, 781 (E.D. Cal. 1992). Upon

26   timely request, a party is entitled to an opportunity to be heard as to the propriety of taking

27   judicial notice and the tenor of the matter noticed. FED. R. EVID. 201(e).

28

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND            22            CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

Capcom's assertion that Exhibits 5-44 are "generally known within the territorial jurisdiction of the court" is wholly improper. "Generally known" facts "are those that exist in the unrefreshed, unaided recollection of the populace at large." *Lussier*, 50 F.3d at 1114. This standard does not apply to the obscure and historic works upon which Capcom relies. Capcom cites *Twentieth Century Fox Film Corp. v. Marvel Ents.*, 155 F. Supp. 2d 1, 41 (S.D.N.Y. 2001), wherein the court judicially recognized Obi-Wan Kenobi's nurturing of the gifted Luke Skywalker in *Star Wars*. However, the six *Star Wars* films reportedly rank in the all-time top 32 grossing films in the U.S.—including three of the top ten. *All Time Top 1000 Grossing Films (US) - MovieWeb*, http://www.movieweb.com/movies/boxoffice/alltime.php (as of Jul. 8, 2008, 23:45 GMT). Thus, whereas *Star Wars*' plot may indeed exist in the unrefreshed, unaided recollection of the populace at large, the same cannot be said for such films as *White Zombie* (1932) and *I Walked With a Zombie* (1943).

The other two cases cited by Capcom -- *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 546-47 (S.D.N.Y. 2007) and *Sobhani v. @Radical.Media, Inc.*, 257 F. Supp. 2d 1234, 1235-36 n.1 (C.D. Cal. 2003) -- are likewise distinguishable. Whereas both concern summary judgment motions, not dismissal motions, the *Gal* court had *denied* the earlier dismissal motion, expressly rejecting the notion that the plaintiff had "claim[ed] substantial similarity based exclusively on alleged similarities in ideas and common stock elements." 403 F. Supp. 2d 294, 308 (S.D.N.Y. 2005). For its part, the *Sobhani* court judicially noticed the content of *Castaway* because the commercials at issue specifically parodied the film. *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1129 n.3 (C.D. Cal. 2007), *citing Sobhani*, 257 F. Supp. 2d at 1235-36 n.1. In contrast, of course, MKR's Counterclaims do not reference the contents of Capcom's proffered exhibits.

Aside from the films and video games, Capcom also seeks to introduce copies of various Wikipedia articles. Far from a source "whose accuracy cannot reasonably be questioned," however, Wikipedia has—by its own admission—faced criticism concerning systematic bias and inconsistencies, lack of reliability and accuracy, and risks of vandalism. *See* Wikipedia, *Wikipedia*, http://en.wikipedia/wiki/Wikipedia (describing criticisms of Wikipedia) (as of Jul. 8, 2008, 21:55 GMT). For this reason, courts have expressly questioned or rejected Wikipedia's

KENYON & KENYON LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND
THIRD PARTY COMPLAINT                23                CASE NO.  3:08-CV-00904 (RS) (MED)

1   reliability. *E.g.*, *Nordwall v. Sec'y of Health and Human Servs.*, No. 05-123V, 2008 WL 857661,

2   at *7 n.6 (Fed. Cl. Feb. 19, 2008) ("Wikipedia may not be a reliable source of information"),

3   *citing Campbell ex rel. Campbell v. Sec'y of Health and Human Servs.*, 69 Fed. Cl. 775, 781 (Fed.

4   Cl. 2006) (information drawn from Wikipedia does not "remotely meet" the reliability

5   requirements of *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)). Thus, judicial

6   notice of these exhibits is especially inappropriate.

7       Moreover, even if Exhibits 5-44 were somehow publicly known, MKR vigorously

8   disputes Capcom's characterization of the subject films and video games. For example, as

9   detailed in Section III above, Capcom grossly exaggerates the alleged similarities between the

10  Films and *Night of the Comet* (Exhibit 21). Likewise, MKR vigorously denies the generic or

11  "stock" elements of which Capcom requests judicial notice. These "facts"—which necessarily

12  require analysis of Capcom's proffered *evidence*—"are not only disputed, they form the essence

13  of the controversy at hand." *Von Grabe*, 312 F. Supp. 2d at 1312. Capcom may not misuse Rule

14  201 to effectively circumvent its burden of proof and duty to litigate this case. *Id.*

15      **C.    The Court Should Exclude Capcom's Proffered Evidence Rather Than
16             Convert This Dismissal Motion**

17      When matters outside the pleading are presented to a court on a Rule 12(b)(6) motion, a

18  court must either exclude the evidence or convert the motion to one for summary judgment. *See*

19  *Lee*, 250 F.3d at 688, *quoting* FED. R. CIV. P. 12(b)(6); *Branch*, 14 F.3d at 453. In that case, a

20  court must allow "sufficient fact gathering" so that all parties may present *all material made*

21  *pertinent by Rule 56. Lucas*, 633 F.2d at 759 (9th Cir. 1980). Given the facts and procedural

22  posture of this case, exclusion is the far more appropriate recourse.

23      The present dispute concerns a video game which unfolds according to the skill of the

24  player and choices made during game play. Thus, as opposed to the Films, whose individual

25  scenes are fixed and easily accessible, discovery concerning the history and content of the

26  Infringing Game is crucial to MKR's development of factual support for its claims. Since such

27  discovery is currently in its infancy, converting this dismissal motion into one for summary

28  judgment would deprive MKR of the "reasonable opportunity to complete discovery and to

KENYON & KENYON
LLP
NEW YORK

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          24          CASE NO. 3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT

1    present necessary factual support for [its] complaint allegations." *Lucas*, 633 F.2d at 759.  Hence,

2    MKR respectfully submits that conversion to a summary judgment motion is premature, and that

3    the better alternative is to simply exclude Exhibits 5-44.  In the alternative, should the Court so

4    convert the instant motion, MKR respectfully requests notice and an opportunity to take

5    discovery for purposes of responding with evidence (an opportunity not afforded by the present

6    motion). *See id.*; FED. R. CIV. P. 56(f).

7    **VII.    CONCLUSION**

8    For the foregoing reasons, MKR respectfully requests the Court find that MKR has

9    effectively stated its claims, and thus DENY Capcom's motion to dismiss.

10

11                                                    KENYON & KENYON LLP

12

13

14   Dated: July 23, 2008                    By:   /s/ Allen J. Baden

15                                                  Allen J. Baden (CSB NO. 255805)
                                                    Mark Yuan  (CSB NO. 246146)
16                                                  Jonathan D. Reichman (*Pro Hac Vice*)
                                                    Mimi Rupp (*Pro Hac Vice*)
17                                                  Attorneys for Defendant, Counterclaim-
                                                    Plaintiff and Third-Party Plaintiff
18                                                  THE MKR GROUP, INC.

19

20

21

22

23

24

25

26

27

28

MEMO IN OPPOSITION TO MOTION TO
DISMISS AMENDED COUNTERCLAIMS AND          25          CASE NO.  3:08-CV-00904 (RS) (MED)
THIRD PARTY COMPLAINT