Allen J. Baden (CSB NO. 255805)
abaden@kenyon.com
Mark Yuan (CSB NO. 246146)
myuan@kenyon.com
Jonathan D. Reichman (*Pro Hac Vice*)
jreichman@kenyon.com
Mimi Rupp (*Pro Hac Vice*)
mrupp@kenyon.com
KENYON & KENYON LLP
River Park Towers
333 W. San Carlos St., Ste. 600
San Jose, CA 95110
Tel: 408.975.7500
Fax: 408.975.7501

Attorneys for Defendant, Counterclaim-Plaintiff and
Third-Party Plaintiff
THE MKR GROUP, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CAPCOM CO., LTD. and CAPCOM ENTERTAINMENT, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE MKR GROUP, INC.,<br><br>Defendant. | Case No. 3:08-CV-00904 (RS) (MED)<br><br>Hearing Date: September 3, 2008<br>Time:          9:30 a.m.<br>Honorable Richard Seeborg |
| THE MKR GROUP, INC.,<br><br>Counterclaim-Plaintiff and Third-Party Plaintiff,<br><br>v.<br><br>CAPCOM CO., LTD. and CAPCOM ENTERTAINMENT, INC.,<br><br>Counterclaim-Defendants,<br><br>and<br><br>CAPCOM U.S.A., INC.,<br><br>Third-Party Defendant. | **DECLARATION OF MIMI RUPP IN OPPOSITION TO CAPCOM'S MOTION TO DISMISS MKR's AMENDED COUNTERCLAIMS AND THIRD PARTY COMPLAINT** |

KENYON & KENYON
LLP
SAN JOSE

Declaration of Mimi Rupp In Opposition To
Capcom's Motion To Dismiss MKR'S Amended
Counterclaims And Third Party Complaint

CASE NO. 3:08-CV-00904 (RS)(MED)

1    1.  My name is Mimi Rupp.  I am over 18 years of age.  I give this declaration of my own

2    personal knowledge for all lawful uses in this case.

3    2.  My firm and I represent Defendant/Counterclaim-Plaintiff and Third-Party Plaintiff THE

4    MKR GROUP, INC., in this case, for which I have been admitted *pro hac vice*.

5    3.  Attached hereto as Exhibit "A" is a true and correct DVD copy of the 2004 Film.

6    4.  Attached hereto as Exhibit "B" are true and correct copies of screen stills from the 1979

7    Film (above) and the Infringing Game (below).

8    5.  Attached hereto as Exhibit "C" are true and correct copies of screen stills from the 1979

9    Film (above) and the Infringing Game (below).

10   6.  Attached hereto as Exhibit "D" are true and correct copies of screen stills from the 1979

11   Film (above) and the Infringing Game (below).

12   7.  Attached hereto as Exhibit "E" are true and correct copies of screen stills from the 2004

13   Film (above) and the Infringing Game (below).

14   8.  Attached hereto as Exhibit "F" are true and correct copies of screen stills from the 1979

15   Film (above) and the Infringing Game (below).

16   9.  Attached hereto as Exhibit "G" are true and correct copies of screen stills from the 1979

17   Film (above) and the Infringing Game (below).

18   10. Attached hereto as Exhibit "H" are true and correct copies of screen stills from the 2004

19   Film (above) and the Infringing Game (below).

20   11. Attached hereto as Exhibit "I" are true and correct copies of screen stills from the 1979

21   Film (above) and the Infringing Game (below).

22   12. Attached hereto as Exhibit "J" are true and correct copies of screen stills from the 1979

23   Film (above) and the Infringing Game (below).

24   13. Attached hereto as Exhibit "K" are true and correct copies of screen stills from the 2004

25   Film (above) and the Infringing Game (below).

26   14. Attached hereto as Exhibit "L" are true and correct copies of screen stills from the 2004

27   Film (above) and the Infringing Game (below).

28

KENYON & KENYON
LLP
SAN JOSE

Declaration of Mimi Rupp In Opposition To
Capcom's Motion To Dismiss MKR'S Amended            - 2 -            CASE NO.  3:08-CV-00904 (RS)(MED)
Counterclaims And Third Party Complaint

1    15. Attached hereto as Exhibit "M" is a true and correct print-out of a scholarly article from

2    <http://www.americanpopularculture.com/journal/articles/fall_2002/harper.htm>.

3    16. Attached hereto as Exhibit "N" is a true and correct print-out of an article from

4    <http://www.laweekly.com/film+tv/pass-the-paddles/the-zombie-zeitgeist/14878>.

5    17. Attached hereto as Exhibit "O" is a true and correct copy of *Brackett v. Hilton Hotels*

6    *Corp.*, No. 3:08-cv-02100 (N.D. Cal. Jun. 30, 2008), obtained from PACER.

7

8

9                                    KENYON & KENYON LLP

10

11   Dated: July 23, 2008                    By: _____

12                                               Allen J. Baden (CSB NO. 255805)
                                                 Mark Yuan  (CSB NO. 246146)
13                                               Jonathan D. Reichman (*Pro Hac Vice*)
                                                 Mimi Rupp (*Pro Hac Vice*)
14                                               Attorneys for Defendant, Counterclaim-
                                                 Plaintiff and Third-Party Plaintiff
15                                               THE MKR GROUP, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

KENYON & KENYON
LLP
SAN JOSE

Declaration of Mimi Rupp In Opposition To
Capcom's Motion To Dismiss MKR'S Amended          - 3 -          CASE NO.  3:08-CV-00904 (RS)(MED)
Counterclaims And Third Party Complaint

# EXHIBIT A

1   Allen J. Baden (CSB NO. 255805)
    abaden@kenyon.com
2   Mark Yuan (CSB NO. 246146)
    myuan@kenyon.com
3   Jonathan D. Reichman (*Pro Hac Vice*)
    jreichman@kenyon.com
4   Mimi Rupp (*Pro Hac Vice*)
    mrupp@kenyon.com
5   KENYON & KENYON LLP
    River Park Towers
6   333 W. San Carlos St., Ste. 600
    San Jose, CA  95110
7   Tel:  408.975.7500
    Fax:  408.975.7501
8
    Attorneys for Defendant, Counterclaim-Plaintiff and
9   Third-Party Plaintiff
    THE MKR GROUP, INC.
10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                          SAN JOSE DIVISION
13

14

15  | CAPCOM CO., LTD. and CAPCOM | Case No.  3:08-CV-00904 (RS) (MED) |
16  ENTERTAINMENT, INC.,

    Plaintiffs,                      Hearing Date:  September 3, 2008
17                                   Time:          9:30 a.m.
    v.                               Honorable Richard Seeborg
18
    THE MKR GROUP, INC.,
19
    Defendant.
20  THE MKR GROUP, INC.,             **NOTICE OF MANUAL FILING**

21  Counterclaim-Plaintiff and Third-Party
    Plaintiff,
22
    v.
23
    CAPCOM CO., LTD. and CAPCOM
24  ENTERTAINMENT, INC.,

    Counterclaim-Defendants,
25
    and
26
    CAPCOM U.S.A., INC.,
27
    Third-Party Defendant.
28

1    Regarding: Exhibit A to the Declaration of Mimi Rupp in Opposition to Capcom's Motion

2  to Dismiss MKR's Amended Counterclaims and Third Party Complaint.

3    This filing is in paper or physical form only, and is being maintained in the case

4  file in the Clerk's office.  If you are a participant in this case, this filing will be served in hard-

5  copy shortly.  For information on retrieving this filing directly from the court, please see the

6  court's main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

7    This filing was not efiled for the following reason(s):

8    [_] Voluminous Document (PDF file size larger than the efiling system allows)

9    [_] Unable to Scan Documents

10    [_] Physical Object (description): _____

11    _____

12    [X_] Non-Graphic/Text Computer File (audio, video, etc.) on CD or other media

13    [_] Item Under Seal

14    [_] Conformance with the Judicial Conference Privacy Policy (General Order 53).

15    [_] Other (description): _____

16    _____

17

18

19  Dated: July 23, 2008                          KENYON & KENYON LLP

20

21                                              By: _____

22                                                  Allen J. Baden (CSB NO. 255805)
                                                    Mark Yuan  (CSB NO. 246146)
23                                                  Jonathan D. Reichman (*Pro Hac Vice*)
                                                    Mimi Rupp (*Pro Hac Vice*)
24                                                  Attorneys for Defendant, Counterclaim-
                                                    Plaintiff and Third-Party Plaintiff
25                                                  THE MKR GROUP, INC.

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that I served a true and correct copy of  NOTICE OF MANUAL FILING along with said Exhibit A upon the following counsel by first class mail and on July 23, 2008.

| | |
|---|---|
| Rodger R. Cole, Esq. (rcole@fenwick.com)<br>FENWICK & WEST LLP<br>801 California Street<br>Mountain View, California 94041<br>(excluding DVD) | Jennifer L. Kelly, Esq. (jkelly@fenwick.com)<br>Mary E. Milionis, Esq.<br>(mmilionis@fenwick.com)<br>FENWICK & WEST LLP<br>555 California Street, 12th Floor<br>San Francisco, California 94104<br>**includes the DVD** |

Cindy Wagner

# EXHIBIT B



1979 Film



Infringing Game

# EXHIBIT C



1979 Film



Infringing Game

# EXHIBIT D



1979 Film



Infringing Game

# EXHIBIT E



2004 Film



Infringing Game

# EXHIBIT F



1979 Film



Infringing Game

# EXHIBIT G



1979 Film



Infringing Game

# EXHIBIT H



2004 Film



Infringing Game

# EXHIBIT I



1979 Film



Infringing Game

EXHIBIT J



1979 Film



Infringing Game

# EXHIBIT K



2004 Film



Infringing Game

# EXHIBIT L



2004 Film



Infringing Game

# EXHIBIT M

# AMERICANA
## THE JOURNAL OF AMERICAN POPULAR CULTURE
### 1900 TO PRESENT

## Zombies, Malls, and the Consumerism Debate:
## George Romero's *Dawn of the Dead*

Americana: The Journal of American Popular Culture (1900-present), Fall 2002, Volume 1, Issue 2
http://www.americanpopularculture.com/journal/articles/fall_2002/harper.htm

**Stephen Harper**

University of Glasgow

In George Romero's satirical film about consumerism, *Dawn of the Dead* (1978), an American shopping mall becomes the site of battles between the zombies who have overrun the country, four human "survivors" who exterminate the zombies and appropriate the mall for themselves, and a gang of marauding bikers which, in the movie's violent climax, seeks to take over the mall. These battles serve as a useful, if melodramatic metaphor for recent theoretical disputes over the nature and value of consumerism, disputes which remain of central importance among cultural critics of differing political persuasions. [1]. At the risk of crudely dichotomizing, these critics have tended to affiliate with one of two camps with respect to what might be called the "consumerism debate."

On one side of this debate, a host of unrepentantly Marxian critics have described the baleful impact of capitalist production on those whom it exploits and the depoliticizing effects of commodity fetishism on consumers. On the other side, postmodern ethnographers and sociologists have argued that consumerism empowers capitalist subjects by granting them a limited, but politically important space in which to live out utopian fantasies of autonomy. The exchanges between these camps are as frequent as they are ill-tempered: just when the "issue" of consumerism seems to be dead and buried, it rises zombie-like from the critical grave. A recent irascible polemic is James Twitchell's denunciation of the "melancholy Marxist" view of consumerism, complete with some scandalous *ad hominem* attacks on academics working in cultural studies. Recently, Western arguments about consumerism have even moved outside the confines of academia and into the realm of popular culture — witness the recent sparring in the British press between Germaine Greer and Nigella Lawson (see Lawson). This paper offers some observations on what might be called the "consumerism debate" based on a consideration of radical anti-consumerist elements in Romero's film.

before discussing this film, I would like to consider briefly one influential theoretical intervention in what I am calling the "consumerism debate." In *Reading the Popular*, John Fiske argues that while consumer "tactics" are never radical, they may be "liberating" to a certain extent. Moreover, he argues, following de Certeau and many others, that consumers should not be despised as the "cultural dupes" of capitalist producers; consumers are instead "secondary producers," finding value in their consumption and making use of capitalist products for their own ends. Fiske rightly reminds cultural critics that people should not be patronized as idiots who compliantly consume the images and products imposed on them by the dominant ideology; and he is surely correct that consumers may be temporarily empowered by the experience of shopping, a point well established by Angela McRobbie and others. But his well-practiced indignation about "cultural dupes" requires a caveat, for this injunction risks patronizing the "ordinary" people whose shopping habits Fiske aims to redeem. Few critics would dispute that an unacceptably dismissive view of consumers as "cultural dupes" has been presented (or at least implied) by radical critics from Adorno to Eagleton. It is important, however, to remember that many "ordinary" people actually sympathize with anti-consumerist views and feel empowered, rather than patronized, by their engagement with oppositional perspectives. Anti-consumerist —as well as consumerist — attitudes and activities can be a source of both pleasure and liberation.

As Raymond Williams famously observed, there is no such thing as "the masses," only ways of imagining people as masses. Of all of these ways, Romero's is surely among the most extraordinary. Zombies function in *Dawn of the Dead* as a *lumpenproletariat* of shifting significance, walking symbols of any oppressed social group. This function is derived in part from their origins in the literature and cinema of the twentieth century, in which zombies are synonymous with oppression and slavery. 2. Romero uses zombies because, as part of a maligned cinematic underclass, they suit his satirical purpose. Both *Dawn of the Dead* and its successor *Day of the Dead* (1985) present the human survivors of the zombie plague as literally and etymologically "living over" the zombies. In Romero's trilogy, Captain Rhodes — the sadistic army commander of *Day of the Dead* — expresses the strongest contempt for the undead, regarding them as a disposable and despicable underclass.

In *Dawn of the Dead*, the social abjection of the zombies is established in the film's remarkable second scene. Here, two of the film's central characters, Roger (Scott H. Reiniger) and Peter (Ken Foree), along with other members of a police SWAT team, storm a brownstone full of Puerto Ricans who have refused to exit their properties as ordered by the authorities. Despite the poverty of these people, one policeman bluntly adumbrates the film's theme of material insecurity and envy. "Shit man," he remarks as he impatiently waits to start shooting at their "nigger asses," "this is better than I got." However, any sympathy the audience may have for such reactionary sentiments is

dispelled when the SWAT team enters the zombie-infested building.

The SWAT scene is hardly mentioned in academic analyses of the movie and has even been dismissed as an unmotivated procrastination (Shumate). But it could be argued that the scene provides an interpretative context for the rest of the film. As well as introducing some hackneyed horror principles (the foul-mouthed policeman pays for his irascibility with his life), the scene invites the audience to consider zombiedom as a condition associated with both racial oppression and social abjection and, therefore, sanctions socio-political interpretations of the film as a whole.

It is difficult to comprehend the radical import of *Dawn of the Dead* without briefly considering the significance and history of its setting — the shopping mall. The dawn of the shopping mall age in the 1960s was met with widespread enthusiasm, and mass hysteria was even reported at several newly-opened malls (Morris 405). In recent decades, mall hysteria may be less common, but the shopping mall remains a cultural fascination in capitalist countries, while in cinema, malls have become a staple location for smart-ass American teen movies, like Amy Heckerling's *Clueless* (1995). It is easy to underestimate, therefore, the relative novelty, in 1978, of Romero's simple but inspired idea of setting *Dawn of the Dead* in a mall.

According to Meaghan Morris, one of the most exciting and attractive aspects of the shopping mall is the contrast between its massive structural stability and the constantly shifting composition of its population (394). In this sense, a mall is like a theatre or a stage: a space demanding action and transformation. Romero certainly recognized the dramatic potential of the mall, which may be regarded as both the epitome of corporate capitalism and — for the same reason — a potential site of resistance to the forces that regulate consumerism.

These regulatory forces were long ago examined by Gibian, who showed how designers try to discipline shoppers' routes through malls. But the disciplinary forces that construct malls are perpetually at risk from those who wish to cheat the system. And the bigger the malls, the more opportunities there are to subvert the agents of discipline. "The order of the system that builds and manages the shopping malls," writes John Fiske, "is consistently at risk of being turned into the disorder of those who use them, in a way that the small corner deli never was" (*Understanding* 43). The mall's subversive allure is clear in films like Kevin Smith's 1995 comedy *Mallrats* (1995), in which two teenage buddies outwit the managers and security staff of their local mall in order to win back their girlfriends. Such films attest to the sense in which shopping malls constitute the "system," whose disciplinary agents must be challenged, tricked, and overcome: the cinematic mall, it might be said, solicits not only the consumption of its goods, but also the subversion of its systems. Before returning to the work done on consumerism and

commodities in cultural studies, I wish first to discuss some of the elements that make *Dawn of the Dead* a radical (i.e. oppositional) anti-consumerist text.

In a manner that recalls John Fiske's writings on the ruses of mallgoers, Romero's survivors make use of various tactics to wrest control of the mall from the living dead. Having done so, the survivors create a shopping utopia for themselves, a place where they can temporarily ignore the threat of the zombies. In *Night of the Living Dead* (1968), the first of Romero's zombie films, the survivors receive no respite from the zombies. In both *Dawn* and *Day*, by contrast, Romero introduces some brief but significant utopian interludes. In *Day of the Dead*, for example, two of the male survivors take sanctuary in a cosy caravan, where they indulge in verbose and alcohol-fuelled philosophizing on the value of hedonism; like so many of Romero's characters, they are content to bury their heads in the sand and to ignore the chaos all around them. *Dawn of the Dead* also contains scenes of release and relaxation; however, these are far more dramatic than the caravan scene in *Day*. Once the survivors in *Dawn* have exterminated the zombies in the mall and secured the doors, they indulge in a carnivalesque parody of rampant consumerism. Their delight is heightened by their awareness that they have not retreated, like the survivors in *Day*, to a safe enclave, but have skilfully taken the entire mall from the zombies and driven them out. Thus, even as he lies dying after being bitten by a zombie, Roger is able to crow with delirious pathos: "we whipped them and we got it all." The same sentiment underpins the fury of Stephen (David Emge) when, at the end of the film, a gang of bikers invades the mall. "It's ours," he says coldly as he aims his rifle at the invaders, "we took it."

With the corpses of the exterminated zombies cleared away, the survivors indulge in a fantasy of purchase power. They "steal" money from the mall bank, cheekily posing for the security cameras; they take all the clothes and consumer goods they desire; they play video games; and in a marvellously frenetic scene, Stephen and Peter "tool up" in the mall's weapon shop with a vast array of guns. The music during these scenes is light, airy and released, inviting us to regard this as an ironic paradise. But however joyous and liberating these "shopping scenes" may be for the characters, Romero's script emphasizes the economic exclusivity of consumerism. Perhaps the most poetic instance occurs in the armoury scene, in which Peter aims an expensive rifle at a zombie's forehead. "Ain't it a crime," he remarks wryly to Stephen, "the only person who could ever miss with this gun would be the sucker with the bread to buy it." Interestingly, this comment is also a variation on the "cultural dupes" argument, this time *from below*, as it were (here it is the affluent middle classes, rather than the witless proletariat, which is mocked for its consumer credulity).

The most striking sequence among these scenes of frenzied consumer abandon is the "supermarket sweep," during which the men snatch whatever food and drink they desire.

In one shot, Stephen picks up a loaf only to be trumped by Peter, who produces an even bigger one. Both men laugh, implicitly recognizing an analogy of anatomical comparison. To regard this moment as a crude phallic interlude, however, is to overlook its mythical significance: comparing their "loaves" Peter and Stephen exploit the scatological licence traditionally granted to carnival revellers. Indeed, the film's scenes of carnival license are among its principle attractions, and they appear to have a particular resonance for the film's audience. To draw a very long parallel, these scenes constitute a reworking of the medieval legend of the Land of Cockayne, an allegory of human sloth and greed in an Edenic land of plenty. The Land of Cockayne legend was a popular utopian fantasy of a prelapsarian world in which every luxury is at hand and in which work is not required.3.

Romero's satirical depiction of instant and celebratory gratification is consistent both with classical European images of luxury and with modernist denunciations of the restlessly acquisitive postmodern *zeitgeist*, such as Christopher Lasch's melancholic *Culture of Narcissism* (1979). Of the film's characters, however, only Fran (Gaylen Ross) voices the film's moral insight. Accusing the men of being hypnotized by the mall, she tells Stephen: "It's so bright and neatly wrapped you don't see that it's a prison too." Fran is expressing, albeit rather preachily, Romero's own perspective: far from endorsing consumerism, she highlights the tendency of human beings to become cultural dupes. In this sense, the "fool's paradise" of the mall is a pretext for a classical humanist condemnation of visceral indulgence.

Romero's film also mobilizes classical images of female false consciousness which, while undoubtedly radical, are problematic from the perspective of postmodern feminism. In his article about Romero and feminism, Barry Keith Grant has less to say about Fran than any other Romero heroines, but she is in many ways the most complex and intriguing female figure. The Barbra (Judith O'Dea) of *Night of the Living Dead* is quickly reduced to helpless catatonia; on the other hand, Sarah (Lori Cardille), in *Day*, is a consistently stronger character than Fran, as is Barbara (Patricia Tallman) in the brilliant feminist remake of *Night*. Grant does, however, note that Fran is presented as a professional. Although this point is not discussed further, there are grounds to support this assertion. Fran helps the men to defend the mall; she also takes responsibility for herself and others, asking Stephen (presciently, as it turns out) to teach her how to fly the chopper lest anything should befall him. These qualities identify her as a spiky feminist heroine. "I'd have made you all coffee and breakfast," she tells the men ironically when they first arrive at the mall, "but I don't have my pots and pans."

Later in the film, however, Fran's feminist resolution is worn down. Bewitched by the hypnotic magic of the mall, she increasingly falls into stereotypically feminine patterns of behavior. In a particularly striking scene, Fran pampers and perfumes herself in front of a mirror, in the classic tradition of nineteenth-century fiction or twentieth-century film.

Various techniques are used in this mirror scene to signal that Fran now identifies with her own glamorous reflection. As she applies her lipstick, she adopts the vacant gaze of the stereotypical female consumer who sees in the department store dummy an image of her objectified, commodified self. Fran becomes a human zombie, no more alive than the conspicuous mannequin heads on which the camera mockingly alights in a series of objective shots. As she makes herself up, she absent-mindedly toys with a pistol, indicating her implication in the film's system of commodity fetishism. In short, despite her own earlier warnings to the men, Fran becomes a cultural dummy.

Although it is fleeting, Fran's narcissism attests to the zombifying power of commodity fetishism on even the liveliest characters. In this sense, *Dawn of the Dead* may be seen as a modernist critique of the alienating effects of the consumption-led, post-Fordist society which, according to many commentators, developed throughout the 1970s (for a sceptical survey of views on post-Fordism see Callinicos, 132-144). In no sense does Romero regard Fran's absorption in fashion and image as liberating. On the contrary, Fran's increasingly lifeless behavior contrasts starkly with her spirited feminist attitude earlier in the film. It comes as no surprise when, in the very next scene, we see Fran in a domestic role, preparing a meal for Peter and Stephen in what appears to be an incongruous yet perfect recreation of a bourgeois living room. Despite her earlier feminist quip, Fran finds her way to the pots and pans after all. Consumerism alone, Romero implies, will not liberate women from their traditional subordinate roles.

Romero is not merely interested, however, in decrying commodity fetishism as spiritually deadening or politically inert; on the contrary, he stubbornly returns to the theme of exploitation. Towards the film's end, we are reminded of the exploitation that enables consumerism when one of the invading bikers (Tom Savini) calls the black survivor, Peter, "chocolate man." This racial insult is casual, but within the context of a film about consumerism, it is very resonant, as it identifies Peter with one of consumer society's most throwaway goods (it is no accident that, while Peter's priorities on arrival at the mall are to obtain "the stuff we need: television and a radio," the more frivolous Roger opts for two rather less vital commodities: watches and chocolate). More importantly, the "chocolate man" insult sharpens the film's focus on the economic origins, as well as the social effects of consumerism, since the production of chocolate depends on the exploitation of black labor. (In this connection, it is interesting to note that Peter is the only character in the film whose own production is foregrounded by Romero. While the backgrounds of the white characters are never mentioned, we learn that Peter has a Trinidadian grandfather and two brothers, who conform to the black stereotypes of professional basketball player and prisoner).

In both *Dawn of the Dead* and its sequel, a single phrase governs the film's concern with identification and difference: "they're us." This phrase — which oscillates suggestively

between oxymoron and tautology— functions as a kind of shorthand for the troubled relations between human beings and zombies. The paradox posed by the zombies' human/inhuman condition is expressed in Roger's terrified, half-human face when he "returns" from the dead. It is also present when, having secured and "cleaned up" the mall, the survivors stand staring down at the zombies outside as they vainly claw at the glass doors. In this brilliantly conceived scene, it is Peter who makes the chillingly simple observation "they're us." Fran gives a slight shiver and pulls up the collar of her expensive fur coat (an apparently unnecessary garment under the air-conditioned circumstances), indicating that while guns constitute an effective defense from the enemy, consumer goods provide the psychological protection against any pricks of conscience. The scene dramatizes, perhaps better than any other scene in contemporary cinema, the senses in which consumers become guiltily aware not only of their own pleasures, but of the social costs of consumerism. Clearly, Romero's take on consumer society constitutes a humanist, radical, and one might say Adornian critique of racism, sexism and exploitation. As Tania Modleski writes, in many horror movies "the attack on contemporary life strikingly recapitulates the very terms adopted by many culture critics" ("The Terror" 288) and Romero himself has even been described as a "radical critic of American culture" (Shaviro 82).

Before comparing Romero's modernist critique of capitalism with some cultural studies writings on the subject, I wish briefly to discuss the reception of the film. The typical audience response to the film is, to say the least, enthusiastic. Modleski notes that in the years after its release, *Dawn* became "a midnight favorite at shopping malls all over the United States" and surmises that the movie-going consumers were "revelling in the demise of the very culture they appear most enthusiastically to support" ("The Terror" 290). Perhaps this explains why the film was one of the biggest grossing horror movies at the box office. Whatever the case, the film's transformation of the mall's rational, quotidian environment into a Dionysian orgy of violent indulgence has a deep attraction for its American consumers. The power of this aspect of the film derives from its relevance to the everyday activities of its viewers. As Virginia Nightingale reminds us: "audience is distinctively inflected by the nature and cultural significance of the interaction between audience activities and textual character" (105). This interaction seems to be particularly dynamic in the case of *Dawn of the Dead*: one North American fan related to me how, after viewing late-night showings of the film in a shopping center, he and other members of the audience used to roam through the deserted mall, imagining scenes from the film.

The audience reaction to this film suggests that people can have an ambiguous relationship with consumer culture. Indeed, the experience of viewing *Dawn* has even prompted some to question their consuming habits for the first time. Another fan of the film relates how he overheard a woman commenting to her friend in a New York City

mall: "Oh, my god! Look! It's just like *Dawn of the Dead*! All of these shoppers look like zombies walking about the place!" "She seemed shocked", commented the fan. "It was as if a light had just been turned on, illuminating an aspect of her life never considered" (cited in England). From this piece of "fan" evidence, it is clear that the film has prompted at least one shopper to reconsider her relationship to consumerism. Clearly, the experience of shopping which "ordinary" people supposedly find liberating can also contain a degree of uneasiness. Certainly, it appears that the "happy shoppers" thesis is overgeneralized, as it fails to account for the contradictions which consumers find in their own habits. Cultural theorists need to recognize that radical views about consumerism are not restricted to a coterie of superannuated Marxian critics, but are inscribed within the quotidian experiences of consumers.

I would like to conclude by returning to the dispute about consumerism between the radical and the postmodernist camps of cultural studies outlined at the beginning of this paper. One often-advanced complaint is that critics in the Frankfurt School tradition tend to treat the consuming public as "witless and uncritical." This is an important and, in many cases, justified point (the conception of consumers as feckless dupes is plainly wrongheaded), but it would also appear to be something of a straw man. Most radical critics do not argue that people are simply cultural dummies, but that consumerism is both morally perilous to those who can afford to buy into it and economically exclusive to those who cannot. These two points — which even the film's audience seems perfectly capable of grasping — are made consistently in *Dawn of the Dead*.

It is among the easier tasks of cultural criticism to berate the Marxist fathers of cultural studies for their benighted refusal to concede any liberating potential to consumer practices. In her article "Things to Do with Shopping Centres," Meaghan Morris lightly mocks radical critics' portentous denunciations of commodity fetishism. She selects the following passage from Terry Eagleton for particular scorn:

> The commodity disports itself with all comers without its halo slipping, promises permanent possession to everyone in the market without abandoning its secretive isolation. Serializing its consumers, it nevertheless makes intimate *ad hominem* address to each. (qtd. in Morris 27)

Eagleton's remarks about the dangerous seductiveness of commodities, which are heavily indebted to the apocalyptic rhetoric of the Frankfurt school as well as to a dangerously normative narrative of fallen humanity, are clearly consistent with what A. C. Grayling has called the "sociological orthodoxy" which views consumerism as oppression of the consumer. For Morris, however, such a view is unduly pessimistic and anti-feminist. For her, Eagleton presents an overgeneralized account of the allure of the

commodity:

> What is the sound of an intimate *ad hominem* address from a
> raincoat at Big W? Where is the secretive isolation of the thongs
> in a pile at Super-K? The commodities in a discount house boast
> no halo, no aura. (Morris 408)

In contrast, Morris aims "to make it more difficult for 'radical' culture critics to fall back quite so comfortably on the classic image of European bourgeois luxury to articulate theories of … economic exchange" (408). For Morris, the radical critique of consumerism is itself a Eurocentric luxury, patronizingly aloof from the quotidian concerns of consumers, and women shoppers in particular.

Morris's postmodernist writings on consumerism are clearly at odds with the essentially modernist critique of capitalism and consumerism mounted by Romero (what could be more "classic" or more benightedly "European" than the legend of the Land of Cockayne, on which *Dawn's* satirical sting depends). This poses some difficult questions for the cultural critic. Which critique of consumerism is the more satisfactory—Morris's or Romero's? And to what extent can filmmakers supplement the sociological and cultural conclusions of academic criticism about consumerism?

As implied in my comments above, one of the many strengths of Morris's article is its emphasis on the diversity of shopping malls. It is not sufficient, she argues, to generalize about shopping centers: one must examine their specificities and the diversity of those who visit malls. One must also acknowledge, she argues, the importance of each mall's precise geographical location in the life of the individual shopper. The importance of place in the experience of shopping is explicitly acknowledged in *Dawn of the Dead* when Peter explains to Stephen that the zombies are continuing to clamour outside the mall because they feel a residual connection with the place: "It's not us they're after, it's the place. They remember that they want to be here." Romero even differentiates his zombies in this film to a certain extent by clothing type and occupation. Nevertheless, despite the film's postmodern awareness of individual differences, it might still be argued that *Dawn* bases its politics on hackneyed or stereotypical images of decadence and luxuriance from a dead European tradition. In Romero's defence, it might be said that the dramatic exigencies of cinematic narrative rarely permit sociological completeness; Romero's film, one might say, selects only the worst elements of consumerism for critique and should not be taken as a generalizing statement. But far more importantly (in my view), Romero's critique contains an important element that Morris's analysis does not: namely, a concern with exploitation (of women, of black labour and, by metaphorical extrapolation, of the "masses" symbolized by the zombie throng). Put simply, Romero's critique of consumerism, "Eurocentric" as it may be, contains an ethical concern with exclusion that is absent not only from Morris's work, but also from the writings of the

growing number of journalists who have pitched into the consumerism debate in recent years, in Britain as well as America (see Lawson, Twitchell, and Brooks). These commentators illustrate all too well Marx's argument in the first volume of *Capital* that, under capitalist conditions, the productive origins of commodities are easily forgotten. Marx's insight is still relevant to the field of cultural studies as a whole. Judith Williamson long ago expressed concern about the undue concentration of several strands of cultural studies on the consumptionist perspective—a point elaborated most forcefully and eloquently by Jim McGuigan and Angela McRobbie. *Dawn of the Dead* contains a symbolic corrective to this critical tendency to focus on "consuming passions" at the expense of critical considerations of production.

Another reason for exercising caution in this regard is that oppositional views about consumerism may be far more widespread among both artists and audiences today than postmodern theory has hitherto been prepared to admit. If cultural studies is serious about identifying the politically progressive aspects of consumerism (and I agree that it ought to be), it must acknowledge that radical views about consumerism circulate not only among academic Marxists but also among radical artists.4. Cultural studies should also recognize that the oppositional views of consumerism contained in films can and do affect at least some "ordinary" people outside Europe, like the woman in the New York shopping mall. Although further audience research needs to be done, some moviegoers, it appears, are fascinated by the oppositional perspectives on consumerism that Romero's powerful images afford; this might explain why the film was one of the biggest ever grossing horror movies at the American box office. While I share Tania Modleski's concern that ethnographic studies of subcultural audiences might foster a dangerous "collusion between mass culture critics and consumer society," it would certainly be interesting to discover the extent to which other films that are critical of consumer culture—such as David Byrne's *True Stories*—inform audiences' opinions about consumerism (Modleski, *Studies* xii).

Eagleton's comments about commodity fetishism might be, as Morris says, "comfortable"; but they are no more comfortable than many of the more uncritical celebrations of consumerism. In any case, it is beyond the scope of this short paper to draw conclusions about the extent to which consumerism ought to be celebrated for its liberating possibilities or lamented for its baleful effects. This is a question that has been successfully addressed by sociology and cultural studies; but it is one that is seldom considered by film (or indeed literary) critics. The study of anti-consumerist texts and their audiences might contribute to a richer understanding of people's relation to consumerism than sociology alone can provide.

---

# Notes

driven wheel, consumerism in this sense means primarily of the system of values surrounding public, rather than private or domestic, consumption.

**click here to return to your place in the article**

2. In the absurd 1991 made-for-cable movie *Cast a Deadly Spell*, for example, zombies are imported from Haiti by housing developers to assist with home-construction projects; they arrive in crates like so many white goods and carry a guarantee for six-months, after which they collapse and disintegrate (Marcus 25).

**click here to return to your place in the article**

3. In Western visual culture, the most eminent representation of the legend is Pieter Brueghel the Elder's oil painting of 1567, which depicts three bloated men asleep after indulging in a feast. In this land, all desires can be instantly gratified, obviating the postlapsarian requirement for human toil. Around Brueghel's sleeping men, a pig walks with a knife attached to it, while a duck presents its head on a silver platter, patiently waiting to be killed; such details make the painting a grotesque but comic satire upon gluttony. The *Time Out Film Guide's* description of *Dawn* as a "Bosch-like vision of a society consumed by its own appetites" also contributes (*Time Out Film Guide*).

**click here to return to your place in the article**

4. In a recent magazine article Chuck Palahniuk, author of the anti-consumerist film *Fight Club*, complains in true Adornian style that "shopping has replaced adventure" and has become a "substitute for a real… experience of life" (Hicklin 7).

**click here to return to your place in the article**

---

# Works Cited

Brooks, Libby. "Buy, buy, baby." *The Guardian.* 9 July 2001.

Callinicos, Alex. *Against Postmodernism: A Marxist Critique.* Cambridge: Polity Press, 1989.

*Cast a Deadly Spell.* Dir. Martin Campbell. Perf. Fred Ward and Juliane Moore. HBO and Pacific Western, 1991.

*Clueless* . Dir. Amy Heckerling. Perf. Alicia Silverstone and Paul Rudd. Paramount, 1995.

*Dawn of the Dead.* Dir. George Romero. Perf. David Emge and Ken Foree. Laurel, 1978.

*Day of the Dead.* Dir. George Romero. Perf. Lori Cardille and Tony Alexander. Dead Films Inc. and Laurel, 1985.

de Certeau, Michel. *The Practice of Everyday Life.* Berkeley: U of California P, 1984.

Eagleton, Terry. *Walter Benjamin, or Towards a Revolutionary Criticism.* London: Verso, 1981.

England, Norman C. *The Zombie Farm.* http://www2.gol.com/users/ noman/reflect.htm.

*Fight Club.* Dir. David Fincher. Perf. Edward Norton and Brad Pitt. Art Linson, Fox, Regency, and Taurus, 1999.

Fiske, John. *Reading the Popular.* London and New York: Routledge, 1989.

———. *Understanding Popular Culture.* London and New York: Routledge, 1989.

Gibian, P. "The Art of Being Off Center: Shopping Center Spaces and Spectacles." *Tabloid* 5 (1981): 44-64.

Grant, Barry Keith. "Taking Back The (*Night of the Living Dead*: George Romero, Feminism and the Horror Film." *Wide Angle* 14.1 (1990): 64-76.

Grayling, A. C. "The Last Word on Consumerism." *The Guardian.* 6 January 2001.

Hicklin, Aaron. "The Outsider" [Interview with Chuck Palahniuk]. *Sunday Herald Magazine.* 8 August 2001.

Lasch, Christopher. *The Culture of Narcissism.* London: [n.p.], 1979.

Lawson, Nigella. "It's OK to Love Shopping." *The Observer.* 23 July 2000.

*Mallrats* . Dir. Kevin Smith and Scott Mosier. Perf. Jeremy London and Jason Lee. Alphaville, Universal, and View Askew, 1995.

McGuigan, Jim. "Trajectories of Cultural Populism." *Cultural Theory and Popular Culture.* Ed John Storey. Harlow: Pearson Education, 1998. 587-599.

Marcus, Greil. *The Dustbin of History.* London: Picador, 1997.

McRobbie, Angela. "'Bridging the Gap': Feminism, Fashion and Consumption." *Feminist Review* 55: 73-89.

Modleski, Tania. *Studies in Entertainment.* Bloomington and Indianapolis: Indiana U P, 1986.

———. "The Terror of Pleasure: The Contemporary Horror Film and Postmodern Theory." *The Horror Reader.* Ed. Ken Gelder. London: Routledge, 2000. 285-293.

Morris, Meaghan. "Things to Do with Shopping Centres." *The Cultural Studies Reader.* Ed. Simon During. London: Routledge, 1995. 391-409.

*Night of the Living Dead.* Dir. George Romero. Perf. Duane Jones and Judith O'Dea. Image Ten and Laurel, 1968.

Nightingale, Virginia. *Studying Audiences: The Shock of the Real.* London: Routledge, 1996.

Shaviro, Steven. *The Cinematic Body.* Minneapolis: University of Minnesota Press, 1993.

Shumate, Nathan. *Dawn of the Dead* [review]. Cold Fusion. http://www.rottentomatoes.com.

*Time Out Film Guide.* Ed. John Pym. Harmondsworth: Penguin, 1999.

Twitchell, James B. "In Praise of Consumerism." *Reason.* August 2000.

Williamson, Judith. *Consuming Passions: The Dynamics of Popular Culture.* London: Marion Boyars, 1986.

**Back to Top**

© 2002 Americana: The Institute for the Study of American Popular Culture
AmericanPopularCulture.com

# EXHIBIT N

**LA WEEKLY**
FILM/TV



**SUMMER FUN** QUIZ

Click to Play

Search

NEWS • CALENDAR • FILM+TV • MUSIC • EAT+DRINK • STAGE • ART+BOOKS • LA VIDA • BLOGS • CLASSIFIEDS • DIGITAL • PROMOTIONS

PASS THE PADDLES

PRINT    E-MAIL    WRITE YOUR COMMENT

BE SOCIAL 

## THE ZOMBIE ZEITGEIST
*On the stump since 1968*
BY JOSHUAH BEARMAN
Monday, October 30, 2006 - 11:30 am



**You know the drill:** You wake up, and it's The Day. Outside, the neighbor's car is on fire; a truck careens through pedestrians into a wall and explodes; smoke rises in the distance; your bloody, disheveled daughter is eating the mailman's leg; and the inexorable zombie horde shuffles ever forward. So begins the rest of your (likely short) life.

Since 1968, when George Romero first caused a *Variety* reviewer to question the very future of a film industry that could produce *Night of the Living Dead*, a sanguinary rising tide of zombie culture has engulfed the land. In addition to the burgeoning film catalog, there are zombie books, zombie comics, zombie conventions, Rob Zombie, Inc., and, of course, a *Simpsons* episode in which Bart informs Lisa that the zombies prefer to be called "living impaired." There is even a growing movement of participatory fan-fueled performance-art "zombie walks" — BYOB (Bring Your Own Brains!) — where people don elaborately shredded clothing, powder themselves into a pall with makeup, add lots of blood, and spontaneously shamble together in public places. Just last month, the first such event in Los Angeles attracted an army of 200 undead, gleefully alarming tourists on Hollywood Boulevard.

The full-scale movement has been on the lurch since movies like *28 Days Later* (2002) took zombies mainstream for the first time, and was followed by near-simultaneous appearance of the *Dawn of the Dead* remake and the homage-comedy *Shaun of the Dead*. That paved the way for George Romero's first big studio release, *Land of the Dead*, a roaring comeback that garnered a standing ovation when his entrail-devouring cannibals finally debuted at Cannes in 2005. In the same year, a dozen zombie flicks made it to theaters, along with many more for the video market. Titles included: *Dorm of the Dead*, *Grindhouse*, *Last Rites of the Dead*, *Special Dead*, *Zombie University: Endgame*, and, of course, *Love in the Key of Z*. Mel Brooks' son, Max, is currently touring with his book, *World War Z: An Oral History of the Zombie War*, a "Studs Terkel approach" to zombie conflict that Brad Pitt's Plan B films is working on turning into a movie. I also hear that there's a *28 Weeks Later* in the works. Hell, a friend of mine was off in the New Mexico desert this summer filming his own zombie-comedy-Western — *Wanted: Undead or Alive*.

The zombie Zeitgeist has also infected video games, where walking corpses can finally be exploded and dismembered on demand in the comfort of your own home. *Zombies Ate My Neighbors* for the Sega Genesis was an early, but still pixelated, nod to Romero. Capcom's *Resident Evil* turned sci-fi zombies into a successful video-game franchise, and then licensed itself back into movies. Even *Half Life* and *Halo* amp up the action with zombie throngs. Capcom's latest effort, *Dead Rising*, is a return to the plot purity of Romero's *Dawn of the Dead*: us versus them in a shopping mall. *Dead Rising* also finally puts to good use the Xbox 360's next-generation processing power by rendering onscreen the inescapable dread posed by thousands of undead slowly trapping survivors inside the darkened mall.

It's a winning combination. *Dead Rising* was widely anticipated when previews appeared at E3, the video-game industry's annual trade show in L.A., and it has been flying off the shelves since arriving in early fall. An effectively bloody and addictive romp where "anything and everything is a weapon," the game is a macabre playground of zombie carnage. Yet, it's the limitations that give the game its juice. Instead of sci-fi backdrops and gnarly futuristic hardware, the combat is mostly low-tech, even hand-to-hand, always in close quarters. Fighting tooth and nail with everyday objects to keep yourself and fellow survivors alive calibrates the action to an instinctive, primal effect. And thereby recalls the visceral, claustrophobic anxiety of Romero-inspired cinematic nightmares, making *Dead Rising* the first video game to embrace the full potential of the Zombie Idea.

TOP VIEWED | **TOP COMMENTED** | FILM+TV

**CHRISTOPHER NOLAN'S *THE DARK KNIGHT*: BATMAN CONTINUES**
BY SCOTT FOUNDAS
Heath Ledger cements his legend playing nemesis to Christian Bale's Gotham City hero

**PARKS AND WRECK: L.A.'S FIGHT FOR PUBLIC GREEN SPACE**
BY MATTHEW FLEISCHER
In search of the Emerald City

**KATSU SUSHI: YOUR MOMENT OF ZEN**
BY JONATHAN GOLD
The art of simple sushi

**CIRCUS MAXIMALIST: MONIQUE KING'S NINE THIRTY AT THE W**
BY JONATHAN GOLD
Behind the velvet ropes of the Westwood W, chef's latest is all American generosity

**AMERICAN FLATBREAD: THE ANTI-STEAK OF CALIFORNIA'S CENTRAL COAST WINE COUNTRY**
BY JONATHAN GOLD
In the meat-intensive land of *Sideways* tourism, a fresh phenomenon in Los Alamos

"MOST POPULAR" TOOLS SPONSORED BY

PROJEKT REVOLUTION
VERIZON WIRELESS AMPHITHEATRE
AUGUST 10

• ADVERTISEMENT •



SNAP•KEYLINKS

BLOGS

**NIKKI FINKE'S DEADLINE HOLLYWOOD DAILY**
HOLLYWOOD 31 TO CHALLENGE SAG LEADERS
Wed, Jul 23, 3:45 pm

**LA DAILY**
FAREWELL SOPHIA PETRILLO
Wed, Jul 23, 11:53 am

**CATCH OF THE DAY**
WHEN LIFE HANDS YOU LEMONS
Tue, Jul 22, 9:24 pm

**PLAY**
FEIST, SHARON JONES, HOLLYWOOD BOWL, 7/20/2008
Tue, Jul 22, 3:14 pm

**STYLE COUNCIL**
MONDO DIABLO!: CODY'S CREEPY CUTS
Sun, Jul 20, 9:21 pm

SLIDESHOWS

ONLINE
LA WEEKLY SUMMER
CONCERT
2008 GUIDE

backpage.com

buy, sell, trade (3,663)
rentals (4,870)
jobs (3,824)

FREE CLASSIFIEDS
LOS ANGELES, CA

PLAN ACCORDINGLY.



561 KILLED

**That idea dates to first hints of human civilization.** In the irrigated marshes of the fertile crescent, the Sumerians charted the heavens, erected stepped pyramids, and pressed their styluses into clay to record the Epic of Gilgamesh, a collection of myths that includes Ishtar threatening to knock down the Gates of the Netherworld and "let the dead go up to eat the living!" Every culture since has registered the same basic fear, from medieval Europe's revenants to Haiti's trodotoxinated *nzambi*, from which the word zombie originated.

But it's the lurid scenario of an infectious zombie pandemic that gives the modern genre its unique frisson. In 1954, Richard Matheson's novel *I Am Legend* told the story of a sole survivor in apocalyptic Los Angeles (where else?) who fights off bacterially-infected undead bloodsuckers at night while barricaded with limited supplies in his home. The perverse thrill in falling one rung on the food chain combined with the genuine fear of constantly being hunted by undead was a fundamentally terrifying concept that Romero and his followers have been building on ever since.

*Dead Rising* takes up the torch by making the raw struggle for survival interactive. The protagonist, Frank West, is a photojournalist, airlifted into Willamette to cover a mysterious outbreak that's causing the citizens to eat one another. Once Frank is dropped on the roof of the Willamette Mall, it's on; the zombie burn rush is constantly prowling for Frank and any survivors he can save. Or document: Like Robert Forster's cameraman from another politicized portrait of chaos born in 1968, *Medium Cool*, Frank is a detached war photographer, and a critical element of gameplay allows you to rack up points with your single-lens reflex, introducing a strange metaperspective where you can be torn between rescuing that poor woman and getting a well-composed shot of her gruesome demise.

Like Romero's *Dawn of the Dead*, *Dead Rising* juxtaposes the zombie multitudes with American shopping culture. In death as in life, consumption reigns. Using the "sandbox" style of gameplay pioneered by *Grand Theft Auto*, *Dead Rising* makes the metaphor meticulously explorable. Muzak still plays as you dodge hungry zombies to explore stores like Granma's Fanfare and Ned's Knicknackery for potential supplies and weapons. The food court is an important stop for sustenance. With every path blocked by undead, you have to grab what you can for defense, from planters to skateboards to bowling balls to the ever-favorite zombie killer, a chain saw from the hardware store. Learning how the improvised attack of each new item works is part of the dirty, feral fun. A showerhead planted in a zombie's head sprays blood like a fountain. A scythe in the garden allows you to catch a zombie around the neck, put your foot on its chest, and yank its head off for an extra few style points. Capitalizing on zombies' dim wits, you can plop a pail, orange traffic cone or stuffed-animal mask on their heads for comedic effect. Or take in a free shopping spree. I've had Frank run through zombie crowds in a summer dress, hot pants and crop top, and a tuxedo, all the while wearing that stuffed animal mask on his own head, alternately throwing pies in zombies' faces or slashing them clean in two with a souvenir battle-ax. As with *Dawn of the Dead*, the wild bloodbath of *Dead Rising* is strategically leavened by camp, except that now, both are endlessly customizable.

Why is this so satisfying? As in zombie flicks, the violence works because it's guilt-free. Slaughtering the undead isn't pathological; it feels more like God's work. And in *Dead Rising*, that slaughter is wholesale. I haven't played very long, and my zombie kill count, which racks up like pinball in the bottom-right corner, is already topping 3,000. And I haven't even found the submachine gun yet. Or the .50 cal. Or the sniper rifle.

Oh, and there's a plot, too, I guess — as absurd as one expects from a video game. There's Jessie, in a sexy peach business suit, and Brad, who looks and talks like Principal Blackman from *Strangers With Candy*, trying to find Dr. Barnaby and unlock the mystery. Standing in the way is Carlito, a villain who apparently moonlights with the Gipsy Kings, gallivanting amongst the zombies as he does with long, luxurious Latin-lover hair and a billowing white-collared shirt unbuttoned to his waist.

Whatever.

Besides being a ridiculous bore, *Dead Rising*'s story centers around discovering the mystery behind the zombie outbreak, a stinker by definition because, as true connoisseurs know, origins are irrelevant. As zombie culture widens and strays from its roots, a whole host of zombie provenances have been posited, including radiation, toxic chemicals, mutagenic gas and cosmic dust. No elaborate back story, however, rivals the simple, direct, and far scarier original explanation Romero provided, which is



**CANADIAN COBRASNAKE, 7/23/08**
Fence jumping, stage diving and Slurpee drinking north of the border



**HARD FESTIVAL, N*E*R*D, MSTRKRFT, AOKI, SHRINE, 7/21/2008**
Following up their downtown New Year's Eve party, HARD returns with their Summer Music Festival including A-Trak, Spack Rock and more

**FEIST, SHARON JONES & THE DAP-KINGS, HOLLYWOOD BOWL, 7/20/08**
Pacifika also performed at the evening full of indie-folk, soul and electro-flamenco

MORE SLIDESHOWS »

---

**MORE PASS THE PADDLES**

**AFTER THE RAPTURE**
BY JOSHUAH BEARMAN
Wed, Jan 3, 2007, 3:00 pm
Interactive spiritual warfare in *Left Behind: Eternal Forces*

**COLOSSAL**
BY JOSHUAH BEARMAN
Wed, Oct 18 2006, 3:00 pm
The mark of the Shadow, the future of gaming

**ATTENTION, BALL LICKERS!**
BY BRYAN GARDINER
Wed, Aug 30 2006, 12:00 pm
Gaming guides come of age

**THE WRATH OF PONG**
BY BRYAN GARDINER
Wed, May 17 2006, 3:00 pm
Putting down the Kalashnikov, picking up the Joola blade

**ARTSTATION 2**
BY JOSHUAH BEARMAN
Wed, Mar 8, 2006, 8:00 pm
Nic Kelman on games' higher aspirations

MORE PASS THE PADDLES »

---

**MORE BY JOSHUAH BEARMAN**

**MISTER LONELY, HARMONY KORINE'S WAY**
Wed, May 7, 4:55 pm
The director on flying nuns and his Mexican Michael Jackson

**GEEK LOVE**
Wed, Aug 15 2007, 12:00 pm
*Superbad* director Greg Mottola puts his own spin on the Judd Apatow school of emo-raunch filmmaking

**CATCH A WHALE**
Wed, Aug 8 2007, 12:00 pm
Finding your inner Ishmael

**CAMPING, BUT NOT REALLY**
Wed, Jul 18 2007, 3:00 pm
El Capitan Canyon — the great outdoors for pansies

**DAVID KLAWANS**
Wed, May 9 2007, 12:00 pm
Panning for Hollywood gold

MORE BY JOSHUAH BEARMAN »

---



**LA WEEKLY PROMOTIONS**

ONLINE LA WEEKLY SUMMER CONCERT GUIDE 2008

**SUMMER CONCERT GUIDE**
Find the hottest concerts and festivals this summer in the LA Weekly's Summer Concert Guide.

**OPPORTUNITY ROCKS CAREER FAIR**
Be the first to hear about the latest career opportunities. Click here to find your dream job!

---

  TICKETS

**tickex**
the ticket search engine

popular *TICKETS* in your area:
- Los Angeles Lakers
- Wicked
- Kanye West
- REM
- Los Angeles Dodgers
- The Cure
- Playboy Jazz Festival

win $500 in tickets!
Powered by
LA WEEKLY



VIRTUAL CAREER FAIR

THE LITTLE Sexy BLACK BOOK

LITTLE SEXY BLACK BOOK
Bring sexy back with LA Weekly's guide to the sexiest spots in Los Angeles.

**In proper hands, the zombie story** is less about zombies than the human survivors — a tool for social, psychological and economic commentary. Or even metaphysics, as eager academic interpreters with cultural-studies backgrounds and perhaps too much time on their hands have wondered about the implications of zombies on the philosophy of mind; if the body can walk as undead, the induction goes, perhaps the soul is a separate spirit from our material being.

Dunno if Romero is a Cartesian dualist, but there was certainly a broad political critique behind his original black protagonist who survives the night only to be killed by the roving white vigilantes. Ever since, we've been watching zombies act as a cultural lens, a means to measure human frailty under pressure.



Relive your favorite Evil Dead II moments with an axe, chainsaw or whatever you can find

As the undead converge, the humans often become petty, bloodthirsty and predatory, little better than the monsters outside. Romero's *Land of the Dead* has wealthy yuppies living in a fortified high-rise surrounded by a teeming slum of human peons on the edge of zombified terra incognita. In Max Brooks' *World War Z*, the postzombie world stabilizes after the outbreak through a massive apartheid system. Hey — drastic times mean drastic measures; or, as CJ, the vaguely bigoted asshole security guard from *Dawn of the Dead*, menacingly proclaims with gun in hand: "America always takes care of its shit."

But *Dead Rising* is a game; unlike in the movies, the system of choice allows as much self-sacrifice and redemption as you want. Frank need not be a heartless hack. Forget unraveling the mystery — a waste of time, anyhow — and be a hero instead. As with *Grand Theft Auto*, the missions aren't vital to *Dead Rising*. Instead of fucking around with Brad and Carlito, take on the greater task to scour the stores for humans, convince them to join you, and assemble the ragtag team of survivors befitting the zombie end times. You can even arm your crew, and then hack and shoot your way together to the next survivor — by far the most satisfying experience to be had in the Willamette Mall. Together, we proudly saved 32 people so far, some from the human psychopaths who lurk in the mall and use the disorder to prey on others. Then again, re-asserting a humanity on the brink is the hopeful opportunity at the heart of the Zombie Idea; because when the shit goes down, true survival isn't just staying alive, it's staying human.

---

**COMMENTS**                                                                 NO COMMENTS

*All reader comments are subject to our* <u>Terms of Use</u>. *By clicking Post Comment, you acknowledge that you have reviewed and agree to these Terms.*

Name

Email Address

Comment (required)

2hymv

Please enter the security code in this image into the field below.

Security Code

Post Comment

# EXHIBIT O

**United States District Court**
For the Northern District of California

1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9

10   BERENICE BRACKETT,

11            Plaintiff,                          No. C 08-02100 WHA

12      v.

13   HILTON HOTELS CORPORATION, a Delaware        **ORDER DENYING**
     corporation, HILTON SUPPLY MANAGEMENT,       **DEFENDANTS'**
14   INC., a Delaware corporation, KEVIN A.       **MOTION TO DISMISS**
     BARRY, an individual, KEVIN BARRY FINE       **OR TRANSFER FOR**
15   ART ASSOCIATES, a California corporation,    **IMPROPER VENUE**
     JOHN or JANE DOES 1–100, individuals of      **AND TO DISMISS**
16   presently unknown identity, and ABC          **COUNTS III AND IV**
     CORPORATIONS 1–300, corporations of
17   presently unknown identity,

18            Defendants.

19   _____/

20                          **INTRODUCTION**

21          In this copyright infringement action, defendants move to dismiss for improper venue

22   or to transfer the action to the Central District of California.  Defendants also move to dismiss

23   Counts III and IV of plaintiff's complaint, arguing that those state law claims are preempted by

24   federal copyright law.  For the reasons stated below, defendants' motion is **DENIED** in its

25   entirety.

26                           **STATEMENT**

27          Plaintiff is an artist who lives and works in Sonoma County.  Defendant Hilton Hotels

28   Corporation is an international company incorporated in Delaware that has its worldwide

United States District Court

For the Northern District of California

1  headquarters in Beverly Hills. Defendant Hilton Supply Management, Inc., is a Hilton

2  subsidiary also incorporated in Delaware and headquartered in Beverly Hills.

3  Defendant Kevin A. Barry is a Los Angeles-based art dealer. Defendant Kevin Barry Fine

4  Art Associates is a California corporation with its business address in Los Angeles.

5     In 2002 and 2003, plaintiff painted three original pastels entitled *Great Expectations*,

6  *Winter's Velvet*, and *Falling Into Place*. She registered all three of these paintings with the

7  U.S. Copyright Office, under registration numbers VA 1-627-549 (*Great Expectations*),

8  VA 1-627-551 (*Winter's Velvet*), and VA 1-627-553 (*Falling Into Place*).

9     In addition to her paintings, plaintiff sells limited-edition digital prints of her artwork,

10  known as "giclées." Plaintiff sells these prints in runs of no more than 150 copies, hand signs

11  each one, and makes a notation on the print of its order within the run.

12     According to plaintiff, two or more years ago, defendant Kevin Barry purchased one

13  giclée each of *Great Expectations*, *Winter's Velvet*, and *Falling Into Place* from ArtBrokers,

14  Inc., the Marin County-based art dealer that has exclusive rights to sell plaintiff's giclées.

15  Plaintiff claims that Mr. Barry was acting on behalf of his company, Kevin Barry Fine Art

16  Associates. The giclées were allegedly ordered, shipped, invoiced, and paid for in

17  Marin County (Opp. 3). These purchases were three of over eighty alleged transactions that

18  occurred between ArtBrokers and the Barry defendants beginning in May 2003 (*ibid.*).

19     When defendant Barry purchased plaintiff's giclées, he allegedly asked ArtBrokers

20  whether plaintiff might be interested in making bulk sales of her artwork to his company at a

21  price of $5.00 per print (*id*. at 4). Plaintiff says ArtBrokers turned down the offer, and

22  defendant Barry "was denied permission to make any purchases, sales, or displays of her art"

23  (Compl. ¶ 16).

24     Nonetheless, according to plaintiff, defendant Barry "with the knowledge and approval

25  of Hilton and the other defendants . . . made (or had made) large numbers of reproductions

26  of Ms. Brackett's works" (*id*. at ¶ 17). Plaintiff claims that defendant Barry sold at least

27  934 unauthorized copies of her paintings to Hilton Supply Management, and those prints

28  were then resold to Hilton's franchisees.

Plaintiff says she learned of this alleged copyright infringement when she saw her artwork on the website of Homewood Suites, a Hilton division that caters to extended-stay guests.  Copies of *Great Expectations*, *Winter's Velvet*, and *Falling Into Place* appeared in model rooms advertised on web pages directed at potential Homewood Suites franchisees.  Additionally, plaintiff claims that at least two of the paintings appeared on the web pages of individual Homewood Suites hotels as part of a "virtual tour" feature.  Plaintiff speculates that "hundreds or even thousands of unauthorized copies of [her] works are hanging in Homewood Suites hotel rooms across the United States" (*id*. at ¶ 19).

Plaintiff claims that defendants removed her name and the limited-edition print number from each of the prints before displaying them.  She also claims that defendants made subtle alterations to one or more of the works — for example, by transposing elements in the background of the painting (*id*. at ¶ 20).

On April 22, 2008, plaintiff filed this action in the Northern District, alleging claims under federal copyright law and California state law.  On May 13, 2008, defendants moved to dismiss the action for improper venue or, alternatively, to transfer the action to the Central District.  Defendants also moved to dismiss Counts III and IV of plaintiff's complaint, which allege state law tortious interference claims.

**ANALYSIS**

1.    **MOTION TO DISMISS OR TRANSFER FOR IMPROPER VENUE.**

Defendants argue that this action must be dismissed for improper venue or transferred to the Central District of California because the federal copyright venue statute, 28 U.S.C. 1400(a), requires that copyright infringement claims be brought in the district where defendants reside.  In the alternative, defendants request a discretionary transfer pursuant to 28 U.S.C. 1404(a).

A.    **Motion to Dismiss.**

Venue for copyright claims is governed by 28 U.S.C. 1400(a), which provides that a suit "may be instituted in the district in which the defendant or his agent resides or may be found."  At oral argument, defendants' counsel suggested that venue is proper only in the

United States District Court
For the Northern District of California

1  Central District because that is where plaintiff's paintings were allegedly copied and displayed.

2  The test for venue in a copyright infringement suit, however, is not whether the works were

3  copied and displayed in the forum.  Rather, the Ninth Circuit has interpreted Section 1400(a) to

4  mean that venue "is proper in any judicial district in which the defendant would be amenable to

5  personal jurisdiction if the district were a separate state."[1]  *Columbia Pictures Television v.*

6  *Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997) (overruled on other

7  grounds).  An analysis of defendants' motion to dismiss for improper venue thus requires an

8  analysis of personal jurisdiction.  Though personal jurisdiction is normally a statewide concept,

9  this order, following *Columbia Pictures*, will treat the Northern District as if it were its own

10  state for the purpose of establishing personal jurisdiction over defendants.  *Ibid*.

11  This portion of the order can consider facts outside the pleadings but must take

12  plaintiff's version of the facts as true where that version is not directly controverted.  *Doe* v.

13  *Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  Because defendants' motion is based on

14  written materials, plaintiff need only make a prima facie showing of personal jurisdiction.

15  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

16  Personal jurisdiction can be either general or specific.  Specific jurisdiction exists

17  when a suit arises out of or is related to the defendant's contacts with the forum.

18  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984).

19  General jurisdiction refers to the authority of the court to exercise jurisdiction even where the

20  cause of action is unrelated to the defendant's contacts with the forum.  *Id*. at 414 n.9.

21  _____

22  [1]  Plaintiff argues that the Ninth Circuit meant for this test to apply only to non-resident corporations and, given that defendants are all residents of California, venue is automatically proper in this district.  She cites

23  the legislative history of the general venue statute, 28 U.S.C. 1391(c), as well as decisions from the Federal Circuit and the Northern District analogizing the patent and copyright venue provisions to Section 1391(c).

24  *See V.E. Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1575–84 (finding Section 1391(c) applicable to venue determinations under Section 1400(b) in a patent case); *Autodesk, Inc. v. R.K. Mace Eng'g*,

25  2004 WL 603382, at *9 (N.D. Cal. 2004) (Walker, J.) (holding that Section 1400(a) should be read in light of 1391(c)).  In *Goldberg v. Cameron*, however, this Court held that venue in copyright suits is governed not by

26  Section 1391(c) but by Section 1400(a), making clear that the two provisions are distinct.  482 F. Supp. 2d 1136, 1143 (N.D. Cal. 2007) (Whyte, J.).  The *Goldberg* defendants (though individuals, not corporations) were

27  residents of Los Angeles, and Judge Whyte nonetheless applied the *Columbia Pictures* test to determine whether venue was proper in the Northern District.  The caselaw on this issue is thus mixed.  Because this order

28  finds that personal jurisdiction exists over defendants in the Northern District, it need not reach the question of whether a corporation that is incorporated, licensed to do business, or headquartered in this state should automatically be subject to venue in any district of the state under Section 1400(a).

Plaintiff argues that the Northern District, if it were a separate state, would have both general and specific jurisdiction over defendants. Defendants argue the opposite.[2] This order finds that plaintiff has established a prima facie case of specific jurisdiction with respect to the Barry defendants and a prima facie case of general jurisdiction with respect to the Hilton defendants.

### *(1)     Specific Jurisdiction.*

For a court to exercise specific jurisdiction over a nonresident defendant, the following requirements must be met:

> (1)     The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; *or* perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2)     the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3)     the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. Again, while the forum in question would normally be the state, this order must analyze specific jurisdiction in the Northern District for the purpose of establishing venue under the Copyright Act. *Columbia Pictures*, 106 F.3d at 289. Plaintiff carries the burden of establishing specific jurisdiction and has met that burden with respect to defendants Kevin Barry and Kevin Barry Fine Art Associates.[3]

---

[2] Defendants argue in part that this action should be dismissed because plaintiff cited 28 U.S.C. 1391(b)(2), the venue statute applicable to her state-law claims, in her complaint but did not cite 28 U.S.C. 1400(a), which applies to her copyright claims. Given that plaintiff was not required to plead venue at all in her complaint, her omission is not fatal. *See* Fed. R. Civ. P. 8(a); *Dudash v. Varnell Struck & Assoc., Inc.*, 2004 WL 2623903, at *4 (N.D. Cal. 2004) (Patel, J.).

[3] Plaintiff argues that specific jurisdiction also exists with respect to the Hilton defendants because they directed their business toward the Northern District by displaying images on their website of hotel rooms with plaintiff's paintings on the walls. Those images, plaintiff claims, were both viewable and viewed by consumers in this district. Because this order finds that general jurisdiction exists over the Hilton defendants, it need not address whether the Hilton defendants' website advertising constitutes purposeful direction.

United States District Court

For the Northern District of California

### (a)     Purposeful direction.

To establish venue in the Northern District, plaintiff must first demonstrate that defendants purposefully availed themselves of the privilege of doing business in this district or purposefully directed their activities toward the district.  The Ninth Circuit has noted that purposeful availment and purposeful direction are distinct concepts and that purposeful direction is the proper analysis to apply in a tort suit.  *Ibid.*  Because copyright infringement claims sound in tort, a purposeful direction analysis is appropriate here.  *See Brayton Purcell LLP v. Recordon & Recordon*, 361 F. Supp. 2d 1135, 1140 (N.D. Cal. 2005) (Chen, J.).

Purposeful direction is analyzed under a three-part "effects" test, which "requires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Schwarzenegger*, 374 F.3d at 803.

*First*, plaintiff must allege an intentional act on the part of defendants.  This prong of the effects test is met.  Plaintiff has alleged that Kevin Barry, acting on behalf of Kevin Barry Fine Art Associates, selected and purchased her prints and intentionally copied them knowing that they were covered by a copyright.  Plainly, these are allegations of intentional acts.

*Second*, plaintiff must show that defendants' intentional acts were expressly aimed at the forum.  Plaintiff has alleged that defendants purposefully directed their activities toward the Northern District "by browsing and selecting from the art collection of Ms. Brackett's Marin County art dealer, including through in-person visits; by placing orders in Martin County for Ms. Brackett's artwork; and by purchasing and paying for the artwork there" (Opp. 12). Plaintiff cites *Columbia Pictures* for the proposition that the effects test is satisfied where a plaintiff alleges willful infringement against a defendant who knew that the copyright was owned in the forum district.  106 F.3d at 289.  Defendants argue that *Columbia Pictures* does not mandate a finding of specific jurisdiction because in that case the defendant knew that the plaintiff had its principal place of business within the district, whereas defendants here did not know that plaintiff was based in the Northern District, even if they knew that her art broker was.

6

It is true that plaintiff has provided no evidence that defendants knew that she resided in the Northern District. For the purpose of this motion to dismiss, however, it is sufficient that plaintiff has alleged that defendant Barry knew that her art dealer was based in this district. Mr. Barry's intentional act of purchasing plaintiff's prints was expressly aimed at this district; indeed, this was the only district in which he *could* have purchased the prints given that plaintiff sells her giclées exclusively through ArtBrokers. Plaintiff need only make a prima facie showing of jurisdiction, and she has satisfied the second prong of the effects test.

*Third*, defendants' act must have caused harm that defendants knew would likely be suffered in the forum. At the very least, there is evidence that defendant Barry knew that ArtBrokers was based in this district, and he knew or should have known that ArtBrokers would likely suffer some harm from his alleged infringement. This prong of the test is thus met even if defendant Barry truly did not know that plaintiff resided in the Northern District. The goal of the effects test is to establish jurisdiction where the effects of a defendant's contacts are felt in the forum. *See Calder v. Jones*, 465 U.S. 783 (1984). Such is the case here.

### (b)    Defendants' forum-related activities.

Next, plaintiff must show that her claim arises out of or relates to defendants' activities in the Northern District. This requires a showing of 'but for' causation — plaintiff must demonstrate that she would not have been injured but for defendants' conduct directed toward her in the forum. *Ziegler v. Indian River County*, 64 F.3d 470, 474 (9th Cir. 1995). Plaintiff has met her burden. The Barry defendants' acquisition of plaintiff's copyrighted artwork from this district was the 'but for' cause of plaintiff's alleged injury.

### (c)    Fair play and substantial justice.

Finally, where a plaintiff has satisfied the first two prongs of the specific jurisdiction test, "the burden then shifts to the defendant to present a compelling case that the exercise of jurisdiction would not be reasonable." *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397 (9th Cir. 1986). Reasonableness is assessed by weighing:

1.    The extent of the defendant's purposeful injection into the forum;

2.    The defendant's burdens from litigating in the forum;

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

3.    The extent of conflict with the sovereignty of the defendant's state;

4.    The forum state's interest in adjudicating the dispute;

5.    The most efficient judicial resolution of the controversy;

6.    The importance of the forum to the plaintiff's interest in convenient and effective relief; and

7.    The existence of an alternative forum.

*Ziegler*, 64 F.3d at 475–76.

Defendants have failed to present a compelling case that the exercise of jurisdiction would be unreasonable here. Most notably, they have failed to demonstrate that the burden to them of litigating in the Northern District outweighs the general presumption in favor of plaintiff's choice of forum. Relevant discovery materials will likely be found in both districts, and there is no sovereignty conflict where the choice is between two district courts of the same state. Furthermore, the Northern District has an interest in adjudicating the copyright infringement claims of its residents. The exercise of specific jurisdiction over the Barry defendants comports with fair play and substantial justice.[4]

### *(2)    General Jurisdiction.*

General jurisdiction refers to a district court's power to exercise jurisdiction over a defendant who has "substantial" or "continuous and systematic" contacts with the forum, regardless of whether the action is related to those contacts. *Helicopteros*, 466 U.S. at 415. The defendant's contacts must "be of the sort that approximate physical presence." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000). Relevant factors are "whether the defendant makes sales, solicits or engages in business in the state, serves the state's

---

[4] Plaintiff argues that each defendant in this case acted as the agent of the other and thus that if specific jurisdiction exists with respect to the Barry defendants, it exists with respect to the Hilton defendants as well. It is true that 28 U.S.C. 1400(a) specifies that venue lies where a defendant *or his agent* may be found. To satisfy the agency test, however, "the plaintiff must make a prima facie showing that the subsidiary represents the parent corporation by performing services sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the [parent] corporation . . . would undertake to perform substantially similar services." *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003). Plaintiff has not made such a showing and thus cannot rest her argument for jurisdiction over the Hilton defendants on a conclusory allegation that the Barry defendants acted as Hilton's agents.

8

**United States District Court**
For the Northern District of California

1    markets, designates an agent for service of process, holds a license, or is incorporated there."

2    *Ibid*.  While general jurisdiction like specific jurisdiction would normally exist statewide if at

3    all, the Ninth Circuit's interpretation of Section 1400(a) mandates that this order treat the

4    Northern District as its own state for the purpose of analyzing jurisdiction (and thus venue).

5    *Columbia Pictures*, 106 F.3d at 289.

6          Plaintiff has alleged that "the Hilton defendants own, franchise, or manage over fifty

7    hotels in this district" (Opp. 15).  Both defendants are licensed to do business throughout the

8    state of California including in the Northern District (Bernstein Decl. Exh. A).  Defendant Hilton

9    Hotels Corporation provides a variety of services in this district, including renting out thousands

10   of hotel rooms, conference rooms, meeting rooms and offices, and providing spa services and

11   dining facilities (*ibid*.).  Defendant Hilton Supply Management "acts as the purchasing arm of

12   Hilton Hotels, buying the supplies (including artwork) that are then used to furnish Hilton's

13   Hotels" (*id*. at 15–16).

14         Defendants cite *Helicopteros* for the proposition that Hilton Supply Management's

15   contacts are insufficient to support general jurisdiction.  466 U.S. at 413.  In *Helicopteros*,

16   however, the defendant was a foreign corporation based in Colombia, and the Court emphasized

17   the fact that the defendant had no place of business in the forum, nor was it licensed to do

18   business there.  *Id*. at 416.  Hilton Supply Management on the other hand is licensed to do

19   business in the Northern District, and plaintiff has provided evidence that it does conduct such

20   business in this district.

21         Defendants do not controvert plaintiff's claims that Hilton Supply Management acts as

22   the purchasing arm for Hilton Hotels Corporation, which operates thousands of hotel rooms

23   throughout the Northern District.  Plaintiff's allegations thus constitute a prima facie showing

24   that Hilton Hotels Corporation and Hilton Supply Management have minimum contacts with this

25   district "such that the maintenance of the suit does not offend traditional notions of fair play and

26   substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

27

28

**United States District Court**
For the Northern District of California

## B.    Motion to Transfer.

Next, defendants argue that this Court should exercise its discretion under 28 U.S.C. 1404(a) to transfer the action "[f]or the convenience of parties and witnesses [or] in the interest of justice." The purpose of Section 1404(a) is "to prevent the waste of time, energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964 ). In assessing a motion to transfer for convenience, the court considers both public factors which go to the interests of justice and private factors, which go to the convenience of the parties and witnesses. *Ibid*.

### *(1)    Private interest factors*.

Relevant convenience and fairness factors include ease of access to sources of proof, plaintiff's choice of forum, relative convenience to parties, and relative convenience to witnesses. *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). Defendants argue that because the copyright infringement at issue is alleged to have occurred in the Central District and because it will burden them to litigate in the Northern District, the Central District is the proper forum.

Regarding access to sources of proof, defendants contend that the locations of interest are all in the Central District, including the model hotel rooms alleged to have contained copies of plaintiff's work as well as any documentation of copyright infringement that might exist. Given technological advances in document storage and retrieval, transporting documents between districts does not generally create a burden. *Vitria Tech. Inc. v. Cincinnati Ins. Co.*, 2005 WL 2431192, at *3 (N.D. Cal. 2005) (Ware, J.). Nonetheless, to the extent that "the bulk of the relevant evidence usually comes from the accused infringer" in a copyright infringement case, this factor weighs slightly in favor of transfer. *AEC One Stop Group., Inc. v. CD Listening Bar, Inc.*, 326 F. Supp. 2d 525, 530 (S.D.N.Y. 2004).

The next factor is plaintiff's choice of forum. Defendants' contention that a plaintiff's choice of forum is entitled to minimal consideration is incorrect. Rather, there is a general presumption in favor of a plaintiff's choice of forum and "[t]he defendant must make a strong showing of inconvenience" to overcome that presumption. *Decker Coal*, 805 F.2d at 843.

Defendants have failed to make such a showing. Plaintiff chose to file suit in the Northern District because she lives and works in Sonoma County and her art dealer is based in Marin County. She says she travels to Los Angeles only once every several years and it would be both inconvenient and expensive for her to litigate this case in the Central District. This factor weighs against transfer.

Turning to the convenience of the parties, while "the parties' relative financial ability is not entitled to great weight," it is a relevant consideration. *Toy v. Gen. Elec. Co.*, 1995 WL 396848, at *3 ( N.D. Cal. 1995) (Aguilar, J.). Plaintiff is an individual artist while defendant Hilton Hotels Corporation is the leading hospitality company in the world. The inconvenience to plaintiff of litigating this case in the Central District is almost certainly greater than the inconvenience to the Hilton defendants of litigating in the Northern District. This factor thus weighs against transfer.

The final consideration is the convenience of witnesses. Depositions are not a factor in this analysis because they usually occur where witnesses reside. Testimony at trial is what matters. This includes convenience for all witnesses and, a separate but related concern, the availability of compulsory process to bring unwilling witnesses live before the jury.

Regarding witness convenience, as plaintiff points out, defendants have not identified any Central District witnesses whose testimony will be necessary to their case. This Court has held that "[t]o demonstrate inconvenience of witnesses, the moving party must identify relevant witnesses, state their location and describe their testimony and its relevance." *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1108 (N.D. Cal. 2001) (Walker, J.). Defendants have not done so with adequate specificity. Plaintiff, on the other hand, has identified three potential witnesses: Victoria Ryan and Woodward Payne, fellow artists and residents of the Northern District who claim that defendants also copied their artwork, and David Coyle, president of ArtBrokers, who plaintiff says can testify to the wilfulness of defendants' alleged infringement. Without more information from defendants, the convenience-of-witnesses-factor favors plaintiff.

Regarding the availability of compulsory process to bring unwilling witnesses live before the jury, both parties suggest that a California district court lacks the power to subpoena

11

non-party witnesses who reside outside of the district. Plaintiff argues that her witnesses, residents of the Northern District, could not be "compelled to attend a trial in Los Angeles" (Opp. 19). Similarly, defendants contend that any witnesses they might wish to call who reside in the Central District would be "outside the subpoena power of this Court" (Br. 7). These statements are incorrect. The California district courts have the power to subpoena witnesses throughout the state pursuant to FRCP 45(b)(2)(C), which provides that a subpoena may be served anywhere within the state of the issuing court if a state statute allows statewide service. Section 1989 of the California Code of Civil Procedure is the state statute authorizing such service. The parties have listed no witnesses who reside outside of California. The ability to compel the testimony of non-party witnesses is thus a neutral factor in the transfer analysis.

### (2) *Public interest factors.*

Relevant public interest considerations include degrees of court congestion, local interest in deciding local controversies, potential conflicts of laws, and burdening citizens of an unrelated forum with jury duty. *Decker Coal*, 805 F.2d at 843. On balance, the public-interest factors, like the private-interest factors, weigh against transferring this action, especially given that the undersigned's own practice is to bring civil cases to trial within twelve to fourteen months of the first appearance. The delay resulting from a transfer, even one made in a case this young, can be significant.

Defendants have not carried their burden sufficiently to justify a transfer under 28 U.S.C. 1404(a).

### 2. MOTION TO DISMISS COUNTS III AND IV.

Next, defendants argue that plaintiff's complaint fails to allege a state law claim that is not preempted by federal copyright law. In particular, defendants move to dismiss Counts III and IV of plaintiff's complaint, which allege intentional interference with prospective economic relations (Count III) and intentional interference with contractual relations (Count IV).

A motion to dismiss under Rule 12(b)(6) tests for the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Business v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). All material allegations of the complaint are taken as true and construed in the light most

12

favorable to the non-moving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 340 (9th Cir. 1996). Though this order considered facts outside of plaintiff's complaint in its analysis of defendants' motion to transfer, it cannot do so here.

Section 301 of the Copyright Act addresses the circumstances in which the Act "preempts legal and equitable rights granted by state common law or statute." *Laws v. Sony Music Entm't*, 448 F.3d 1134, 1137 (9th Cir. 2006). The Ninth Circuit has developed a two-part test to determine whether the Act preempts a state law claim:

> We must first determine whether the "subject matter" of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103. Second, assuming that it does, we must determine whether the rights asserted under state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders.

*Id*. at 1137–38. Fundamentally, this requires an analysis of "whether the state law claim contains an element not shared by the federal law; an element which changes the nature of the action so that it is qualitatively different from a copyright infringement claim." *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1439–40 (9th Cir. 1993).

Defendants correctly argue that the first prong of the preemption test is satisfied because plaintiff's paintings fall within the definition of copyrightable works under 17 U.S.C. 102. Plaintiff does not contest this point.

The second prong defendants maintain is also met because plaintiff's state law causes of action are not qualitatively different from the rights laid out in Section 106 of the Copyright Act, which protects a copyright owner's exclusive rights to reproduce her work, prepare derivative works, and distribute copies of her work.

Taking all of the allegations in plaintiff's complaint as true, however, Counts III and IV do raise at least one claim not covered by the Copyright Act. Federal copyright law does not address defendants' alleged interference with the contracts plaintiff entered into with other customers who purchased limited-edition prints. Those customers understood that they were buying a print of which there were a limited number in existence. Plaintiff claims that defendants knew she ran this limited edition print business and nonetheless made an indeterminate number of copies of her prints and displayed them in Hilton hotel rooms. In so

13

United States District Court

For the Northern District of California

1  doing, plaintiff argues, defendants disrupted the foundation of her contracts with her other

2  customers and caused her economic damage.

3  In cases in which a third-party contractual relationship is alleged to have been disrupted

4  by a defendant's infringement of a copyright, "[m]ost courts have held that the Copyright Act

5  does *not* preempt the enforcement of contractual rights." *Altera Corp. v. Clear Logic, Inc.*,

6  424 F.3d 1079 (9th Cir. 2005). Defendants argue that because Counts III and IV of plaintiff's

7  complaint could not exist absent the alleged copying of her work by defendants, they are

8  preempted. Holding as such would essentially preempt any state law claim stemming from

9  alleged copyright infringement even if that claim added an element that changed the nature of the

10  action. The Ninth Circuit has made clear that where a state law claim adds an additional

11  element, it is not preempted by Section 301. Counts III and IV add such an element.

12  This case is distinguishable from *Sybersound Records, Inc. v. UAV Corp.*, in which the

13  Ninth Circuit found that the plaintiff had failed to state a claim for intentional interference with

14  prospective economic relations because its allegations did not demonstrate or allow for an

15  inference that its relationships with its customers were disrupted. 517 F.3d 1137, 1151 (9th Cir.

16  2008). Here, plaintiff has alleged facts sufficient to support such an inference. The market for

17  her giclées depended upon the existence of a limited number of prints and she has alleged that

18  that market suffered as a result of defendants' actions (Compl. ¶ 35). Plaintiff will need to prove

19  these allegations at trial but they must be taken as true for the purpose of this motion to dismiss.

20  Counts III and IV therefore survive defendants' motion to dismiss.

21  **CONCLUSION**

22  For all of the above-stated reasons, defendants' motion is **DENIED**.

23

24  **IT IS SO ORDERED.**

25

26  Dated: June 30, 2008.

27  WILLIAM ALSUP
   UNITED STATES DISTRICT JUDGE

28

14