**United States District Court**
For the Northern District of California

**\*E-FILED 10/10/08\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CAPCOM CO., LTD, et al.,                          NO. C 08-0904 RS

              Plaintiffs/Third-Party Defendants,   **ORDER GRANTING MOTION**
  v.                                                          **TO DISMISS COUNTERCLAIMS**

THE MKR GROUP, INC.,

           Defendant/Third-Party Plaintiff.

_____/

## I.  INTRODUCTION

This intellectual property rights dispute, plucked from the world of marauding zombies, pits the owners of the rights to a well known film against the makers of a popular video game. Specifically, the video game maker, plaintiffs/third party defendants Capcom Co., Ltd., et al. (collectively, "Capcom"), moves to dismiss the amended counterclaims and third party complaint ("the counterclaims") brought by the film owner defendant/third party plaintiff, The MKR Group, Inc. ("MKR"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Those counterclaims aver copyright and trademark infringement, as well as state and common law violations.  MKR opposes the motion.  Because the copyrighted and allegedly infringing works are not substantially similar under the applicable extrinsic test, the motion to dismiss the copyright counterclaim will be granted.  MKR's trademark infringement counterclaim is also subject to

1  dismissal because the three source identifying elements fail to rise to the level of a violation of the

2  Lanham Act.  Finally, the remaining state and common law counterclaims must be dismissed as they

3  are preempted by federal copyright and trademark law.  In light of the nature and grounds for these

4  dismissals, leave to amend would be futile and the counterclaims are therefore dismissed with

5  prejudice.

## II.  BACKGROUND

A.    MKR and Capcom

As alleged in the counterclaims, MKR owns the copyrights and trademarks to the 1979

motion picture "George A. Romero's Dawn of the Dead" (hereinafter "Dawn of the Dead"), and its

primary business is to monetize the value of that asset.  MKR's president and principal shareholder,

Richard P. Rubinstein, produced the film, and the renowned "horror" film director, George A.

Romero, directed it.  Dawn of the Dead and the 2004 remake, not owned by MKR, are successful

movies well known to the public.  The original movie has sold over one million DVDs, has earned

over $7,000,000 in its first two years of release, and has received praise from film critics.  The

movie's success has spawned an extensive merchandise licensing program covering such items as

action figures, t-shirts, Halloween costumes, masks, and postcards.

Capcom is a developer and distributor of video games for use on game consoles such as the

Microsoft Xbox 360.  Capcom's video games have sold millions of units within the United States

and overseas.  On August 8, 2006, Capcom released in North America a single player horror video

game called "Dead Rising" for use on the Xbox 360.[1]  In 2004, Capcom contacted MKR to enquire

about the availability of a license to use elements from Dawn of the Dead in a video game.  Capcom,

however, did not pursue the matter further.  Instead, it placed on the front of the box containing the

Dead Rising game a disclaimer reading: "THIS GAME WAS NOT DEVELOPED, APPROVED OR

LICENSED BY THE OWNERS OR CREATORS OF GEORGE A. ROMERO'S DAWN OF THE

DEAD™[.]"  Later in 2006, MKR discovered that Capcom applied to register "Dead Rising" as a

---

[1]     According to Capcom, the survival horror genre of video games, akin to horror
motion pictures, are typically dark, violent, and supernatural.  The player's goal is to "survive" long
enough to escape from an isolated location overrun with monsters such as zombies.  There is often a
"safe haven" where the characters can rest, eat, regain strength, and remain safe from attack.

trademark with the United States Patent and Trademark Office.  MKR filed a notice of opposition

against that application on January 29, 2007, which remains pending.

B.    The Works at Issue

In Dawn of the Dead, a plague reanimates the dead into flesh eating zombies and threatens to destroy the United States.  After escaping from Philadelphia via helicopter, a television traffic helicopter pilot, Stephen, his pregnant girlfriend, Francine, and Philadelphia SWAT team members, Roger and Peter, land on a helipad on the top of a small town's shopping mall.  Once in the mall, the four main characters barricade the complex, kill those zombies already inside, and then attempt to keep out others.  Throughout the many months they are in the mall, the four main characters frequently visit its numerous abandoned shops in search of clothes, food, and weapons.  Eventually, a motorcycle gang invades the mall, thereby opening the premises to a new zombie invasion.  After the four main characters battle the intruders, Stephen and Roger fall victim to zombie bites and die agonizing deaths while Peter and Francine run to the mall's roof and escape in their helicopter.

In Dead Rising, the video game player controls the main character, Frank West, a freelance photojournalist intent on photographing why the United States National Guard quarantined the fictional town of Willamette, Colorado.  Frank discovers that the town is overrun with zombies.  He takes pictures of the town from a helicopter and is then dropped off onto the rooftop of the town's shopping mall, which has a helipad.  At this point, the player must battle nonstop against zombies and other characters to search for the truth behind the town's zombie infestation.  The mall's stores provide Frank with the resources he needs to survive such as weapons and supplies.  Throughout the game, the player must use Frank's camera to take pictures — more points are awarded for graphic photos.  Depending in part upon critical choices made by the player, numerous characters of various kinds come and go as the game progresses.  The ultimate goal is to survive for three days and return to the helicopter, having deciphered the cause of the zombie outbreak.

C.    Procedural History

Capcom filed a complaint for declaratory relief on February 12, 2008, seeking a declaration that its video game does not infringe any copyright, trademark, or other intellectual property rights belonging to MKR.  On May 12, 2008, MKR filed its third party complaint along with four

United States District Court

For the Northern District of California

1  counterclaims against Capcom claiming: (1) copyright infringement; (2) violations of the Lanham

2  Act; (3) violation of Cal. Bus. & Prof. Code §§ 17200 and 14330;[2] and (4) violation of common law

3  trademark infringement, unfair competition, misappropriation, and dilution.

4        On June 11, 2008, Capcom filed the instant motion, contending that: (1) MKR fails to state a

5  claim for copyright infringement in its first counterclaim because MKR's alleged copyrighted work

6  and Capcom's allegedly infringing work are not substantially similar as a matter of law; (2) MKR

7  fails to state a claim for violation of the Lanham Act in its second counterclaim because it represents

8  nothing more than the copyright claim improperly labeled as a separate trademark action; and (3)

9  MKR's claim for relief under Cal. Bus. & Prof. Code § 17200 in its third counterclaim as well as its

10  claim for common law trademark infringement, unfair competition, misappropriation, and dilution in

11  its fourth counterclaim fail as a matter of law because they are preempted pursuant to § 301 of the

12  Copyright Act.

13                      III.  LEGAL STANDARD

14        A complaint may be dismissed as a matter of law pursuant to Rule 12(b)(6) for one of two

15  reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal

16  theory. *SmileCare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir.

17  1996).  For purposes of a motion to dismiss, all allegations of material fact in the complaint are

18  taken as true and construed in the light most favorable to the non-moving party. *Parks Sch. of Bus.,*

19  *Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

20        "A complaint should not be dismissed unless it appears beyond doubt the plaintiff can prove

21  no set of facts in support of his claim that would entitle him to relief." *Clegg v. Cult Awareness*

22  *Network*, 18 F.3d 752, 754 (9th Cir. 1994).  The court, however, "is not required to accept legal

23  conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn

24  from the facts alleged." *Id.* at 754-55.  A court does "not require heightened fact pleading of

25  specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 127

26  

27        [2]      In 2007, the California legislature repealed Cal. Bus. & Prof. Code § 14330.  Stats.

28  2007, c. 711 (A.B. 1484), § 1.  That portion of the counterclaim, therefore, is dismissed with prejudice.

S. Ct. at 1974.  A court's review is limited to the face of the complaint, documents the complaint references, and matters about which the court may take judicial notice.  *Anderson v. Clow (In re Stac Elecs. Sec. Litig.)*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

Motions to dismiss generally are viewed with disfavor and are to be granted rarely.  *See Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997).  Leave to amend must be granted unless it is clear that amendments cannot cure the complaint's deficiencies.  *Lucas v. Dep't of Corr.*, 66 F.3d 245, 248 (9th Cir. 1995).  Nevertheless, when amendment would be futile, dismissal may be ordered with prejudice.  *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

IV.  DISCUSSION

A.      Judicial Notice

At the outset, pursuant to Rule 201 of the Federal Rules of Evidence, Capcom requests that the Court take judicial notice of: (1) the 1979 Dawn of the Dead movie and the Dead Rising video game; (2) numerous other zombie movies and video games; and (3) certain ideas and elements common and prevalent in such movies and games.  While generally a court cannot consider material outside of the complaint when deciding a motion to dismiss under Rule 12(b)(6), a court may consider exhibits submitted with the complaint and those "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading . . . ."  *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994) (overruled on other grounds).  Thus, the contents of Dawn of the Dead and Dead Rising may be considered for purposes of this motion to dismiss.  Exhibits one through four, which represent the works themselves and the corresponding script to the film, will also be considered as MKR does not question their authenticity.

Capcom's remaining requests for judicial notice, however, must be denied.  Rule 201 allows a court to invoke judicial notice for, "two kinds of facts: (1) those that are generally known within the court's territorial jurisdiction; and (2) those that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned, for example, almanac, dictionary, calendar or similar sources."  *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006).  In other words, "the fact must be one that only an unreasonable person would insist on

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   disputing." *Id.* (quoting *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)).

2          As MKR asserts, it can hardly be said that the zombie movies and video games presented in

3   exhibits six through forty-four are "generally known," especially in light of the fact that many of

4   these movies were made long ago, indeed in some instances as far back as 1932.  These exhibits,

5   therefore, do not qualify for judicial notice.  *See Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124,

6   1129 (C.D. Cal. 2007) (declining to take judicial notice of various specific shows not commonly

7   known).  The Wikipedia articles Capcom submits as a synopsis of these movies and video games are

8   similarly inappropriate for judicial notice.  *See Nordwall v. Sec'y of Health & Human Servs.*, No. 05-

9   123V, 2008 WL 857661, at *7 n.6 (Fed. Cl. Feb. 19, 2008) ("Wikipedia may not be a reliable source

10  of information.").  Finally, while exhibit five, the script to Dead Rising, relates to the content of the

11  video game in question, its authenticity cannot be determined by resort to irrefutable sources

12  because it does not reflect who wrote it, nor when and for what purpose it was written, it was not

13  filed with Capcom's pending copyright for Dead Rising, and by its nature it may not track exactly

14  how the game itself appears to the player.

15  B.     Copyright Counterclaim

16          To bring a copyright infringement counterclaim, MKR must assert ownership of a valid

17  copyright, and the copying of constituent elements of the work that are original to it.[3]  *Feist Publ'ns,*

18  *Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).  Capcom does not contest MKR's valid

19  copyright to Dawn of the Dead.  At issue here, therefore, is whether Dawn of the Dead and Dead

20  Rising "are substantially similar in their protected elements."  *Cavalier v. Random House, Inc.*, 297

21

22          [3]      That latter concept requires proof that Capcom had "access" to Dawn of the Dead,
    and that the allegedly infringing work, Dead Rising, is "substantially similar."  *Idema v.*
23  *Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1175 (C.D. Cal. 2001).  Access to a copyrighted work is
    defined as having "an opportunity to view or to copy [a] plaintiff's work."  *Sid and Marty Krofft*
24  *Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1172 (9th Cir. 1977) (superseded on
    other ground by 17 U.S.C. § 504(b)).  The level of access must be a "reasonable" amount, which
25  means it is "more than a bare possibility."  *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482
    (9th Cir. 2000).  Access can be proven by circumstantial evidence if the work has been widely
26  disseminated.  *Id.*  Strong evidence of access can lead a court to invoke the inverse ratio rule, which
    permits the application of a lower standard of proof for substantial similarity.  *Idema*, 162 F. Supp.
27  2d at 1175-76.  In the instant case, access will be presumed because Dawn of the Dead is widely
    disseminated, and the analysis will be limited to substantial similarity.  Even applying the inverse
28  ratio rule, however, the two works are not substantially similar as explained below.

F.3d 815, 822 (9th Cir. 2002).

       1.    <u>Substantial Similarity on a Motion to Dismiss</u>

MKR argues that the question of substantial similarity may not properly be resolved on a motion to dismiss under FRCP 12(b)(6).  In support of that contention, MKR understandably invokes case precedent that calls into question the propriety of resolving the issue even on summary judgment let alone on an initial pleading motion.  *See Frybarger v. Int'l Bus. Machs. Corp.*, 812 F.2d 525, 528 (9th Cir. 1987) (stating that summary judgment is not highly favored on the issue of substantial similarity).  Nevertheless, courts have determined substantial similarity as a matter of law in the appropriate case where the evidence demonstrates that no reasonable jury could find substantial similarity.  *Funky Films, Inc. v. Time Warner Entm't. Co., L.P.*, 462 F.3d 1072, 1076-77 (9th Cir. 2006).  When both the copyrighted work and the allegedly infringing work are before the Court and capable of examination and comparison, a motion to dismiss may be the vehicle for resolving the dispute.  *See Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945) ("There is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss.").

While the Ninth Circuit since *Christianson* does not appear to have addressed whether the issue of substantial similarity is susceptible to determination at the motion to dismiss stage, at least one other circuit has held that such inquiry is proper, and district courts have increasingly found the issue of substantial similarity subject to adjudication on a motion to dismiss in the appropriate case.  *See Nelson v. PRN Prods., Inc.*, 873 F.2d 1141, 1143-44 (8th Cir. 1989) (determining that a district court could properly decide substantial similarity as a matter of law on a motion to dismiss); *Zella*, 529 F. Supp. 2d at 1130-31 (citing *Christianson*, and determining that substantial similarity may be decided on a motion to dismiss); *Cory Van Rijn, Inc. v. Cal. Raisin Advisory Bd.*, 697 F. Supp. 1136, 1137, 1145 (E.D. Cal. 1987) (granting motion to dismiss based on lack of substantial similarity); *Rosenfeld v. Twentieth Century Fox Film*, No. CV 07-7040 AHM, 2008 WL 4381575, at *6 (C.D. Cal. Sept. 25, 2008) (citing *Christianson* for the proposition that substantial similarity may be considered on a motion to dismiss); *Thomas v. Walt Disney Co.*, No. C-07-4392 CW, 2008 WL

United States District Court

For the Northern District of California

425647, at *2 (N.D. Cal. Feb. 18, 2008) (deciding substantial similarity on a motion to dismiss); *Identity Arts v. Best Buy Ent. Servs. Inc.*, Nos. C 05-4656 PJH, C 06-1631 PJH, 2007 WL 1149155, at *5 (N.D. Cal. April 18, 2007) (finding no obstacle to addressing substantial similarity on a motion to dismiss under Rule 12(c)); *Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005) ("[T]here is ample authority for the proposition that a district court may make that determination [of substantial similarity] on a motion to dismiss for failure to state a claim under Rule 12(b)(6).").

### 2.    The Extrinsic Test

The substantial similarity inquiry is comprised of an objective "extrinsic test" and a subjective "intrinsic test" both of which the copyright holder must ultimately establish. *Funky Films*, 462 F.3d at 1077. Only in the event that the claim fails when analyzed under the objective "extrinsic" prong is it subject to dismissal, for the intrinsic test, which "examines an ordinary person's subjective impressions of the similarities between two works," is exclusively within the province of the jury. *Id.*; *Zella*, 529 F. Supp. 2d at 1133 n.8.

Under the extrinsic test, a court "focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." *Funky Films*, 462 F.3d at 1077 (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)). In applying the test, the "court 'compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Id.* (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)). A court must take care to inquire only whether the protectable elements are substantially similar standing alone. *Id.* In doing so, the court will filter out and disregard the unprotectable elements in making its substantial similarity determination. *Id.*; *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994); *see Thomas*, 2008 WL 425647, at *2 ("Under the extrinsic test, the Court defines the scope of copyright protection by 'analytically dissecting' the alleged similarities between the works and separating protected elements of expression from unprotected ideas.").

### 3.    Application of the Extrinsic Test

Under this framework, Capcom argues that Dawn of the Dead and Dead Rising are not substantially similar. That is, MKR's copyright counterclaim fails the extrinsic test because once

United States District Court

For the Northern District of California

1    unprotectable elements are filtered out, the two works share at most superficial similarities in plot,

2    sequence of events, setting, theme, dialogue, mood, pace, characters, or dialogue.  MKR counters

3    that the two works contain so many similarities that the extrinsic test is easily satisfied.[4]

4         MKR presumably has highlighted those aspects of the video game it believes most

5    substantially resemble its movie.  *Zella*, 528 F. Supp. 2d at 1132; *see Bethea*, 2005 WL 1720631, at

6    *10 (stating that it is plaintiff's burden to identify the sources of alleged similarity between the

7    works).  The principal similarities between Dawn of the Dead and Dead Rising identified by MKR

8    are that: (1) both works are set in a bi-level shopping mall; (2) the mall has a gun shop, in which

9    action takes place; (3) the mall is located in a rural area with the National Guard patrolling its

10   environs; (4) both works are set in motion by a helicopter that takes the lead characters to a mall

11   besieged by zombies; (5) many of the zombies wear plaid shirts; (6) both works feature a subtext

12   critique of sensationalistic journalism through their use of tough, cynical journalists, with short

13   brown hair and leather jackets, as a lead male character; (7) both works feature the creative use of

14   items such as propane tanks, chainsaws, and vehicles to kill zombies; (8) both works are a parody of

15   rampant consumerism; (9) both works use music in the mall for comedic effect; and (10) Dead

16   Rising's use of the word "hell" references the tagline for Dawn of the Dead's release ("When there's

17   no more room in hell, the dead will walk the earth.").  In short, MKR concludes that the two works

18   share so many similarities that the critical divide between unprotectable ideas and the protectable

19   expression of ideas has been bridged.  *See Feist*, 499 U.S. at 344-45 (copyright law provides no

20   protection for ideas, but only the expression of ideas).

21        "Scenes a faire," where events flow naturally from generic plot-lines or sequences of events

22   necessarily resulting from the choice of a setting or situation constitute one type of unprotectable

23   idea.  *Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002).  The boundary between idea and

24   expression is an elusive one, with protection that covers the 'pattern' of the work, the sequence of

---

26-28

[4]    At the summary judgment stage, expert testimony might be admissible *if necessary*.  *Bethea v. Burnett*, No. CV04-7690 JFW, 2005 WL 1720631, at *10 (C.D. Cal. June 28, 2005) (quoting *Apple Computer*, 35 F.3d at 1443).  While that may suggest the need to defer determination until summary judgment, here MKR has not indicated a need for expert testimony in aid of analysis nor does the Court see how such testimony would be either necessary or useful.

United States District Court

For the Northern District of California

events, and the development of the interplay of characters. *Williams v. Crichton*, 84 F.3d 581, 587-88 (2d Cir. 1996).

Among the elements which the Court must filter out as unprotectable are: (1) "ideas" as opposed to the "expression" of those ideas; (2) facts, historical events, or other information over which no party is entitled to claim a monopoly; (3) elements borrowed from another creator or from the "public domain"; (4) instances in which a particular "expression" at issue "merges" with the "idea" being expressed; and (5) a similar instance in which the form of the "expression" is so standard" in the treatment of a given "idea" that it constitutes scenes a faire. *Bethea*, 2005 WL 1720631, at *10 (quoting *Idema*, 162 F. Supp. 2d at 1176-77).

Examples aid in applying this abstract principle. In *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 360 (2d Cir. 1983), the Second Circuit found that a small warlord action figure did not infringe upon another small action figure. Even though the action figures looked similar, the similarities were attributable to the unprotectable idea of a super muscleman positioned in a traditional fighting pose. *Id*. The court found that protectable expression might only arise from the way the two action figures emphasized the idea, such as by accentuating certain muscle groups instead of others. *Id*. Another example of unprotectable scenes a faire arises from stories of police work in the Bronx found in *Walker v. Time Life Films*, 784 F.2d 44, 50 (2d Cir. 1986). There, the court held that because elements such as derelict cars, drunks, prostitutes, vermin, morale problems of police officers, and the familiar figure of an Irish cop would appear in any realistic work about police officers in the Bronx, those elements represented unprotectable scenes a faire. *Id*. In short, the use of such common stock characters or occurrences demonstrate that "in the life of men generally, there is only rarely anything new under the sun." *Berkic*, 761 F.2d at 1294. If the similarities between the elements of MKR's work, and Capcom's allegedly infringing video game are of "small import quantitatively or qualitatively" then Capcom will be found innocent of infringement. *Williams*, 84 F.3d at 588.

A comparison of the movie and the video game reveals profound differences. MKR has not identified any similarity between Dead Rising and any *protected* element of Dawn of the Dead. Rather, the few similarities MKR has alleged are driven by the wholly *unprotectable* concept of

10

**United States District Court**

For the Northern District of California

humans battling zombies in a mall during a zombie outbreak.  Each one of MKR's claimed similarities, as analyzed below, ultimately must be "filtered" out as unprotectable.  *See Idema*, 162 F. Supp. 2d at 1177 ("This 'filtration' process is accomplished under the first part of the two-part analysis established by the Ninth Circuit to determine or assess 'substantial similarity' of an allegedly infringing work: the 'extrinsic,' or 'objective' test.").  Nearly all the similarities between the two works identified by MKR, upon close scrutiny, constitute nothing more than a collection of unprotectable elements thereby failing the extrinsic test and sending the copyright claim to its doom.

a.      Plot and Sequence of Events

The plot underlying each of the two works are not substantially similar.  "Plot" consists of the sequence of events by which the author expresses his theme or idea in sufficiently concrete terms to warrant a finding of substantial similarity where it is common in both works.  *Zella*, 529 F. Supp. 2d at 1135.  Both Dawn of the Dead and Dead Rising contain a scene where the main characters arrive at a shopping mall by way of a helicopter.  But even that similarity dissolves upon close inspection.  In Dead Rising the central character, Frank, makes the helicopter journey from the infected town to the shopping mall roof and upon arrival at the helipad enters the "safe haven" part of the game where he is protected from attack.  He then enters the mall and begins his quest to uncover the reason behind the zombie infestation.

By contrast, Dawn of the Dead does not immediately start at the mall.  Instead, the four main characters escape from zombies in Philadelphia via helicopter.  After flying for some time they come to a small zombie-infested town where they spot a mall.  They decide to land on the helipad on top of the mall and enter the safe portions of the interior.  The characters then begin to rid the mall of all zombies.  From this point onwards the plot and sequence of events in each work move in widely divergent directions.  *See Williams*, 84 F.3d at 590 (any similarities in the plot and sequence of events represented nothing more than random similarities scattered throughout the works).

b.      Characters

An analysis of the characters in both works also reveal a lack of substantial similarity.  MKR insists that Stephen, one of four main characters in Dawn of the Dead, and Frank, the main character

in Dead Rising, are substantially similar.  MKR is correct that both characters are male with short brown hair, wear leather jackets, and undertake activities connected to journalism.  These similarities, however, do not suggest infringement, but rather elements of a stock character expected to be present in any number of stories.  Other elements of both characters moreover reflect significant dissimilarity.  For instance, Dead Rising completely revolves around Frank, a fairly cynical and athletic young freelance photographer who wants to report what is going on in the small town while Stephen is portrayed as a timid non-athletic middle aged television news helicopter pilot of equal prominence with the other three characters.  Beyond some superficial, generic physical similarities of gender, hair color and wardrobe, therefore, nothing links one to the other.

Other characters of note, Brad in Dead Rising and Peter in Dawn of the Dead, are both tall athletic African-Americans who know how to handle weapons.  Both exude confidence and have a cool head when surrounded by the imminent zombie danger.  As with Stephen and Frank, however, those similarities do not develop from the stock to the distinctive.  Peter is a SWAT member who is not developed beyond his expertise with weapons and sardonic demeanor while Brad is not developed beyond his part as a member of the Department of Homeland Security determined to rescue another particular character and depart the mall safely.  *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930) ("[T]he less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly.").

Another group of characters present in each work are the zombies themselves.  Dawn of the Dead has a number of distinctive zombies ranging from a Hare Krishna, an extremely overweight character, and a girl with a distinctive yellow and green striped shirt.  Others are dressed in plaid shirts or are covered with gore and blood.  By contrast, Dead Rising lacks any similar distinctive zombie characters.  All appear to be stock elements with largely generic attire.  While Dead Rising does sport some zombies in plaid and covered in blood, those attributes are too hazy to amount to substantial similarity.

Finally, there are dozens of other characters in Dead Rising that have no counterpart in Dawn of the Dead (Carlito, Isabela, Dr. Barnaby, the janitor, the psychopaths, and the other fifty survivors found in the mall).  *See Identity Arts*, 2007 WL 1149155, at *15 ("[P]laintiff cannot merely sweep

**United States District Court**

For the Northern District of California

aside the presence of so many other varied characters who appear in the differing spots, and whose attributes and demeanor bear no similarity with respect to one another.").

        c.    <u>Theme</u>

      Any similarity in the theme of the movie and the video game relates to the unprotectable idea of zombies in a mall.  Once viewed beyond the presence of this general idea, any similarity in themes evaporates.  Dawn of the Dead, according to MKR, involves a satirical social commentary on the excesses of consumerism, where zombies seek to enter the mall in a desperate search for the consumer goods that drove them while alive.  Ironically, as the movie suggests, the survivors in turn are trapped in the mall with all the consumer goods they could ever want, but can only enjoy them in the restricted world of the shopping mall itself.  Whatever a critic may opine as to Dawn of the Dead's success in communicating such an anti-consumerism message, what is clear from a review of Dead Rising, contrary to MKR's interpretation, is that it does not begin to try to duplicate such a message.  To the extent that Dead Rising may be deemed to posses a theme, it is confined to the killing of zombies in the process of attempting to unlock the cause of the zombie infestation.  The social commentary MKR draws from Dawn of the Dead, in other words, appears totally absent from the combat focus found in Dead Rising.

        d.    <u>Dialogue</u>

      As to dialogue, MKR identifies only one instance of similarity in both works: the reference to "hell."  In the movie, in response to the zombie invasion Peter quietly states what comes to operate as the film's tagline, "this, my friend, is hell."  In Dead Rising, Carlito, a character with no counterpart in Dawn of the Dead, ominously intones, "when there is no more room in hell, the dead will walk the earth."  One allegedly similar line from a movie and a video game is insufficient to support a claim of infringement.  *See Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989) ("Ordinary phrases are not entitled to copyright protection."); *Benjamin v. Walt Disney Co.*, No. CV 05-2280 GPS, 2007 WL 1655783, at *5 (C.D. Cal. June 5, 2007) (insufficient dialogue for substantial similarity in the phrase "I have a plane to catch" uttered by the protagonist in each work to force the signing of divorce papers); *Identity Arts*, 2007 WL 1149155, at *12, 13 (finding the statement "it's coming from the audience" in allegedly infringing movie trailers insufficient to

1   support a finding of substantial similarity).

2          e.      Mood

3          The mood of Dawn of the Dead and Dead Rising is difficult to compare owing to the

4   different media each occupies (a movie and an interactive video game).[5]  *See Idema*, 162 F. Supp. 2d

5   at 1185 (noting the difficulty in comparing the written word versus a movie).  To the extent they can

6   be compared, they are not substantially similar.  The mood of Dawn of the Dead is dark, horrific, but

7   somewhat comedic in featuring the main characters struggling to survive for months in the mall.

8   The mood of Dead Rising, on the other hand, is one of adventure and mystery as Frank tries to

9   uncover the secret behind the zombie infestation of the town.  In short, Dawn of the Dead endeavors

10  to create an atmosphere of suspense and anxiety while the video game focuses on action and

11  competition.[6]

12         f.      Setting

13         The setting of the movie and the video game likewise does not give rise to a finding of

14  substantial similarity.  While both works are set in a rural two-story mall with a helipad on top and a

15  gun shop and music playing inside, these locales represent scenes a faire that flow from the

16  unprotectable idea of zombies in a mall.  At the same time, each mall is distinct from the other in

17  that the one in Dawn of the Dead is relatively small with a major department store and an ice rink,

18  while the other in Dead Rising is a modern mega-mall without a major department store or ice rink,

19  but with separate theme-based sections including a roller coaster, theater, outdoor park, supermarket,

20  and underground tunnel system.  Indeed, both malls contain escalators and a fountain, but these are

21  features found in most malls, and cannot support a finding of substantial similarity.

22         g.      Pace

23  _____

24         [5]     While it is difficult to analyze two different works contained in different media, it is
equally difficult to decide how this difference helps one party over another.

25         [6]     That is not to say that Dead Rising is devoid of comedic elements.  As in Dawn of the
26  Dead, the relentless zombies are confronted with various comedic weapons including various food
products such as pies.  The use of such devices, however, does not rise to the level of substantial
27  similarity.  *See Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1451 (9th Cir. 1988) (finding that the
comic mood is common to the genre of action-adventure television series and movies and therefore
28  did not demonstrate substantial similarity).

United States District Court
For the Northern District of California

An examination of the pace of Dawn of the Dead and Dead Rising reveals no substantial similarity. Dawn of the Dead takes place over many months as evidenced by the evolution of the character Francine, not visibly pregnant at the outset but close to giving birth by the end of the events in the mall. Dead Rising, by contrast, takes places entirely over a three day period. The pace of the works is similar in some respects, but overall is substantially not so. The beginning of Dawn of the Dead quickly moves from Philadelphia to the helicopter landing at the mall. Once in the mall, the pace varies from slow to fast depending on whether the main characters are resting peacefully in their walled-off security room or are roaming out into the mall battling zombies. The pace in Dead Rising is one of constant, fast-paced action depending on the player's preference. If the player follows the game storyline cues, a fast pace ensues to facilitate completion of the game with the rescue of all survivors within the three day window. By the same token, if the player chooses not to follow the storyline cues, then the pace slackens and the player wanders the mall and confronts zombies. Even if this is viewed as presenting some superficial similarity, "pace, without more, does not create an issue of overall substantial similarity between the works." *Williams*, 84 F.3d at 590.

### h. Total Concept and Feel

The final factor, the total concept and feel, differs to a large extent between the movie and the video game. Dawn of the Dead is a dark comedy about survivors of a global zombie infestation desperately trying to survive for months in a rural mall by clearing it of all zombies to create a safe environment in which to live in peace while the zombie hoards encompass the world outside. In contrast, Dead Rising is an adventure/mystery story where the main character attempts to enter a quarantined area to uncover in three days why a small town is infested with insects that turn the dead into zombies. The total concept and feel of Dawn of the Dead is of a world under seige, while Dead Rising presents an environment to be conquered.

### i. *Metcalf* Analysis

Finally, MKR argues that under *Metcalf* even if each factor viewed individually fails to demonstrate substantial similarity, the motion to dismiss must be denied because, taken as a whole, such a showing has been demonstrated. In *Metcalf*, plaintiff submitted his idea and script for a movie to defendants who rejected the project, but subsequently produced a television series dealing

United States District Court

For the Northern District of California

1    with similar issues.  294 F.3d at 1071-72.  Both works involved overburdened county hospitals in

2    the inner city of Los Angeles comprised mostly of African-American staff members.  *Id*. at 1073.

3    Both dealt with poverty and urban blight, and featured similar characters and plot developments.  *Id*.

4    The court found that the common elements and the totality of similarities raised a triable factual

5    question of substantial similarity, even if those similarities, when considered individually, were

6    unprotectable.  *Id*. at 1074.  That is, the cumulative weight of the similarities allowed plaintiffs to

7    survive summary judgment.  *Id*.  Courts since *Metcalf*, however, have been reluctant to expand its

8    concepts beyond the specific facts of that case.  *Zella*, 529 F. Supp. 2d at 1138.  Even were *Metcalf*

9    to be applied here, the totality of the separate comparative factors do not amount to a finding of

10   substantial similarity between the works at issue.  MKR's alleged similarities constitute nothing

11   more than a string of disconnected facts and generic ideas which are not protected under copyright

12   law.  *See id*. at 1139 (finding that plaintiffs could not merely cobble together generic elements of the

13   works to make a *Metcalf* argument).

14                  j.      MKR's Intrinsic Argument

15           MKR makes much of the argument that those involved in the game industry perceive Dead

16   Rising to be an obvious "rip-off" of Dawn of the Dead.  While such anecdotal evidence may well be

17   accurate, even to accept it at face value would be to beg the question.  The ultimate issue on this

18   motion is whether or not the allegedly infringing work implicates protectable elements under

19   copyright law, regardless of whether or not it is, in fact, a "rip-off."  Moreover, to the extent that the

20   argument eventually would become relevant, it would arise only in the application of the "intrinsic"

21   test, the second prong of the copyright analysis.  As MKR must first successfully pass through the

22   extrinsic test, which as set forth above it does not accomplish, the perception in the marketplace that

23   a work has been lifted, accurate or otherwise, simply does not come into play.

24                  k.      No Substantial Similarity as a Matter of Law

25           MKR's proffered similarities upon inspection do not support a finding of substantial

26   similarity.  *See Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (determining that

27   "random similarities scattered throughout the works" do not support a finding of substantial

28   similarity).  Works more comparable than Dawn of the Dead and Dead Rising have been found

lacking substantial similarity as a matter of law. *See*, *e.g.*, *Williams*, 84 F.3d at 583-87 (comparing children's book about visit to a dinosaur zoo to the movie Jurassic Park); *Walker*, 784 F.2d at 46 (comparing the book "Fort Apache" and the film "Fort Apache: The Bronx"). Because leave to amend would be futile as the findings are based on the works themselves rather than on MKR's pleadings, the infringement claim must therefore be dismissed with prejudice. *Thomas*, 2008 WL 425647, at *6.

C.    Lanham Act Counterclaim

MKR's second counterclaim avers a violation of the Lanham Act.[7]   Copyright and trademark law target two different legal concepts. Copyrights protect "the artist's right in an abstract design or other creative work." *RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 563 (C.D. Cal. 2005). On the other hand, "[t]rademark law is concerned with the protection of symbols, elements or devices used to identify a product in the marketplace and to prevent confusion as to its source." *Id.* Copyrights, therefore, protect the work as a whole, while trademarks protect the distinctive source-distinguishing mark. *Whitehead v. CBS/Viacom, Inc.*, 315 F. Supp. 2d 1, 13 (D.D.C. 2004).

The Supreme Court has "been 'careful to caution against misuse or over-extension' of trademark and related protections into areas traditionally occupied by patent or copyright." *Dastar v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003) (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001)). Under Lanham Act § 43(a), a person who makes a misrepresentation which is likely to cause confusion as to the origin of his or her goods is liable in a civil action. *Id.* at 30 n.4 (quoting 15 U.S.C. § 1125(a)(1)). "Origin of goods" "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." *Id.* at 37.

Reflecting the two different theories, numerous courts have analyzed the same set of facts under both copyright and trademark law without concluding that the trademark claims "piggybacked" on the copyright claims. *See*, *e.g.*, *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d

---

[7]      As with copyright, a district court may resolve a trademark claim on a motion to dismiss. *See Murray v. Cable Nat'l Broad. Co.*, 86 F.3d 858, 860-61 (9th Cir. 1996) (affirming Rule 12(b)(6) dismissal because there was no likelihood of confusion possible, taking the allegations of the complaint as true).

United States District Court
For the Northern District of California

792, 806, 812 (9th Cir. 2003) (concluding that artist's photographs which depicted Barbie in different poses did not violate Mattel's copyright or trademark rights in the Barbie doll); *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1010 (9th Cir. 1994) (upholding trial court's damages award where defendant copied Nintendo games (copyright infringement) and then sold the games as a package, but advertised that they were Nintendo products (trademark violation)).

Here, Capcom maintains that MKR's Lanham Act counterclaim fails because it is nothing but a repackaged copyright claim masquerading as a Lanham Act trademark claim. MKR counters that the core of its Lanham Act counterclaim is Capcom's wholesale exploitation of MKR's Dawn of the Dead trademarks and other identifying elements from the film. That is, MKR's Lanham Act counterclaim is explicitly grounded in Capcom's exploitation of those components of the film which are source identifying; MKR is not trying, it contends, to protect ideas or other creative content. In support of its counterclaim, MKR pleads that Capcom seeks to capitalize on: (1) Romero's name on a disclaimer; (2) the term "dead" in its title; (3) the zombie head design trademark on Dead Rising's packaging; and (4) the "plaid boy" costume consisting of a blood stained, plaid shirt, and a zombie mask.[8] MKR sufficiently has pled source identifying elements, rather than the ideas and creative content that *Dastar* prohibits. These source identifying elements are what the Lanham Act is intended to protect despite Capcom's arguments to the contrary.[9]

While MKR has sufficiently pled source identifying elements, the three contested elements fail to rise to the level of a violation of the Lanham Act as a matter of law. First, the use of Romero's name on the disclaimer is a nominative fair use. The front lower left corner of the box for Dead

---

[8]     This proposed source identifying element is not pled in MKR's counterclaim, but is instead raised for the first time in its opposition. Even if this character were pled in MKR's counterclaim, such use of a character within a visual work falls within the realm of copyright law, not trademark. *See Comedy III Prods., Inc. v. New Line Cinema*, 200 F.3d 593, 596 (9th Cir. 2000) (holding that use of character images not a trademark violation, but rather an issue under the dominion of copyright law). As discussed above, the use of zombies with plaid shirts in Dead Rising is not substantially similar to the plaid shirt zombies in Dawn of the Dead. The trademark claim based on the use of this character, therefore, is dismissed.

[9]     As MKR states in its opposition, it does not allege "reverse passing off." Reverse passing off is defined as "removing or obliterating the original trademark without authorization before reselling goods produced by someone else." *Shaw v. Lindheim*, 919 F.2d 1353, 1364 (9th Cir. 1990).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Rising contains the following disclaimer: "THIS GAME WAS NOT DEVELOPED, APPROVED

2  OR LICENSED BY THE OWNERS OR CREATORS OF GEORGE A. ROMERO'S DAWN OF

3  THE DEAD™[.]"  MKR argues that the use of this disclaimer itself dilutes its trademark and may

4  cause consumer confusion.  In support of that proposition, MKR relies upon *E. & J. Gallo Winery v.*

5  *Gallo Cattle Co.*, No. CV-F-86-183 REC, 1989 WL 159628, at *30 (E.D. Cal. June 19, 1989), which

6  reasoned that the use of a disclaimer to resolve litigation may not be an appropriate *remedy* for an

7  injunction where it is likely that the disclaimer itself might cause consumer confusion and where

8  defendants have not shown that a disclaimer would be effective in preventing consumer confusion as

9  to the source of a product.

10      MKR, however, refers to no authority where a pre-litigation disclaimer disavowing any

11  connection between the works, like the disclaimer Capcom uses here, gives rise to a trademark

12  claim.  Instead, it appears the analysis of this issue falls under the Ninth Circuit's nominative fair use

13  test.  Nominative fair use of MKR's trademark is permitted if Capcom can prove that: (1) the product

14  in question is not readily identifiable without use of the trademark; (2) only so much of the mark is

15  used as is reasonably necessary to identify the product; and (3) the user do nothing which would, in

16  conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.  *Abdul-*

17  *Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 412 (9th Cir. 1996).  First, the prominent use of the mark

18  "George A. Romero's Dawn of the Dead" is necessary because there is no other way to refer to the

19  movie than by its title.  Second, the use of the full title is necessary to identify properly the movie

20  and is important in differentiating between myriad other different movie titles.  Third, nothing about

21  using a mark in a disclaimer denying affiliation gives rise to confusion.  MKR's claim premised on

22  the disclaimer, therefore, must be dismissed.

23      MKR next maintains that the titles, Dawn of the Dead and Dead Rising, are confusingly

24  similar because both share the term "dead" and connote the same meaning of zombies awakening.

25  Dead Rising could only interfere with MKR's rights, however, if "the title has no artistic relevance to

26  the underlying work whatsoever, or, if it has some artistic relevance, unless the title explicitly

27  misleads as to the source or content of the work."  *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894,

28  902 (9th Cir. 2002) (quoting *Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989)).  Under the first

part of *Mattel*, MKR acknowledges that Dead Rising refers to zombies contained within the game. Opposition at 17. Under the second part, Dead Rising as a title must explicitly mislead as to the source of the work, which it simply does not do. Moreover, the shared use of one word and the idea of zombies awakening is not enough to sustain a charge of infringement because when a defendant uses less than the whole of a plaintiff's mark, it must appear that the part taken identifies the owner's product without the rest. *Caron Corp. v. Ollendorff*, 160 F.2d 444, 445 (2d Cir. 1947) (quoting *Parfumerie Roger & Gallet v. M.C.M. Co., Inc.*, 24 F.2d 698, 699 (2d Cir. 1928)). MKR cannot demonstrate that "dead," standing alone, identifies either the movie or the video game as a whole. Indeed, that common word is contained in countless movies and game products.

Finally, MKR maintains that the zombie head design trademark on Dead Rising's packaging reflects Capcom's intent to traffic on the fame of Dawn of the Dead. Comparing the packaging of Dawn of the Dead with Dead Rising, however, reveals no use of the zombie head design. The cover of Dawn of the Dead contains half a zombie head looking over a horizon. The half of the head that appears is white colored, cartoonish, bald, with a portion of the face covered in blood. By contrast, the front and back of the Dead Rising box contains a picture of the character Frank attacking numerous zombies. Of the many zombies displayed, there is one bald zombie on the bottom left corner of the front cover, but the full head and torso of the zombie is portrayed without any blood, and most of the head is shadowed. The zombie presented also appears to be much more lifelike than the half of the zombie head on the cover of Dawn of the Dead. This comparison, therefore, reveals that there simply is no basis for claiming that the zombie head design itself appears anywhere on the packaging of Dead Rising. Accordingly, MKR's Lanham Act counterclaim must be dismissed with prejudice.

D.   State and Common Law Counterclaims

MKR's third and fourth counterclaims are for violation of Cal. Bus & Prof. Code § 17200 and for California common law trademark infringement, unfair competition, misappropriation, and dilution respectively. Capcom contends that the Copyright Act and the Lanham Act preempt each of MKR's state law counterclaims.

1.   Preemption Under the Copyright Act

United States District Court

For the Northern District of California

1    There is no dispute that all state law claims for relief falling within the scope of the federal

2    Copyright Act are subject to preemption.  *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137 (9th

3    Cir. 2006).  A state law claim is preempted by the federal Copyright Act if: (1) the work involved

4    falls within the "subject matter" of the Copyright Act; and (2) the rights that a plaintiff asserts under

5    state law are "rights that are equivalent" to those protected by the Copyright Act.  *Kodadek v. MTV*

6    *Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998) (citing 17 U.S.C. §§ 102, 103, 301(a)).

7                    a.    Copyrightable Subject Matter

8    The first issue to be determined is whether the subject matter of MKR's Section 17200 state

9    law counterclaim is within the subject matter of the Copyright Act.  MKR does not allege a single

10   new fact in support of its counterclaim but instead merely incorporates by reference the same

11   conduct alleged in support of its two federal law counterclaims.

12                   b.    Equivalent Rights

13   MKR alleges that Capcom's activities constitute deceptive acts or practices in the conduct of

14   business, trade, or commerce.  Like its copyright infringement counterclaim, the only allegation that

15   might give rise to a violation is that Capcom made a video game so similar to MKR's movie that its

16   actions constitutes copyright infringement.  MKR's complaint appears to allege that, because of such

17   infringement, Capcom's reproduction of a similar work amounts to deceptive business practices.  In

18   essence, MKR's allegations seek to remedy supposed violations of rights protected by the Copyright

19   Act.  Thus, MKR's counterclaims are based on the same rights as those protected by the federal

20   copyright laws, and there is no element which changes the nature of the action such that it is

21   qualitatively different from a copyright infringement claim.  *Summit Mach. Tool Mfg. Corp. v.*

22   *Victor CNC Sys., Inc.*, 7 F.3d 1434, 1439-40 (9th Cir. 1993).  Because both prongs of the preemption

23   analysis are met, MKR's Section 17200 state law counterclaim is preempted.  17 U.S.C. § 301(a).

24               2.    Preemption Under the Lanham Act

25   MKR's allegations of California common law trademark infringement and dilution are

26   similarly subject to preemption.  The Congressional design behind the Lanham Act is to allow the

27   public to buy with confidence, and to prevent the trademark holder from being the victim of piracy.

28   *Golden Door, Inc. v. Odisho*, 646 F.2d 347, 352 (9th Cir. 1980).  "If state law would permit

1   confusing or deceptive trademarks to operate, infringing on the guarantee of exclusive use to federal

2   trademark holders, then the state law would, under the Supremacy Clause, be invalid . . . ." *Id.*

3   (quoting *Mariniello v. Shell Oil Co.*, 511 F.2d 853, 858 (3d Cir. 1975)).  It appears that the

4   trademark infringement and dilution counterclaims that MKR raises under California common law

5   are exactly the types of claims that federal trademark law is designed to preempt especially where,

6   as here, the rights holder does not allege a single new fact or element in support of those

7   counterclaims.[10]

8                                    V.  CONCLUSION

9           Accordingly, Capcom's motion to dismiss is granted.  MKR's counterclaims for copyright

10   infringement and trademark infringement, violation of Cal. Bus. & Prof. Code § 17200, and

11   violation of California common law trademark infringement, unfair competition, misappropriation,

12   and dilution are dismissed with prejudice.

13           IT IS SO ORDERED.

14

15   Dated: October 10, 2008                     _____

16                                               RICHARD SEEBORG
                                                 United States Magistrate Judge

17

18

19

20

21

22           [10]      MKR's remaining state law counterclaims for unfair competition and
23   misappropriation also must be dismissed.  While MKR does not differentiate under what legal
     theory it is pursuing the two remaining counterclaims (under copyright or trademark law), what is
24   clear is that there are no new facts pled under either legal theory as MKR merely incorporates all
     previous facts.  The end result, therefore, remains the same.  Both state law counterclaims are
25   preempted by the Copyright Act for falling within its subject matter and for failing to include any
     new elements not already subsumed under the federal copyright counterclaim.  Similarly, the two
26   remaining counterclaims allege no new facts that are not already covered by MKR's federal
     trademark counterclaim.  *See Summit*, 7 F.3d at 1439, 1441 (stating that federal patent law limits the
27   states' ability to regulate unfair competition, and holding that California misappropriation claim was
     preempted by federal law).

28   ORDER GRANTING MOTION TO DISMISS COUNTERCLAIMS
     C 08-0904 RS

**THIS IS TO CERTIFY THAT NOTICE OF THIS ORDER HAS BEEN GIVEN TO:**

Jennifer Lloyd Kelly     jkelly@fenwick.com, ecf@fenwick.com, gdunlap@fenwick.com

Jonathan David Reichman     jreichman@kenyon.com

Mark Delun Yuan     myuan@kenyon.com, ascott@kenyon.com, cwagner@kenyon.com

Mary Elizabeth Milionis     MMilionis@Fenwick.com, dgarrett@fenwick.com

Mimi K Rupp     mrupp@kenyon.com

Philip Joseph McCabe     pmccabe@kenyon.com, ascott@kenyon.com, cwagner@kenyon.com

Rodger R. Cole     rcole@fenwick.com, vpieretti@fenwick.com


Counsel are responsible for distributing copies of this document to co-counsel who have not
registered for e-filing under the Court's CM/ECF program.

**Dated: 10/10/08**                              **Richard W. Wieking, Clerk**

                                              **By:** _____**Chambers**_____

United States District Court
For the Northern District of California